jms

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 03-40142-JAR |
| | ) | |
| DAVID C. WITTIG and | ) | |
| DOUGLAS T. LAKE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER DENYING CHANGE OF VENUE

Defendants Douglas Lake and David Wittig move for a change of venue (Docs. 319 & 320),

pursuant to Fed. R. Crim. P. 21(a).  The parties have fully briefed the motions.  In addition, on April 4,

2005, the Court held a hearing on the motions at which time the parties presented oral argument.  The

Court has reviewed the written submissions and oral argument and is now prepared to rule.

### *Background*

This is not defendants' first attempt to change the venue of this case from the Topeka division of

the District of Kansas to another district court.  Defendants previously moved for a transfer of this case

from the District of Kansas to either the District of Colorado or another district that the Court deemed

appropriate.  The Court denied defendants' motion by order dated June 30, 2004, and ordered that the

case be transferred to the Kansas City division of the United States District Court for the District of

Kansas for trial.

Voir dire began in defendants' prior trial in the Kansas City division on October 12, 2004, and concluded October 15, 2004.  The presentation of the evidence began on October 19, 2004, and lasted until December 6, 2004.  The case was submitted to the jury on December 7, 2004 and jury deliberations continued until December 20, 2004, when the jury indicated that it was hopelessly deadlocked.  On December 20, 2004, the Court declared a mistrial.

Following the Court's declaration of a mistrial, the Court held a status conference and reset the case for trial to begin on May 9, 2005.  Defendants, citing what they characterize as "unrelenting media coverage" since they last requested a change of venue, urge that their upcoming trial must be transferred "to a metropolitan district outside of Kansas . . . to protect [their] constitutional right[s] to a fair trial." Defendants argue that the media coverage of this case is so pervasive and inflammatory that the Court should presume that all persons in Kansas harbor bias and prejudice against them.

After examining the pretrial publicity this case has received, the Court concludes that defendants have not shown that prejudice should be presumed, such that their change of venue motions should be granted.  Because the news coverage, particularly highly editorialized coverage, has been more extensive in the Topeka news market than in the Kansas City news market, the Court orders the case be transferred to the Kansas City division.  An intra-district transfer, coupled with juror questionnaires and individualized, sequestered voir dire of all potential jurors, ensures that defendants' case will be tried to a fair an impartial jury and therefore satisfies Constitutional requirements.[1]

***Discussion***

[1]The government has filed a motion to designate the place for future trial proceedings as Topeka, Kansas (Doc. 291).  In light of the Court's intra-district transfer of this case, this motion will be denied.

2

Defendants move for a change of venue pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure.[2]   The Constitution guarantees a defendant "a fair trial by a panel of impartial, 'indifferent' jurors."[3]   "A fair trial in a fair tribunal is a basic requirement of due process."[4]   Indeed, "our system of law has always endeavored to prevent even the probability of unfairness."[5]   The standards governing a change of venue ultimately derive from the due process clause of the Fourteenth Amendment which safeguards a defendant's Sixth Amendment right to be tried by "a panel of impartial, indifferent jurors."[6]

The Constitutional requirement of impartiality does not limit jury membership to persons completely ignorant of the facts and issues of a case.[7]   But jurors must be able to lay aside impressions or opinions shaped by pretrial exposure to the media and render a verdict based solely on the evidence presented during trial.[8]   The question the trial court must consider is whether the publicity has given jurors such fixed opinions that they cannot impartially judge the defendant's guilt.[9]   In *Sheppard v.*

---

[2]Fed. R. Crim. P. 21(a) states: "Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

[3] *United States v. Abello-Silva*, 948 F.2d 1168, 1176 (10th Cir. 1991) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961), *overruling on other grounds recognized by United States v. Martinez*, 78 Fed. Appx. 679, No. 02-4200, 2003 WL 22376830 (10th Cir. Oct 17, 2003)).

[4]*In re Murchison*, 349 U.S. 133, 136 (1955).

[5]*Id.*

[6]*Irvin v. Dowd*, 366 U.S. at 722.

[7]*See id.*

[8]*Murphy v. Florida*, 421 U.S. 794, 800 (1975).

[9]*Patton v. Yount*, 467 U.S. 1025, 1035 (1984).

*Maxwell*,[10] the Supreme Court described the critical role of an impartial jury, noting:

> [L]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. And the Court has insisted that no one be punished for a crime without a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.[11]

In *Sheppard*, the Supreme Court further noted the "pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of jurors,"[12] such that:

> [T]rial courts must take strong measures to ensure that the balance is never weighed against the accused. . . . [W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.[13]

Pretrial publicity in topical criminal cases is inevitable and only impacts a defendant's rights when it dictates the community's opinion as to guilt or innocence.[14]  Pretrial publicity can give rise to a due process violation in two ways: "(1) where prejudice is presumed because the publicity was 'sufficiently prejudicial and inflammatory and [it] . . . saturated the community where the trial was held, . . . or [(2)] where the defendant establishes actual prejudice resulting from the publicity."[15]

---

[10]384 U.S. 333 (1966).

[11]*Id.* at 350(internal quotations and citations omitted).

[12]*Id.* at 362.

[13]*Id.* at 362-63.

[14]*United States v. Abello-Silva*, 948 F.2d at 1176.

[15]*United States v. Walker*, 890 F. Supp. 954, 959 (D. Kan. 1995) (citing *Cummings v. Dugger*, 862 F.2d 1504, 1511 (11th Cir.), *cert. denied*, 490 U.S. 1111 (1989) and *United States v. Awan,* 966 F.2d 1415, 1427 (11th Cir. 1992)).

4

The court has considerable discretion in passing on motions under Rule 21(a).[16]  The defendant has the burden of establishing the presumption of prejudice.[17]  In determining whether presumptive prejudice exists, the court must consider the totality of the circumstances, "including the type of pretrial publicity, the time lapse between peak publicity and the trial, and the credibility of prospective jurors who indicate during voir dire that they could be impartial despite having been exposed to pretrial publicity about the case."[18]  Because the defendant seeking to prove presumptive prejudice from pretrial publicity must establish that an 'an irrepressibly hostile attitude pervaded the community,' this bar facing the defendant has been characterized by the Tenth Circuit as "extremely high."[19]  Thus, "the presumptive prejudice standard . . .  is only rarely applicable, and is reserved for an extreme situation."[20]  Indeed, despite the proliferation of the news media and its technology, the Supreme Court has not found a single case of presumed prejudice in this country since the watershed case of *Sheppard*.[21]

Defendants ask the Court to presume that the media coverage since their first motion for change of venue has so prejudiced the venire in Kansas, that defendants cannot receive a fair trial

---

[16]*United States v. Neal*, 718 F.2d 1505, 1510 (10th Cir. 1983), *cert. denied*, 469 U.S. 818 (1984) (citations omitted).

[17]*United States v. Walker*, 890 F. Supp. at 959 (citing *United States v. Abello-Silva*, 948 F.2d at 1176).

[18]*Id.* (citing *United States v. Lehder-Rivas*, 955 F.2d 1510, 1524 (11th Cir.), *cert. denied sub nom.*, 506 U.S. 924 (1992)).

[19]*United States v. McVeigh*, 153 F.3d 1166, 1182 (10th Cir. 1998), *overruled on other grounds by Hooks v. Ward* 184 F.3d 1206 (10th Cir. 1999).

[20]*Id.* (quoting *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985)).

[21]*Id.*

absent a transfer to another district.  To support their claim of presumptive prejudice, defendants rely

upon the media coverage, primarily articles appearing in the Topeka Capital-Journal and the Kansas

City Star, and news stories appearing on Kansas City television station.  In addition, defendants refer

the Court to a survey conducted in March 2004, which they argue indicates that the persons in all

Kansas divisions are prejudiced against them.

**A.  Media Coverage**

Defendants concentrate on five categories of media coverage: (1) defendant Wittig's prior

conviction; (2) the Court's remarks about defense counsel's behavior; (3) the amount of defense

counsel's fees; (4) the government's injection of the ratepayer issue into the public domain; and (5)

editorial news coverage.  The Court addresses each category of news coverage along with the news

coverage as a whole in turn.

*Wittig's Conviction*

Numerous references to Wittig's July 14, 2003, bank fraud conviction have appeared in

Kansas newspapers.  Defendants' motion for change of venue directs the Court to twenty-two articles

published since April 15, 2004, which mention the prior conviction.  However, only six stories have

been printed in the Kansas City news market.  Of those six stories, one story is factual in nature,

discussing the filing of appellate briefs in the Tenth Circuit and subsequent oral argument.  This story,

which appeared in the Kansas City Business Journal, portrayed Wittig in a favorable light, suggesting

that his conviction was not supported by the evidence.  The other five stories briefly mention Wittig's

prior conviction, but also note that he has appealed the conviction.  The brief reference to Wittig's prior

conviction in these five news stories can hardly be characterized as so pervasive that an impartial jury

cannot be drawn from the Kansas City venire, particularly since nearly two years has elapsed since the conviction. Moreover, individualized, sequestered voir dire will identify those persons who know of the prior conviction, and those persons may be dismissed for cause.

### Defense Counsel's Behavior

Defendants refer the Court to numerous articles about the behavior of defense counsel, which the Court has repeatedly characterized as contemptuous. According to defendants, the Court's criticism of defense counsel "could create the impression that the Court favors the government or is biased against the defendants themselves or defendants' counsel." The Court disagrees; the obvious import of these news articles is the Court's continuous and on-going effort to maintain order and decorum in the courtroom in the face of overblown theatrics and oftentimes offensive behavior. The exercise of control over attorneys, a duty of every district court judge, is not indicative of bias against attorneys or their clients.[22] Notably, it is defense counsel who have thrust themselves into the limelight by continuously refusing to obey the Court's orders. In this way, defense counsel have manufactured the very pretrial publicity that they now allege prevents their clients from receiving a fair trial. It is doubtful that the conduct of defense counsel has created a public bias against their clients. To the extent the individualized voir dire reveals that persons in Kansas City harbor a bias against defendants because of defense counsel's actions, the persons may be removed from the prospective jury pool.

### Amount of Defense Counsel's Fees

Defendants correctly note that a large number of articles have appeared in Kansas newspapers

---

[22]*See e.g.*, *Sanders v. Russell*, 401 F.2d 241, 246-247 (5th Cir. 1968) (noting that *pro hac vice* lawyers are subject to the court's control and that a federal district court is free to and should take measures against unethical conduct by attorneys if and when it occurs in connection with any proceeding pending before it).

discussing the amount of defense counsel's fees.  These articles are factual in nature and merely report the amount of fees that defense counsel have been paid.  Defendants urge that the stories suggest that the legal bills are unreasonable and, as a result, potential jurors "could believe that there is something wrong with what attorneys in this case have billed."  That persons might believe that defendants' attorneys have over-billed for their services bears no relationship to defendants' guilt or innocence.  Nor is it likely to cause prejudice against defendants; if anything, the suggestion that defendants have been overcharged might elicit feelings of empathy.

Defendants' additional argument is likewise unpersuasive.  Defendants urge that the persons in the jury pool might believe that defendants "would not spend that much money unless they did something wrong."  Not only is this argument purely speculative, but also applies to the retention of an attorney.  Surely the mere retention of what the news media might characterize as an expensive attorney does not mandate a change of venue.  Moreover, individualized, sequestered voir dire provides the Court with an opportunity to explore jurors' ability to abide by the presumption that defendants are innocent until proven guilty.  If voir dire reveals that a potential juror believes that defendants must be guilty simply because of the amount of fees paid to their attorneys, the individual may be excused from service.

*Ratepayer Issue*

Defendants argue that the government "has now publicly trumpeted its case . . . as one that will vindicate the interests of Westar ratepayers."  To support this assertion, defendants rely upon United States Attorney Eric Melgren's press release announcing the government's plan, in the wake of the prior mistrial, to retry this case.  In the press release, Melgren referred to Westar customers,

stockholder and employees.  The contents of the press release only appeared in three newspaper

articles: two articles were published in the Kansas City Star and in the Topeka Capital-Journal on

February 2, 2005; and one article appeared in the Kansas City Business Journal on February 1, 2005.

These three isolated articles are hardly indicative of the type of widespread, negative pre-trial publicity,

which necessitates a change of venue.  Moreover, defendants are asking the Court to presume that

ratepayers will be prejudiced against defendants, without providing any support for such a presumption.

An examination of the voir dire conducted in the first trial belies this presumption.[23]  Indeed, many

potential jurors could not even identify their utility provider, and all persons, including Westar

ratepayers, indicated their satisfaction with their utility provider.

*Editorials*

Lastly, defendants stress that articles prepared by the editorial board of the Topeka Capital-

Journal had a prejudicial effect on potential jurors.  These editorials are negative in tone and, for

instance, urge the government to retry defendants to "bring David Wittig and Douglas Lake to justice."

One article encourages Westar to challenge the legal fees submitted by defense counsel because

"Westar owners and customers want justice."  While it is true that highly editorialized articles are more

inflammatory than mere accounts of the factual developments in a case,[24] none of these editorials

appear in the Kansas City news market.  By transferring this case to the Kansas City division, any

---

[23]For a detailed analysis of the voir dire at the first trial, see section C of this Memorandum and Order.

[24]*See e.g., United States v. Higgs*, 353 F.3d 281, 308 (4th Cir. 2003) (distinguishing between factual news coverage and inflammatory coverage); *Mills v. Singletary*, 63 F.3d 999, 1010-12 (11th Cir. 1995) (noting in its consideration of prejudice that no editorials about the case had been printed); *Andrews v. Shulsen*, 600 F. Supp. 408, 417 (D. Utah 1984) (noting that the media coverage of defendant's case was not inflammatory in part because the accounts were factual in nature, as compared to with editorial comments on the case).

prejudice or bias attributable to the editorials appearing in the Topeka Capital-Journal can be avoided.

*Pre-trial Publicity as a Whole*

There can be no doubt that some of the news coverage surrounding this case may be characterized as negative in substance and in tone.  Even the most negative media coverage in this case, however, falls far short of the highly inflammatory pretrial publicity which has been found to deprive other defendants of a fair trial.  For instance, in *Rideau v. Louisiana*,[25] the Supreme Court, "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury," overturned the conviction of a habeas petitioner whose filmed confession was repeatedly broadcast on the local news of a Louisiana community.[26]  During the 20-minute filmed confession, the petitioner, who was in jail and flanked by officers, admitted in detail the commission of a robbery, kidnapping, and murder.[27]  The Court held that it was a due process violation for the district court to deny a change of venue when "tens of thousands of people" in the community "had been exposed repeatedly and in depth to the spectacle of [the petitioner] personally confessing in detail to the crimes with which he was later to be charged . . . ."[28]

Similar inflammatory pretrial publicity was present in *United States v. Abrahams*.[29]  In *Abrahams*, a motion for change of venue was granted when the news media described in great detail

---

[25]373 U.S. 723 (1963).

[26]*Id.* at 727

[27]*Id.* at 725

[28]*Id.* at 726.

[29]453 F. Supp. 749 (D. Mass. 1978).

the activities of the defendant.[30]  The stories described among other things: the defendant's use of six

aliases; the startling discovery of the defendant's true identity; the FBI's characterization of defendant

as an "armed and dangerous" fugitive; the defendant's convictions for income tax fraud, defrauding

another commodities dealer, and writing a $3,000 bad check; the charges against the defendant

pending in two other federal courts, three state courts, and Canada, for contempt, prison escape,

passport fraud, obtaining money under false pretenses, issuing worthless checks, probation violation for

bond default, contributing to the delinquency of a minor, and writing numerous bad checks for large

amounts; the defendant's failure to appear for various court appearances; and the consequent denial of

bail.[31]  Notably, it was the media coverage of the "allegedly unlawful behavior of the defendant and [his

company], defendant's prior convictions, and the other charges pending against him" that the court

found justified a transfer of venue.[32]

      The news coverage in this case is much less inflammatory than the coverage in *Rideau* and

*Abrahams*.  The pretrial publicity in this case does not involve heinous facts about defendants as did the

publicity in *Rideau*.  The facts in *Abrahams* are too distinguishable as neither of defendants here have

criminal repertoires even approaching that of Abrahams.  Defendant Wittig has a single conviction and

Lake has no criminal history; to the Court's knowledge, neither defendant faces additional charges

pending in other courts.  Nor are highly sensational facts, such as a prison escape present here.  The

pretrial publicity in this case simply does not compare with the inflammatory reporting of inherently

---

[30]*Id.* at 752.

[31]*Id*. at 752.

[32]*Id*. at 753.

11

prejudicial facts needed to support a claim of presumptive prejudice.  Bearing in mind that "[p]resumed prejudice is rarely invoked,"[33] the Court concludes that the news coverage in this case does not mandate a change of venue.

Moreover, the Court notes while the case has received substantial attention from both newspapers and television stations, the summary of news coverage provided by defendants shows that the media reporting of this case has decreased markedly since the Court's declaration of a mistrial.  For instance, only ten articles, none appearing on the front page, were printed in the Kansas City Star since December 20, 2004.  The news coverage of this case peaked during the last trial when the jury appeared deadlocked.  Over five months will pass between the peak publicity period and the trial.  The Supreme Court has noted that the passage of time can serve to soothe and erase widespread prejudice engendered by public publicity.[34]  Given that "public memory is notoriously short,"[35] the Court finds that the passage of five months since the peak publicity period will help allay any possible prejudice against these defendants.

## B.  March 2004 Survey

Quite interestingly, to support their assertion of prejudice defendants refer the Court to the same survey used to support their first change of venue motion.  This survey was conducted in March 2004, more than a year before defendants' second trial is scheduled.  But, defendants urge that it is the

---

[33]*Hale v. Gibson*, 227 F.3d 1298, 1332 (10th Cir. 2000) (citation omitted).

[34]*Patton v. Yount*, 467 U.S. 1025, 1035 (1984) (citation omitted).

[35]*Lowe v. Kansas City Bd. of Election Comm'rs*, 752 F. Supp. 897, 902 n.8 (W.D. Mo. 1990); *see also United States v. Pfingst*, 447 F.2d 177, 186 (2d Cir. 1973) (explaining that the memory of the public for news is short).

"unrelenting media coverage since [the] last motion for change of venue [was filed]," that necessitates a transfer.  This survey was conducted long before any of this so-called "unrelenting media coverage" even occurred.  Thus, the survey is irrelevant to the instant change of venue motion as it does not show the percentage of potential jurors in Kansas City who are aware of the pretrial news coverage.  Nor does it show that those who may have been exposed to this media coverage formed any opinions about the defendants as a result of this exposure, or are even able to recall what they saw.

To the extent defendants attempt to extrapolate the results of the March 2004 survey to suggest that the public is prejudiced now against them, this attempt fails.  Not only is such an extrapolation purely hypothetical and without a factual basis, the March 2004 survey is itself flawed.  As the Court previously observed, the "survey's flawed methodology renders suspect its measure of recognition and prejudice," as the survey utilized "loaded" questions of "questionable integrity."  Defendants have presented no evidence to dispel this observation.

## C.  Historical Analysis: Voir Dire during the First Trial

In this instance, the Court is in a unique position to judge any possible prejudice in the venire because it presided over defendants' prior trial and conducted very extensive voir dire in the Kansas City division.  Indeed, the voir dire questioning by the Court was so intense that it drew the praise of counsel for defendant Lake who remarked, "this jury was carefully vetted.  I've never seen a more careful voir dire."[36]

---

[36]*See also* defendant Wittig's Motion for Change of Venue (Doc. 320) (characterizing the Court's voir dire as "detailed, lengthy, individualized voir dire," and recognizing that many jurors with knowledge of the case were dismissed by the Court when the jurors admitted difficulty setting aside what they learned about defendants through the media).

13

The voir dire process in the first trial demonstrated the ability to select a jury of fair and impartial jurors, untainted by pretrial publicity.  This real experience demonstrated that the dire predictions, evaluations and positions of the defendants' jury consultants and experts were overstated and largely unsupported.  Defendants predicted, based upon the results of the March 2004 survey and testimony of experts, that the Kansas City venire was so saturated with negative publicity that an impartial jury could not be seated.  However, the voir dire process revealed that some people in the jury pool had never heard the names Wittig, Lake and/or Westar.  While many people stated that they had heard one or more of these names, or had read or heard one or more media reports, very few of them had anything but a vague recollection about what they heard.  Some people could only recall hearing the names.  Others related that they understood it had something to do with unspecified charges and an upcoming trial.  Still others related that they knew it had something to do with corporate executives.

Those people who had any detailed recollection were excused by the Court, without any formal challenge for cause.  Likewise, those people who indicated that they could not or were unsure whether they could be fair and impartial, were excused by the Court, without any formal challenge for cause. The Court excused anyone whose responses indicated they had followed the case, recalled detail, or who had a financial interest in Westar.  In addition, the Court excused anyone who indicated that they had difficulty according these or any defendants with the presumption of innocence.  Notably two of the three people who articulated difficulty with the presumption of innocence did so, only after defense counsel's improper and violative voir dire questions, designed to elicit responses that they preferred the defendants to offer evidence.

14

Ninety-one persons are identified in the voir dire transcript from the prior trial.  Eight of those persons were not examined at all; they were excused at the beginning of the second day of voir dire when they indicated that they could not serve because of scheduling, family, work or health concerns. Eighty-three persons were individually examined during voir dire.  Of the eight-three persons examined:

- seventy-four persons had heard, read, or discussed some aspect of this case, but most of these seventy-four persons had very limited or vague recollections;

- fifteen of these seventy-four persons were excused by the Court, based on the quantitative or qualitative knowledge about the investigation, charges, and accusations;

- two persons were excused by the Court because they knew defendant Wittig or someone in his family;

- three persons were excused because they were Westar shareholders;

- eighteen persons were excused by the Court because of scheduling, family, work or health concerns;

- three persons were excused by the Court because of criminal history in their family that they believed might impair their objectivity;

- two persons were excused by the Court because they were practicing lawyers; one worked for a firm who had represented Westar; the other was a criminal defense lawyer who knew many of the people involved in the case;

- three persons were excused by the Court because they articulated that they might have difficulty in being fair and impartial in any case about corporate executives, not just this specific case; and

- two persons were excused by the Court because they articulated reluctance in according any defendant the requisite presumption of innocence.[37]

---

[37]One of these persons was asked questions by defense counsel which invited her to say that she would like the defendants to put on evidence.  After the Court interrupted this inappropriate questioning by defense counsel, this person appeared visibly shaken as the Court asked her questions, while defense counsel laughed, jeered and sneered in the background.

Tellingly, it was the Court who excused each of the aforementioned persons. None of the parties challenged these persons for cause, and none of the parties objected to the Court's *sua sponte* excusal of any of these persons.

After excusing these aforementioned persons, and individually questioning them, there were thirty-five persons qualified for jury service. Of these thirty-five, twenty persons indicated that they had some knowledge about the case, defendants and/or Westar, although most described their recollection as quite vague and limited.

Of the thirty-five persons qualified for jury service, twelve stated that they were Westar ratepayers. Defendants unsuccessfully challenged eleven of these twelve persons for cause. Notably, defendants did not challenge for cause one of the twelve Westar ratepayers; in fact, when this person asked to be excused from service because of heavy work responsibilities, defendants vehemently objected to his excusal for this reason. Defendants did not challenge this person for cause, nor exercise a peremptory challenge against him. Indeed, of the twelve Westar ratepayers qualified as jurors, defendants challenged eleven for cause, but when those challenges were denied, defendants chose to exercise peremptory challenges against only four of them. The government exercised a peremptory challenge against a fifth Westar ratepayer. Ultimately, of the twelve Westar ratepayers qualified as jurors, six were selected as jurors and one was selected as an alternate. Had defendants chose to exercise peremptory challenges against Westar ratepayers, they would have been able to excuse ten of the ratepayers that they had challenged for cause; the other person they had challenged was excused by the government. Therefore, all eleven of the Westar ratepayers could have been excluded.

Rather than using their ten peremptory challenges to exclude Westar ratepayers, defendants

16

used only four to exclude ratepayers.  Defendants exercised their four other peremptory challenges to exclude persons for whom the Court had denied the defendants' challenges for cause.  Defendants' stated bases for these four unsuccessful challenges for cause were: a person whose WorldCom stock portfolio had lost 7% of its value; a person who seemed too eager to be on the jury; a retired correctional officer; and a person whose company contracts with federal government.

These statistics belie defendants' position before the first trial and now, that the venire in Kansas City has been tainted by intense and adverse pretrial publicity.  On the contrary, many people had little if any recollection, although they had heard some or all of the names associated with this case. Some of these people expressed that they had little recognition of the case because the case had no resonance with them; the events took place in Topeka and concerned a Topeka based company.  Not surprisingly, Westar shareholders indicated more familiarity with the case than others, but these individuals were excused *sua sponte*.  Despite defendants' arguments that Westar ratepayers would have an increased interest and familiarity with the case, the voir dire proved otherwise.  Many of the Westar ratepayers expressed little or no knowledge of this case.  A number of persons were not even entirely sure who their utility company was.  All of the Westar ratepayers expressed their satisfaction with the utility service, rather than dissatisfaction or prejudice against the company and its management.

Moreover, the voir dire process demonstrated that defendants did not believe that all Westar ratepayers should be categorically excused.  As previously noted, defendants exercised only four peremptory challenges to excuse the eleven Westar ratepayers qualified as jurors.  Defendants actually objected to the excusal of one of these ratepayers.  Notably, this particular ratepayer expressed more familiarity with the case than most.  Yet, defendants were adamant in their opposition to his being

excused because of his work responsibilities.  Defendants' allegation that the government's "injection of the ratepayer issue into the public domain" has prejudiced the venire is suspect in light of defendants' treatment of certain ratepayers during the voir dire in the first trial.

In its denial of defendants' first motion for change of venue, the Court stated, "[d]espite the heavy pretrial publicity, much of which has been negative in substance and tone, the Court concludes that among a potential jury division of over 745,000 people in the Kansas City division, 12 people can be selected who will not be tainted by exposure to this pretrial publicity. . . ."  The actual experience of voir dire in the first trial validates this conclusion.  The fact that the first trial ended in a mistrial is indicative of a fair and impartial jury, not one predisposed to defendants' guilt.  The Court plans to conduct individualized, sequestered voir dire of the venire in defendants' upcoming trial.  Finally, the Court notes that, as it did in the first trial, it will utilize non-suggestive, comprehensive juror questionnaires to aid in the selection of an impartial jury.  The Court concludes that these measures will ensure defendants' Constitutional right to a fair and impartial jury, such that transfer to a district outside of Kansas is unnecessary.  Of course, if the voir dire process evidences actual prejudice precluding a trial by a fair and impartial jury, the Court will entertain motions to change venue at that time.

**IT IS THEREFORE ORDERED** that defendant's motions for change of venue (Docs. 319 and 320 ) are DENIED WITHOUT PREJUDICE.

**IT IS FURTHER ORDERED** that the government's motion to designate the place for future trial proceedings as Topeka, Kansas (Doc. 291) is DENIED.

**IT IS FURTHER ORDERED** that this case is transferred to the Kansas City division of the United States District Court for the District of Kansas, for trial.

IT IS SO ORDERED.

Dated this 4<u>th</u> day of April, 2005, at Topeka, Kansas.


<u>  S/ Julie A. Robinson        </u>
Julie A. Robinson
United States District Judge