jar/jms

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 03-40142-JAR** |
| | ) | |
| **DAVID C. WITTIG and** | ) | |
| **DOUGLAS T. LAKE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## MEMORANDUM ORDER DENYING RECUSAL
## AND MEMORANDUM ORDER OF TRIAL PROCEDURES

Defendants Douglas Lake and David Wittig move for recusal (Docs. 313 & 311). The parties have fully briefed the motions. In addition, on April 4, 2005, the Court held a hearing on the motions at which time the parties presented oral argument. The Court has reviewed the written submissions and oral argument and is now prepared to rule. Because the Court's exercise of its discretion and responsibility to control the order and decorum of proceedings, and the Court's admonition and discipline of attorney misconduct is not a basis for recusal, defendants' motions for recusal are denied. Further, in the aftermath of egregious conduct by defense counsel at the first trial, the Court sets out rules and instructions for trial procedure on retrial.

### Background

This Court presided over defendants' prior trial which began on October 12, 2004. During the

1

trial, the Court observed numerous instances of improper conduct by defense counsel.  Defendants'

trial ended in a mistrial on December 20, 2004, when the jury indicated that it was hopelessly

deadlocked.  Following the Court's declaration of a mistrial, the Court held a post-trial status

conference on January 4, 2005, where the Court again warned defense counsel that their conduct

during the previous trial was contemptuous.  Given that, the Court indicated that it would enact a

number of controls to maintain order and decorum in the courtroom during defendants' second trial.

Defendants now seek recusal of this Court based upon its observations of and reaction to inappropriate

conduct by defense counsel and its indication that certain trial procedures would be enacted to thwart

this inappropriate conduct.  The Court considers first defendants' motion to recuse, and then sets forth

its written trial procedures.

## MOTION TO RECUSE

### A.  Applicable Law

Defendants argue that this judge's recusal is mandated by 28 U.S.C. § 455(a).[1]   The statute

provides that a judge "shall disqualify [herself] in any proceeding in which [her] impartiality might

reasonably be questioned."[2]   The standard for recusal under section 455(a) is not subjective, but rather

objective.[3]   The district court considers "whether a reasonable person, knowing all of the relevant facts,

---

[1] Defendant Wittig also seeks disqualification pursuant to the Kansas Code of Judicial Conduct, Canon 3(E)(1)(a), incorporated into this district's local rules by D. Kan. Rule 83.6.1.  Canon 3(E)(1) states: "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer . . . ."

[2] 28 U.S.C. § 455(a).

[3] *See Nichols v. Alley*, 71 F.3d 347, 350 (10th Cir. 1995) (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 858 n.7 (1988) and *Liteky v. United States*, 510 U.S. 540, 548 (1994)).

would harbor doubts about the judge's impartiality."[4]  As the Supreme Court explained in *Liljeberg v. Health Care Services Acquisition Corp.*,[5] "[t]he goal of section 455(a) is to avoid even the appearance of partiality."[6]

In considering a motion to recuse pursuant to section 455(a), "the initial inquiry is whether a reasonable factual basis exists for questioning the judge's impartiality."[7]  This inquiry is limited to outward manifestations and the reasonable inferences to be drawn from those manifestations.[8]  Thus, "the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue."[9]

The Tenth Circuit has cautioned that "section 455(a) must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice."[10]  This is so, for "a judge has as strong a duty to sit when there is no legitimate reason to recuse as [she] does to recuse when the law and facts require."[11]  Nor is section 455(a) intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice.[12]  In enacting the statute, Congress expressed concern over its abusive invocation

---

[4]*Id*. at 350-51 (quoting *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993)).

[5]486 U.S. 847 (1988).

[6]*Id*. at 860.

[7]*Nichols*, 71 F.3d at 351 (citing *Cooley*, 1 F.3d at 993).

[8]*Id.* (citing *Cooley*, 1 F.3d at 993).

[9]*Id.* (quoting *Cooley*, 1 F.3d at 993).

[10]*Cooley*, 1 F.3d at 993 (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1234 (10th Cir. 1986)).

[11]*Nichols*, 71 F.3d at 351 (citing *United States v. Greenspan*, 26 F.3d 1001, 1006 (10th Cir. 1994)).

[12]*Cooley*, 1 F.3d at 993 (citation omitted).

as a means of judge shopping, stating:

> Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial.  Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.[13]

With these broad parameters as a guide, the Court turns to the arguments made by defendants in their recusal motions.

**B.  Discussion**

Defendants essentially base their motion to recuse on the Court's comments criticizing the behavior of their counsel during trial and at a January 4, 2005, post-trial status conference.  Defendant Wittig states that because such comments "came completely out of left field," they indicate to a reasonable person that this judge is biased.  Similarly, defendant Lake states that "[t]he Court's comments . . . are not supported by anything significant in the record of the first trial, but by the Court's observations after the fact of defense counsel's allegedly offensive conduct."  Because defendants have not accurately summarized the conduct of defense counsel during the prior trial, nor the Court's response to this inappropriate conduct, the Court provides the following summary of events that occurred at trial and at the January 4, 2005, hearing.

**1.  Recap of Events Transpiring Since the Last Trial, Including Misconduct of Defense Counsel**

At the outset, the Court notes that not all of the misconduct committed by defense counsel can

---

[13]*Id.* (quoting H. Rep. No. 1453, 93d Cong., 2d Sess. 1 (1974), *reprinted in* 1974 U.S. Code Cong. & Admin. News 6351, 6355).

be listed in this summary.  To attempt to so list every instance of unethical behavior would be nearly

impossible given the voluminous record of the first trial and the prolific instances of misconduct.

Moreover, other improper conduct, such as the defense counsel using the Court's limine rulings as a

sword against the government, rather than as the intended shield of the defendants, are difficult to

explain without a detailed discussion of the evidentiary nuances and witness examinations present in the

first trial.[14]  However, the Court has provided below a summary of some of the most egregious

conduct.

### *Disorderly and Disruptive Behavior During Voir Dire*

Defense counsel's misconduct commenced during voir dire.  While the Court was conducting

intensive, individual voir dire of potential jurors out of the hearing and presence of the venire, at times,

defense counsel laughed, snickered and made comments in the background.  Much of this

unprofessional behavior occurred among the associate attorneys, Jason Masimore and Shawn

McEnnis, representing defendant Lake.  Indeed, this behavior was so egregious that it moved a

potential juror to write a letter about the conduct, citing his *or her* concern that such conduct "might

prejudice what [the jury] hear[s] from witnesses."[15]  The individual stated that while being questioned

during voir dire, he or she observed "negative expressions including sneers and glares directed at [him

or her] from members of the defense team who were in the background."  The referenced defense team

---

[14]The Court does not wish to rehash the evidence presented during the last trial, as the prior trial is history
and the trial strategies may and, likely will, change in the defendants' upcoming trial.

[15]Notably, although the Court observed this same behavior by counsel and warned counsel to stop the
behavior during voir dire, the Court was not aware of this communication until after its declaration of a mistrial, when
the prosecutor attached the communication to a motion (Doc. 288, Ex. A).

members "in the background" presumably refers to the associate attorneys sitting at the back of

defendant Lake's table and further corroborates the Court's own observations.  Unfortunately, this

inappropriate conduct caused this individual to describe his or her first experience as a potential juror as

"negative."

      The Court first addressed this conduct with nonverbal response by frowning and showing its

displeasure with counsels' behavior.  These nonverbal cues had little effect.  Had the Court realized that

potential jurors were also perceiving such inappropriate behavior, the Court would have reprimanded

counsel and taken other corrective measures immediately.  The Court later admonished counsel on the

record about this conduct.

      The sneering and glaring of defense counsel at potential jurors, as inappropriate as it may have

been, was overshadowed by the conduct of defendant Wittig's counsel, Adam Hoffinger.  In its general

order of trial practices and procedures, the Court precludes counsel from instructing the jury or asking

the jury about the law or legal principles during voir dire.  The Court also instructed counsel during the

limine conference that it was the Court's province to instruct on the law, and that they were not to ask

questions about legal principles or rules of law. Mr. Hoffinger violated this order several times during

voir dire.

      Any violation of a Court order is egregious, but the nature of Mr. Hoffinger's violation was

extremely egregious.  Mr. Hoffinger did not violate the order by simply asking about a rule of law or

legal principle.  Rather, Mr. Hoffinger violated the order by misinstructing and misstating a legal

principle.  Excerpts of the transcript evidence Mr. Hoffinger's abusive and violative practice of asking

potential jurors whether they expected the defense to present evidence:

> [S]omeone would have to prove to you that it was okay to take personal plane trips. . .
> . So you would want me, for example, to prove for Mr. Wittig or someone for Mr.
> Lake to put witnesses on or to give you some documents to prove to you . . . .[16]

The Court admonished Mr. Hoffinger for asking these questions, noting:

> I'm warning counsel that if they think that this voir dire is going to consist of any planting
> notions in people's heads as to defendants having some burden of proof and then using
> that to justify a strike for cause, the Court's not going to allow that. . . .  We covered, I
> thought, that I did not want you all instructing the jury and didactic type questions. . . .
> And that is what I view as questions that were essentially trap questions, Mr. Hoffinger.
> . . .  I am not going to allow that to happen again.  And I better not hear any questions
> along those lines again.[17]

Despite that admonition, Mr. Hoffinger later asked another member of the venire questions designed to

trap her into saying that she would expect the defendants to present evidence, including:

> Would you expect anything from the defense?  What would you expect us to do?  You
> would expect the defense to present accurate information?  What kind of information
> would you want us to present?  Would you want my client to testify and tell you what
> happened?

At that point, the Court took over the questioning,[18] and once completed, again admonished Mr.

Hoffinger.[19]

It is axiomatic that a defendant has a presumption of innocence, which means that a defendant

need not present evidence, as the defendant has no burden of proof in a criminal case.[20]  In spite of this

---

[16]Tr. 258-259.

[17]Tr. 276-80.

[18]Tr. 358-362

[19]Tr. 364-372

[20]*See, e.g.*, *Taylor v. Kentucky*, 436 U.S. 478, 483 (1978) (citing *Coffin v. United States*, 156 U.S. 432, 453,
(1895). ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law,
axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.")).

elementary principle of criminal law, Mr. Hoffinger asked three potential jurors whether they would like defendant Wittig to present some evidence.  Of course, Mr. Hoffinger did not attempt this violative line of questioning with every potential juror, but was instead selective.  He then used the person's expressed unwillingness to grant the defendant the presumption of innocence as a basis to challenge the person for cause.  The manner of his questions was suggestive, and, in effect, encouraged the person to agree that it would be preferable if the defendant presented evidence on particular subjects.  Thus, Mr. Hoffinger not only violated the Court's order, but he also misrepresented the law to the potential jurors.

Moreover, Mr. Hoffinger violated this rule repeatedly, despite the Court's stern admonitions. After his first violation, the Court admonished Mr. Hoffinger.  Two days later, he violated the rule again. At that point, the Court called all counsel, including the prosecutor and defense counsel, into chambers and had an off the record discussion with Mr. Hoffinger about the professional duties and responsibilities of counsel.  The Court told Mr. Hoffinger that he could not ask any further questions during voir dire.  Thereafter, another of defendant Wittig's counsel, Ms. Junghans, examined potential jurors.

### Disorderly and Disruptive Behavior During Trial

During the trial, Mr. Hoffinger's disorderly and disruptive conduct largely diminished.    While some of the associate attorneys representing defendant Lake engaged in laughing, sneering, mocking and disruptive comments during voir dire and the first week or two of trial,[21] their misconduct also

---

[21]*See, e.g.*, Tr. 285 (Mr. Hathaway complaining about defense counsel's laughter during his oral argument); Tr. 313-314 (Court admonishing counsel about muted comments at court's rulings); Tr. 867-868 (Court admonishing counsel about laughter and inappropriate behavior of associates); *see also* Tr. 1776-1778 (Court's later reference to

8

largely diminished.  Defendant Wittig's counsel, Paula Junghans, and defendant Lake's counsel,

Edward Little, however, continued to engage in repeated instances of misconduct.[22]

Defense counsel repeatedly interrupted the Court when it made rulings,[23] and repeatedly

continued to argue with the Court after it had ruled.[24]  Despite repeated admonitions by the Court to

stop this behavior, defense counsel continued to blatantly disrespect the Court's rulings.  The instances

are too many to catalogue.  Indeed, this happened during virtually every bench conference; and there

were too many bench conferences to catalogue.  In fact, the Court warned counsel that they were

abusing their use of bench conferences.  Rather than raising simple evidentiary objections from the floor,

which the Court could then sustain or overrule contemporaneously, as is the normal routine procedure,

defense counsel sought a bench conference for the vast majority of their evidentiary objections.  Then,

at the bench, rather than merely stating their objection, defense counsel persisted in long-winded

arguments that were usually unnecessary.  This Court ordinarily rules on common evidentiary objections

without argument and so advised the defense.  Nevertheless, defense counsel continued their practice

of arguing every objection.  Furthermore, other defense counsel who had not even lodged an objection

from the floor, would often then demand that the Court hear their arguments as well.

---

this same inappropriate behavior).

[22]*See, e.g.*, Tr. 2253 (Mr. Hathaway complaining about Mr. Hoffinger laughing during an oral argument; Mr. Hoffinger denied that it was him laughing; Mr. Little denied that anyone was laughing.); Tr. 3357 (Mr. Hathaway complaining that defense is laughing and scoffing during his oral argument); Tr. 7334-7335 (Mr. Hathaway asking the Court to limit the number of counsel at defense counsels' tables because of their continued disruptive behavior).

[23]*See, e.g.*, Tr. 858-859 (Junghans); Tr. 471-474 (Junghans, Hoffinger and Little repeatedly interrupting Court); Tr. 3863-3864 (Little refusing to accept the Court's ruling at a bench conference and accusing the Court of cutting him off); and Tr. 6620-6621 (Little raising a new objection after Court had completed the ruling).

[24]*See, e.g.*, Tr. 7024-7025.

9

Time and again, when the prosecutor tried to respond, or tried to object to the defense's practice of long-winded arguments by multiple counsel, defense counsel would respond by accusing the prosecutor of interrupting them.  When the Court would tell defense counsel that it was ready to rule and needed to hear no further argument, defense counsel would then respond that the Court was "cutting (them) off."   After the Court ruled, defense counsel would often persist in arguing, ignoring or challenging the Court's attempts to end the bench conference.  This can only be characterized as abusive conduct.

Moreover, as the jurors reported to the Court after the mistrial had been declared, defense counsel would often leave the bench, storming back to their tables with theatrical mannerisms. Sometimes, this conduct was apparent to the Court, as the Court could hear snippets of remarks that were critical of not only the Court's rulings, but also the Court.  This was not lost on the jury, the Court learned, in talking to them after the mistrial.

Throughout the trial, the Court endeavored to never admonish, warn or respond to inappropriate conduct in the jury's hearing.  The Court also tried to monitor the defense's conduct to determine whether the jury was able to hear or see it.  Of course, as the Court noted in frustration on October 27, 2004, the eleventh day of trial, the Court's role is not one of a "playground monitor."[25] The Court's many duties and responsibilities consisted of ruling on numerous evidentiary objections, monitoring the evidence for all too frequent violations of the Court's limine rulings, and evaluating the evidence in anticipation of ruling on motions under advisement, including the defense's motions for

---

[25]*See* Tr. 1772.

judgment at the close of the government's case and the close of their case.  In a case of this length and complexity, this is no simple task.                Unfortunately, the Court's duties also became acting as a playground monitor, for the defense persisted in childish, inappropriate, unprofessional, uncivil, and even unethical behavior.[26]  The Court is certain that it did not hear and see everything.  Indeed, the jury described conduct by defense counsel Ms. Junghans that the Court did not see.  Had the Court been sitting in the jury box, and had the Court seen the conduct the jury described, the Court would have taken measures to thwart Ms. Junghans' conduct.

The jury's description of Ms. Junghan's conduct would offend almost anyone's sensibilities.  Indeed, the jury advised the Court that this conduct distracted them, offended them and insulted their intelligence.  While the jury mentioned Ms. Junghan's dress, and in particular the length of her skirts, this was not the conduct they complained about, although the length of her skirts was related to the conduct they deplored.  It was Ms. Junghans' behavior, chiefly the manner in which she sat throughout the trial, that so concerned the jury.[27]  Moreover, in conveying their concerns about this conduct to the Court, the jurors were quite vocal and insistent that this conduct was not inadvertent or unconscious.  Rather, based on their observations over ten weeks of trial, they considered her conduct intentional, designed to distract them.

This Court has no reason to disbelieve the accounts of the jurors.  More than half of them spoke to these issues.  Further, the Court perceived that the other jurors agreed, for they nodded their

---

[26]*See* Tr. 7337-7338 (Court's brief summary of the types of conduct it had observed throughout the trial).

[27]The Court alluded to this conduct at the January 4, 2005, hearing in which it referred to Ms. Junghans' "*behavior* and her dress and *her behavior*." (emphasis added).

heads in assent as their fellow jurors described this particular conduct of Ms. Junghans, as well as the

previously catalogued conduct of the other defense counsel.  The Court will respond to Ms. Junghans'

conduct in the most direct way the Court can fathom.  As discussed in the trial procedures section of

this order, the Court will order that Ms. Junghans sit behind the defense table, and not parallel to the

end of the defense table, where she sat at the last trial, and where the jury had a full view of her body

and manner of sitting.

Of course, this particular misconduct of Ms. Junghans was not known to the Court during the

trial.  The Court could only deal, during the trial, with the misconduct that was evident to the Court.

And, this Court tried every measure short of citing counsel in contempt to deal with that observable

misconduct.  The Court tried nonverbal conduct, such as frowning at counsel to attempt to register

disapproval without words.  That did not work.  As mentioned previously, during voir dire, when Mr.

Hoffinger violated the Court's restrictions on voir dire questions, this Court called all counsel into its

chambers, during a recess of voir dire, and admonished them off the record and outside the hearing of

their clients, to stop acting unprofessionally.  This attempt to ensure proper and professional behavior

by defense counsel also failed.

Later, this Court admonished Mr. Little, as the lead counsel for defendant Lake, about the

childish and inappropriate laughter and nonverbal conduct of associates at his table.  Rather than

sincerely apologizing to the Court or taking responsibility to make his co-counsel behave, Mr. Little

denied that these lawyers had acted this way.  He essentially told the Court that he did not believe the

Court's description of what had occurred at his counsel table, stating:

Secondly, if there was this alleged misbehavior on the part of my team, I apologize for

12

it; *but I don't believe it occurred.* Because if it was real misbehavior, the Court would have stopped us the second it observed it.[28]

The Court's admonishments were not always contemporaneous with the observed behavior. This is because counsel's misconduct was frequent, and the Court was often focused on the numerous evidentiary objections. The Court was also mindful of the need for efficiency in the presentation of the case. Frankly, had the Court stopped the trial to admonish counsel out of the jury's presence for each observed incident, the trial might have taken twice as long as it did.

Nevertheless, this Court admonished counsel repeatedly at the bench, outside the hearing of their clients, hoping to deter any further conduct, while not subjecting them to the humiliation or embarrassment of being chastised in front of their clients. This Court also tried admonishing and warning counsel out of the hearing of the jury but in front of their clients. These warnings did not temper the repeated unprofessional conduct; rather, counsel continued to engage in the conduct even after they were admonished to stop.

Counsel Edward Little not only continued to engage in such conduct, he was openly defiant of the Court's rulings. Mr. Little interrupted the Court, berated the Court, yelled at the Court and challenged the Court's impartiality. For example, when Mr. Little requested that the Court require Mr. Hathaway to disclose how many more witnesses he would call and how long their direct examinations would take, the Court denied Mr. Little's request. The Court noted that Mr. Hathaway had already complied with the Court's directive that he provide at least 48 hours notice of the order of witnesses, and that in light of the extensive cross examinations, one could not expect Mr. Hathaway to predict with

---

[28]Tr. 1780 (emphasis added).

certainty how long he would spend on the direct examination of subsequent witnesses.  Displeased with

this ruling, Mr. Little refused to accept the ruling, and this exchange followed:

| | |
|---|---|
| MR. LITTLE: | But, Your Honor-- |
| THE COURT: | You can sit down.  I don't need to hear any more of this. |
| MR. LITTLE: | No, you cut me off. |
| THE COURT: | This is argument. |
| MR. LITTLE: | You cut me off. |
| THE COURT: | This is argument, Counsel. |
| MR. LITTLE: | I want the record to  reflect-- |
| THE COURT: | Yes, I'm cutting you off. |
| MR. LITTLE: | --I'm being repeatedly cut off.  I didn't finish my sentence.  You cut me off. |
| THE COURT: | All right.  You finish your sentence, Mr. Little. |
| MR. LITTLE: | Thank you. |
| THE COURT: | Finish your sentence. |
| MR. LITTLE: | What I was about to say, Your Honor, before I was cut off, was that when we add up the direct without the cross -- and it seems to me the only objection in this courtroom about this cross is that it's effective -- that if we deduct the cross from the direct, I guarantee you. . . .[29] |

Mr. Little went on, to "finish (his) sentence," by complaining that the Court allowed Mr. Hathaway to

make speaking objections, and that the Court ruled "immediately [on objections] without hearing from

us every time."[30]  Mr. Little then again accused the Court of cutting him off when the Court reminded

him that it had ruled and wished to hear no further argument on the point.[31]

On another occasion, the Court asked Mr. Little a pointed question, trying to get to the heart of

the issue raised during a bench conference.  Mr. Little pointedly refused to answer the Court's question

---

[29]Tr. 1774-1775.

[30]*See infra* note 83 for a few of many examples of speaking objections by all counsel.

[31]Tr. 1775; *see also* Tr. 5581 (Court admonishing counsel for their persistence with long-winded arguments on ordinary evidentiary objections).

and again accused the Court of cutting him off:

| | |
|---|---|
| THE COURT: | Do you need to go further than that? |
| MR. LITTLE: | Yes, I do and it-- what let's me speak-- |
| THE COURT: | Okay, tell me why.  Tell me why. |
| MR. LITTLE: | Well, I keep getting interrupted.  I'm trying to say something. |
| THE COURT: | Well, because you are not answering my question. |
| MR. LITTLE: | No, but you cut me off before I speak. |
| THE COURT: | Just answer my question. |
| MR. LITTLE: | If you get-- you're-- |
| THE COURT: | Answer my question, please. |
| MR. LITTLE: | Please don't yell at me in this courtroom. |
| THE COURT: | I will yell at you if you yell at me.  Now answer my question. |
| MR. LITTLE: | I didn't yell. |
| THE COURT: | You-- I'm tired of this argument with you.  You've been doing this to me since day one of the trial, Mr. Little.  I'm trying to cut to the chase. You started answering but you were not answering the question that I needed to have answered, so will you answer it, please.[32] |

The record often does not reflect the Court making a record of what she observed Mr. Little doing during his episodic bouts of contemptuous behavior; rather, the Court's immediate concern was to calm Mr. Little down and keep the peace.  Frequently, Mr. Little visibly reacted with anger as soon as Mr. Hathaway began to speak.[33]  Later, when the Court would make a record about Mr. Little's egregious conduct, he accused the Court of picking on him and ignoring Mr. Hathaway's conduct.  But Mr. Hathaway was not engaging in contemptuous, disrespectful conduct.  The jury's observations that Mr. Hathaway was professional and respectful are consistent with the Court's observations of his behavior.  The jury's observations of defense counsel's disrespectful, unprofessional behavior are also consistent with the Court's observations.

---

[32]Tr. 6815-6816.

[33]*See, e.g.*, Tr. 5142-5144.

Moreover, although the jury clearly ascertained that defense counsel had acted inappropriately, the jury did not witness most of the inappropriate conduct, for such conduct usually occurred at the bench or when the jury was out of the courtroom.  Nor did the jury witness the inappropriate conduct that occurred during individual voir dire, unless it occurred during their individual examinations.  The Court excused several potential jurors, specifically in response to counsel's inappropriate behavior, endeavoring to prevent counsel's misconduct from harming defendants' right to a fair trial.

### Overt Hostility and Disrespect Directed at the Court and Court Staff

While all defense counsel exhibited disrespect for the Court, Christopher Wilson, one of defendant Lake's counsel, exhibited open hostility to the Court and court staff.  On countless occasions, the Court observed Mr. Wilson sneering, glaring, staring and, in general, exhibiting the nonverbal behavior of one who is attempting to threaten or intimidate someone.[34]  The Court could not and still cannot fathom what Mr. Wilson thought he could gain by such conduct; it defies common sense that he thought he could intimidate the Court or court staff.  Moreover, as discussed below, Mr. Wilson also exhibited disrespect for the jury, something the Court was not aware of until its post-trial visit with the jurors.

During the trial, Mr. Wilson played a minor role.  He conducted cross-examination of two government witnesses and no direct examination of defense witnesses.  His presence was, however, observed and felt.  Often, during bench conferences, he would express displeasure with the Court's rulings by stomping away from the bench conference, slamming books and making disruptive noises at

---

[34]*See* Tr. 7341-7342.

the defense table.  On at least one occasion, he walked away from a bench conference and stormed out of the courtroom, slamming the door on the way out.[35]  The jury observed this behavior.  Another example of his scorn for the Court occurred during one of his two cross-examinations.  When he continued to ask questions that the Court had ruled were beyond the scope of the direct examination, he finally closed his cross examination of a witness, by hostilely proclaiming in the presence of the jury, "Given your rulings, Your Honor, I have nothing further to say."[36]

Finally, during the jury instruction conference on December 6, 2004, while the jury was not in the courtroom, the Court's patience with Mr. Wilson wore thin.  While Lisa Cahill, one of defendant Lake's attorneys, was at the podium addressing an issue concerning a jury instruction, the Court noticed that Mr. Wilson was glaring at the Court and muttering something under his breath.  The Court had observed Mr. Wilson glaring at the Court with sheer hostility on numerous occasions during the trial and during bench conferences.  In light of the barrage of misconduct by other counsel, the frequent evidentiary objections, and other tactics and strategies employed in this case, the Court chose to ignore Mr. Wilson's inappropriate conduct on those prior occasions.

This time the Court could no longer ignore Mr. Wilson's conduct.  Therefore, during this instruction conference, the Court, in a calm, low-key manner, asked Mr. Wilson whether there was a problem.  Mr. Wilson immediately vaulted out of his chair, causing other defense counsel to grab his arm.  Mr. Wilson bellowed that he had "lots of problems," indicating that his problem was with the

---

[35]Tr. 7336.

[36]Tr. 4021.

Court.[37]  The Court recessed the hearing shortly after that incident.  After the recess, Mr. Wilson was

not in the courtroom, and the Court ordered that he not return.[38]

### Disrespect for the Court's Rulings and the Court's Role in Controlling Order and Presentation of Evidence

In the first trial, at counsel's behest, the Court conducted numerous bench conferences,

objections and hearings outside of the jury's presence.  During these hearings or bench conferences, the

Court ascertained that counsel were arguing objections for which the Court did not need argument to

rule.  The number and frequency of bench conferences disrupted the presentation of evidence.

Moreover, the defense counsel demanded bench conferences, only to raise the same issues over and

over again.  For example, the defendants repeatedly objected to the government's offer of business

records, using the affidavits of custodians of records, pursuant to Fed. R. Ev. 902(11), to establish the

foundation for the business record exception to the hearsay rule.   The defense repeatedly engaged in

verbose bench arguments, long after the Court had ruled that the Rule 902(11) procedure was proper,

that the procedure merely established the foundation for the hearsay exception, and that the affidavits

could not be used to establish relevancy or other objections to the admissibility of the documents.[39]

The defense also repeatedly challenged the Court's ruling that with respect to documents that

have been admitted into evidence, the government, or any party for that matter, may use those admitted

---

[37]Tr. 7308-7309.

[38]Tr. 7339-7341.

[39]Notably, in their latest round of pretrial motions, the defense for the first time raises an objection that
utilizing the 902(11) procedure offends their right to confront witnesses, pursuant to the Supreme Court's decision in
*Crawford v. Washington*, 541 U.S. 36 (2004).  The Court will address that motion in a separate order.

documents in examining any witness.  The defense repeatedly argued, and refused to accept the

Court's ruling, that documents that are admitted are admitted for all purposes.  The defense never cited

any authority for their unusual posture that only certain witnesses can be asked about certain

documents.  Indeed, part of the government's evidence was that certain witnesses, officers, directors or

employees of Westar had not seen or been involved in the creation of certain documents.  That

evidence was probative of the government's theory that certain matters had not been disclosed to

certain parties in the company.  The defense continued to raise such objections despite numerous bench

conferences during which the Court went to great lengths to repeatedly explain to the defense why their

objections had been overruled and why the Court had ruled in the manner that it did.[40]  It became

apparent to the Court that rather than relying on a continuing objection, defense counsel continued to

raise these objections in a manner that disrupted the presentation of witness testimony.  Ironically,

defense counsel did not admit documents by calling the custodian of the documents.  The defense

instead embraced the manner in which the government presented its evidence, which defense counsel

had earlier challenged as improper, by seeking the admission of documents pursuant to Rule 902(11).

Defense counsel then used these documents to cross-examine government witnesses and to examine

their own witnesses.[41]

### Counsel's False Accusation Against Opposing Counsel

On November 5, 2004, during an oral argument outside of the presence of the jury, Mr. Little

---

[40]*See, e.g.*, Tr. 205-213, 250-251, 347-350, 368-378, 380-385, 516-525, 1548-1553, 1755-1763, 1935-1938, 2059-2060.

[41]*See, e.g.*, Tr. 1200-1201 (Little offers Lake diary, using F.R.E. 902(11), through government witness Koupal and cross examines Koupal about Lake's entries in the diary).

accused Mr. Hathaway of bullying him inside and outside of the courtroom.  In fact, Mr. Little alleged

that Mr. Hathaway was bullying him right at that moment:

| | |
|---|---|
| MR. HATHAWAY: | Your Honor, they had this in discovery. |
| MR. LITTLE: | I'm not finished. |
| THE COURT: | Wait a minute.  Let him finish and then you'll have the last word on that.  Anything more, Mr. Little? |
| MR. LITTLE: | If he could sit down and not stand there in a threatening way. |
| THE COURT: | No, no, no, talk to me.  Just talk to me.  All right? |
| MR. LITTLE: | Well, I really object, Your Honor, and I want to put this on the record.  On the rare occasions when I interrupt Mr. Hathaway, I'm shot down.  He does it repeatedly.  He's a bully, he's threatening.  He's threatened me outside this courtroom and he's threatening me now.  I think he should sit down and act like a professional. |

As Mr. Little made these accusations, he turned toward Mr. Hathaway with his fists clenched.  The

record reflects that the Court did not describe what it was observing at that point.  Rather, the Court

focused on calming Mr. Little down to keep the peace by asking him to direct his comments to the

Court, not to Mr. Hathaway.[42]  At the Court's direction, Mr. Hathaway sat down.  The Court

reminded Mr. Little that he had displayed unprofessional conduct, a comment that apparently incited

Mr. Little to yell at the Court.  Mr. Little's conduct during this exchange can be characterized as

nothing other than contemptuous:

| | |
|---|---|
| MR. LITTLE: | Why am I being-- |
| THE COURT: | Mr. Hathaway-- |
| MR. LITTLE: | I didn't do anything wrong right now. |
| THE COURT: | Don't you yell at me, counsel.  Don't yell at me. |
| MR. LITTLE: | Tell me when I can speak. |
| THE COURT: | No, I'm talking.  Please don't interrupt me.  That's been part of the problem |

---

[42]Tr. 3363-3364.

20

around here is I rule, I get interrupted.  I rule, I get interrupted.[43]

The Court later warned Mr. Little that he had acted contemptuously and that the Court had come close

to citing him in contempt.[44]

The Court subsequently stated on the record what it observed during this alleged "bullying"

incident.  Notably, the Court's observations were that Mr. Hathaway was not threatening or bullying

Mr. Little in the courtroom:

> And I'm still I think somewhat in shock, Mr. Little, about what went on Friday as you
> stood there and were making an argument to me and Mr. Hathaway stood up I guess
> to object and said something like, "Judge" or something, started to interrupt you, which
> obviously angered you, Mr. Little, and accusations started flying about Mr. Hathaway
> bullying and threatening you.  And obviously I can't speak to what goes on outside of
> the courtroom.  But part of your allegation or accusation was that he was bullying and
> threatening you right then and there.  And I tried to get your attention because you had
> turned toward Mr. Hathaway, with obviously a very angry look on your face, and I was
> trying to get your attention to tell you to address your comments to the Court.  As all
> counsel know, they're not supposed to talk to each other or argue with each other.
> They're supposed to address their comments to the Court.  But in any event, Mr.
> Hathaway did not bully you or threaten you in my presence, Mr. Little.  I don't think
> anyone that was here would think that that was a truthful accusation.  He stood way
> apart from you.  He merely stood up.  He wasn't even looking at you.  He was looking
> at the Court.  I told him to sit down.  He was interrupting you.  We've had that issue
> arise again and again, primarily with people interrupting me when I was trying to make a
> ruling.  But in any event, I want the record to be clear that there was no bullying or
> threatening going on in this courtroom.  Mr. Hathaway did not bully or threaten you,
> Mr. Little.  He didn't bully or threaten anyone.  And I haven't seen any lawyer in this
> courtroom bully or threaten another lawyer.  And I better not see it.[45]

The Court had witnessed Mr. Little make this accusation, while Mr. Hathaway stood  approximately

---

[43]Tr. 3364.

[44]Tr. 3462.

[45]Tr. 3460-3461.

fifteen feet away from Mr. Little, not facing or looking at Mr. Little.  From the Court's observation, Mr. Little's accusation was false.  Mr. Hathaway was not engaging in any conduct that could reasonably be perceived as "bullying."

### Court's Response After Trial to Egregious Conduct of Counsel

After the Court had declared a mistrial, it visited with the jurors in the jury room before they departed the courthouse.  This is a common practice of this Court and many judges, who have found that jurors greatly appreciate the opportunity to talk to the judge, so that the jurors may ask questions and offer their observations about the case, or offer general observations about the court system.  This Court considers those who have served on a jury to be citizens who are most likely better informed about the courts than citizens who have never served on a jury.  In a nation where many do not understand or appreciate the work of the judicial branch, citizens who have served as jurors are in a position to inform and educate others about their experiences.  This Court, and many other courts, appreciate the opportunity to discuss our judicial system with those who have sacrificed their time to serve as jurors.  Thus, this Court met with jurors, offering to hear their questions, observations and opinions on a variety of subjects.

Because this trial ended in a mistrial, the Court did not discuss with the jurors details about this case nor the evidence presented.  In particular, the Court avoided discussions with the jury concerning their deliberations.  These jurors, having served for ten weeks, a significant period in their lives, were nevertheless eager to share stories about their experience.

Unfortunately, in light of the egregious conduct of counsel, and despite the Court's best efforts

22

to shield counsel's conduct from the jury,[46] some of the egregious conduct catalogued above was apparent to the jury.  The jury was not privy to virtually any of the disrespectful verbal exchanges between counsel and the Court because almost all of this occurred at the bench or while the jury was out of the courtroom.  Nevertheless, counsel's disrespectful, antagonistic, manipulative conduct was readily apparent to the jury.  During the Court's post-trial visit with the jurors, they expressed their uniform disenchantment with behavior that they perceived as disrespectful to both the Court and the jury.

### Jurors' Reports of their Observations of Egregious Conduct of Counsel

Among the jurors' comments about counsel's behavior were:

- Mr. Hathaway's conduct was professional and respectful;
- Defense counsel's conduct was not professional or respectful.

- Defense counsel acted childish and played games, and "we're (the jury) smarter than that."

- Defense counsel stomped around after the judge ruled on something.

- Mr. Wilson acted  hateful and obnoxious.  When all other parties were standing in honor of the jury entering the courtroom, the jury noticed that Mr. Wilson would be sitting, or would sit down, before the jury was fully in the courtroom.  The jury perceived that he was demonstrating his lack of respect for them.[47]

- Ms. Junghans wore short skirts, did not sit behind the table, and sat with her body positioned directly toward the jury, in a manner that was offensive and disrespectful.

- Mr. Little "kept pestering" Mr. Hathaway.

---

[46]*See* Tr. 7335.

[47]This is something the Court did not see during the trial, probably because, like most everyone else, the Court's eyes were on the jury as they entered the courtroom.

- The younger defense lawyers behaved better than Messrs. Little, Wilson, and Hoffinger and Ms. Junghans.

- Mr. Hoffinger pretended to be asleep at times, as if the evidence meant nothing.

- The jury did not appreciate defense counsel making facial expressions because the jury was smart enough to see through such theatrics.

- Every time the Court ruled against Mr. Little "he pouted and acted like why are you doing this to me?"

- Defense counsel treated the jury like they were stupid.  For example, multiple times Mr. Little asked the judge to instruct the jury of the date when defendant Lake joined Westar.  The jury had this date committed to memory.

### *Court's Admonitions to Counsel About Past Conduct and Future Expectations*

On January 4, 2005, the Court conducted a post-trial status conference and heard argument on the government's motion for the Court to reconsider its pretrial ruling denying the government's motion for a restraining order.  After hearing argument on that issue, the Court spent about forty minutes addressing defense counsel's prolific instances of misconduct during the trial.  The Court admonished counsel and warned them that such behavior during the retrial would be sanctioned.  The Court read extensively from the *Code of Trial Conduct* promulgated by the American College of Trial Lawyers. The Court advised counsel that the Court would be entering an order governing trial procedures during the next trial.[48]   Morever, the Court warned counsel that if the Court witnessed contemptuous conduct, the Court would cite counsel in contempt.  The Court also placed all counsel on notice that they should all be prepared to try the case, in the unfortunate event that lead counsel chose to ignore the Court's

_____

[48]Notably, although *this order* is the order that the Court referenced it would be filing, the defendants' motions for recusal are based in part on their representations of what the Court's trial procedure order is, a premature and speculative basis for their motions.

orders, rulings and expectations to an extent warranting a citation for contempt.  In other words, the Court placed all counsel on notice, including local counsel, that these defendants each had multiple counsel, many of whom had been present during the entire trial, and that if a lead counsel chose to act in a manner warranting a contempt hearing, the Court would expect the trial to proceed, given the considerable attorney resources each defendant had.

**2.  Analysis of Defendant's Motion to Recuse**

Defendants argue that the Court's: (1) comments about defense counsel's behavior during trial and at the January 4, 2005 hearing; (2) "personalization" of defense counsel's advocacy; (3) post-trial debriefing of the jury; (4) proposed order to maintain decorum during the upcoming trial; and (5) alleged improper contact with a juror during trial would cause a reasonable person to question the Court's impartiality such that recusal is necessary.  Essentially, defense counsel, who are apparently still unchastened for their misconduct and disrespect to the jury, the Court and the judicial system, argue that this Court is not fair and impartial because it called defense counsel's conduct offensive and despicable.  The defendants now challenge the Court's authority to exercise discipline and maintain order and decorum with a motion for recusal, arguing that this Court's statement during the January 4, 2005 hearing that it would not hesitate to cite counsel in contempt for future contemptuous conduct, renders it incapable of presiding over the next trial.

### *Comments about Defense Counsel's Conduct*

Defendants' claim that this judge's stern admonitions to defense counsel concerning their conduct requires her recusal must fail.  "It is well within [the Court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or

25

otherwise engages in improper or delaying behavior." [49]  "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties or their cases, ordinarily do not support a bias or partiality challenge."[50]  As the Supreme Court has explained:

> Not establishing bias or partiality . . . are expressions of impatience, dissatisfaction or annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.  A judge's ordinary efforts at courtroom administration–even a stern and short-tempered judge's ordinary efforts at courtroom administration–remain immune.[51]

Indeed, even ordering an attorney imprisoned for contempt of court is insufficient by itself to show bias requiring recusal.[52]

Only "when judicial remarks display a high degree of favoritism or antagonism as to make fair judgment impossible," must a judge recuse herself.[53]  An example of a judicial remark requiring recusal is a statement allegedly made by a district judge in a World War I espionage case against German-America defendants that "[o]ne must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans."[54]  As evidenced by this comment, such favoritism or antagonism occurs "only in the rarest circumstances."[55]

In addition, judicial remarks deriving from extrajudicial sources may constitute a basis for

---

[49]*United States v. Donato*, 99 F.3d 426, 434 (D.C. Cir. 1997).

[50]*United States v. Liteky*, 510 U.S. 540, 555 (1994).

[51]*Id.* at 555-56.

[52]*Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1141 (2d Cir. 1994).

[53]*Liteky*, 510 U.S. at 555.

[54]*Id.* (citing *Berger v. United States*, 155 U.S. 22 (1921)).

[55]*Id.*

recusal.  The "extrajudicial source" doctrine is the only common basis upon which to establish disqualifying bias.[56]  Acquisition of alleged bias or prejudice from a source outside the judicial proceedings is, however, only a factor in the analysis of a section 455(a) recusal motion.[57]  As the Supreme Court has explained, that an opinion held by a judge derives from an extrajudicial source "is not a *necessary* condition for bias or prejudice recusal, since predisposition developed during the course of a trial will sometimes (albeit rarely) suffice.  Nor is it a sufficient condition for . . . recusal, since some opinions acquired outside the context of judicial proceedings . . . will *not* suffice."[58]  Thus, the Court concluded that "it would be better to speak of the existence of a significant (and often determinative) 'extrajudicial source' *factor*, than of an 'extrajudicial source' *doctrine*, in recusal jurisprudence."[59]

The Supreme Court discussed the admonishment of counsel as a ground for recusal in *Liteky v. United States*.[60]  To support their motion of recusal in *Liteky*, the petitioners referred to statements uttered by the district judge, especially admonishments of counsel; the judge's alleged "anti-defendant" tone; the judge's cutting off of testimony said to be relevant to defendants' state of mind; and the judge's refusal to allow petitioners to appeal *in forma pauperis*.[61]  The Court held that "[a]ll of these

---

[56]*Id*. at 551.

[57]*Id.* at 554-55.

[58]*Id*. at 554 (emphasis in original).

[59]*Id.* at 554-55 (emphasis in original).

[60]510 U.S. at 556.

[61]*Id.*

27

grounds are inadequate . . . [as] [t]hey consist of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses."[62]  The Court also stressed that all of defendants' bases for recusal "occurred in the course of judicial proceedings, *and* neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible."[63]

As did the Court in *Liteky*, this Court holds that its criticism of defense counsel's behavior at trial and at the January 4, 2005, status conference does not require recusal.  The Court's attempt to maintain decorum in the courtroom and rebuke attorneys for unethical conduct simply may not form the basis for recusal.  The Court's statements concerning defense counsel's conduct are based almost entirely on its perceptions of the conduct as it occurred during the trial.  The Court's post-trial discussion with the jury merely confirmed that the jurors too observed improper conduct, and in a few instances, the jury observed misconduct that the Court did not observe.  This discussion thus cannot be characterized as "a significant (and often determinative) 'extrajudicial source' factor" requiring recusal.  Moreover, the Court's criticisms of defense counsel's action are hardly indicative of "a deep-seated and unequivocal antagonism that would render fair judgment impossible."[64]

The Court must also address defendants' reliance on a *Kansas City Star* newspaper article, which characterized the Court's January 4, 2005 hearing with defendants, as evidence that this Court cannot be fair and impartial.  Defendants point to language in this article, ostensibly describing that this

---

[62]*Id.*

[63]*Id.* (emphasis in original).

[64]*See Liteky*, 510 U.S. at 555.

28

Court "raged at attorneys" and "unleashed a 45-minute verbal fusillade" at them.  In *United States v. Bayless*,[65] the Second Circuit Court of Appeals had occasion to consider the role of media accounts in the recusal inquiry.  The court, noting that press coverage is not a ground for recusal, aptly stated:

> We cannot adopt a per se rule holding that when someone claims to see smoke, we must find that there is fire.  That which is seen is sometimes merely a smokescreen.  Judicial inquiry may not therefore be defined by what appears in the press.  If such were the case, those litigants fortunate enough to have easy access to the media could make charges against a judge's impartiality that would effectively veto the assignment of judges.  Judge-shopping would then become an additional and potent tactical weapon in the skilled practitioner's arsenal.[66]

Thus, "[a]lthough public confidence may be as much shaken by publicized inferences of bias that are false as those that are true, a judge considering whether to disqualify [herself] must ignore rumors, innuendoes and erroneous information published as fact in the newspapers."[67]

Defendants' reliance on the *Kansas City Star* newspaper article is misplaced for several reasons.  First, it is not evidence.  Second, a newspaper article authored by a reporter, who could not be fully informed about the nature, incidence or severity of counsel's violations of court orders, and disruptiveness of the court process, is simply not persuasive evidence.  The standard for recusal under section 455(a) is, of course, "whether a reasonable person, *knowing all of the relevant facts*, would harbor doubts about the judge's impartiality."[68]  No spectator, such as a reporter, could possibly be fully informed, as no such person participated in any of the numerous bench conferences during which

---

[65]201 F.3d 116 (2d Cir. 2000).

[66]*Id.* at 129 (citation omitted).

[67]*Id.* (citation omitted)

[68]*Nichols v. Alley*, 71 F.3d 347, 350-51 (10th Cir. 1995) (emphasis added).

defense counsel exhibited disrespectful behavior.  No spectator, such as a reporter, could possibly be fully informed, as no such person was privy to every pretrial and limine ruling, nor could they understand the nuances of the presentation of testimony and exhibits that ran afoul of the Court's rulings, or ran afoul of the rules of evidence, procedure, and ethics.  Rather, the observations of the Court, which was fully informed and fully engaged in the process, as well as the record, represent what a fully informed, reasonable person would conclude about the Court's admonishment of counsel.

Third, this newspaper article is not a truthful, objective account of what occurred at the January 4, 2005 hearing, but rather contains the type of information which the Court should  ignore.[69]  Notably, if newspaper articles had any evidentiary weight, the Court would have to find that the preponderance of the evidence weighed in favor of the versions reported by the Associated Press and *Topeka Capital Journal*.  Those reporters were also present at the hearing, and reported what they determined newsworthy, including the oral arguments on the government's motion to reconsider denial of its motion for an order restraining Westar from paying the defendants' criminal attorneys fees.

The *Topeka Capital Journal* and Associated Press reporters also reported that the Court admonished defense counsel about their conduct and about the Court's intention of entering an order governing procedure at the retrial.  Yet, it is notable that those reporters apparently did not perceive the Court to have engaged in the conduct described by the *Kansas City Star* reporter, who stated that the Court "raged" at defense counsel, and with a "voice at times trembling with emotion," the Court "unleashed at 45-minute verbal fusillade," an "explosion," and a "tirade."  This does not at all represent

---

[69]*See, e.g., Bayless*, 201 F.3d at 129 ("a judge considering whether to disqualify [herself] must ignore . . . erroneous information published as fact in the newspapers").

the tone, words or tenor of the January 4, 2005 hearing during which the Court reviewed defense counsel's misconduct, read lengthy excerpts from the *American College of Trial Lawyers Code of Trial Conduct*, and gave counsel notice that the Court would be filing a trial procedure order, and that counsel could expect sanctions if they engaged in such misconduct in the retrial.  A reading of the transcript of the January 4 hearing (attached as Attachment A), belies the loaded invective used by the *Kansas City Star* reporter to describe the Court's discussion and an audiotape of the January 4 hearing (attached as Attachments B and C)[70] confirms that the author of the article did not accurately portray the tone and tenor of the Court's discussion.  Thus, to the extent that the defendants rely on the Court's discussion of these matters during the January 4 hearing, there is simply no basis for their motions to recuse.

Stripped of sensationalism, the January 4, 2005, hearing simply announced the Court's intention not to permit unethical conduct by any counsel during the upcoming trial.  The Court noted that it had tolerated what it viewed as contemptuous conduct before, out of concern for the defendants' right to counsel.  The Court placed counsel on advance notice that despite its failure to cite them for contemptuous conduct at the first trial, they would be cited in contempt at the retrial should they choose to act in an unethical and improper manner.

### Personalization of Defense Counsel's Advocacy

Defendants also allege that a reasonable informed person would perceive this Court to be biased because it "appeared to adopt a personal stake in the trial, making numerous statements

---

[70]This audio recording, although not an official record, was contemporaneously made by Sherry Berner, Certified Shorthand Reporter, for her use in preparing the official transcript of the January 4, 2005 hearing. Both the original audiotape and a copy on compact disk are attached as Attachments B and C.

throughout the trial that it felt personally attacked." To support this allegation, defendants cite to several passages in the record where this judge referred to herself in the first person, rather than referring generally to "the Court." Such references are not evidence of adopting a "personal stake" in these proceedings. Moreover, the Court's response to defense counsel's hostile tactics, such as the continual sneers directed at this judge and profane comments concerning the Court's rulings and the Court, can only be characterized as a personal attack directed at this judge. These actions, and the Court's response to them is not a basis for recusal, because "a party, [and presumably an attorney,] cannot force disqualification by attacking the judge and then claiming that these tactics must have caused the judge to be biased against [him]."[71] Rather, hostility toward a judge counsels against recusal, "lest [courts] encourage tactics designed to force recusal."[72]

### Post-trial Debriefing of the Jury

As previously discussed, the Court met with the jury at the conclusion of defendants' first trial to thank them for their time and service. The Court spoke with the jury for about one and one-half to two hours, but never referred to the evidence or discussed the case in any detail. Instead, the jurors felt compelled to express their dissatisfaction with the conduct of defense counsel. Quite ironically, defendants now allege that this judge's post-trial discussion with the jury violated § 15-4.3(b) of the ABA Standards for Criminal Justice. Section 15-4.3 states in relevant part:

> While it is appropriate for the court to thank jurors at the conclusion of a trial for their public service, such comments should not include praise or criticism of their verdict.

---

[71]*FDIC v. Sweeney*, 136 F.3d 216, 219 (1st Cir. 1998) (citation omitted).

[72]*United States v. Bertoli*, 40 F.3d 1384, 1414 (3d Cir. 1994).

(b) After the conclusion of the trial and the completion of the jurors' service, the court may engage in discussions with the jurors. Such discussions should occur only on the record and in open court with counsel having the opportunity to be present. This standard does not prohibit incidental contact between the court and jurors after the conclusion of the trial.

(c) At the conclusion of the juror's [sic] service, with the concurrence of all the parties and the court, the judge may conduct a discussion with the jurors who agree to participate for the purpose of educating the court and counsel.

Nothing in section 15-4.3 prohibits the Court from meeting with jurors to thank them for their service. Nor have the defendants cited any cases suggesting that such a meeting is improper.[73] More importantly, defendants have provided no evidence suggesting that the Court's post-trial discussion with the jury provides a basis for recusal. The case law that defendants cite in support of this contention is inapposite. For instance, in *United States v. Craven*,[74] a case cited by defendants, a judge held *ex parte* conversations with court appointed experts and used information learned in these conversations as a basis for a downward departure. The circuit court held that this conduct was improper and remanded the case to a different judge.[75] Here, the Court based no legal rulings during the prior trial on its conversations with the jury. Nor could the Court have done so, as its discussion with the jurors only occurred after the declaration of a mistrial and the subsequent release of the jurors from service.

---

[73]Rather, courts recognize that such meetings are proper. *See, e.g.*, *Nationwide Mut. Fire Ins. Co. v. Tucker*, 608 So. 2d 85, 86 (Fl. Ct. App. 1992) ("We recognize that from time to time a trial judge may conduct an informal conference with a jury after the jury has been discharged. These conferences are held with the hope of developing a better understanding of those factors which may play a part in the actions of the jury and to help make the juror's service less burdensome and more enjoyable."); *United States v. Doherty*, 675 F. Supp. 719, 721 (D. Mass. 1987) ("Thereafter, once the jury had been discharged, the courtroom staff and I met informally with the jurors in the jury room to thank them personally for their lengthy service and to answer their questions about court procedures.").

[74]239 F.3d 91 (1st Cir. 2001).

[75]*Id.*

### Proposed Order to Maintain Decorum

At the January 4, 2005, hearing, the Court stated that it would be issuing an order to ensure the maintenance of decorum in the courtroom during defendants' upcoming trial.  The Court has not, until today, issued any order or imposed any trial procedures.  Nevertheless, defendants spend considerable time in their briefs expressing their dissatisfaction with what they anticipate the trial procedures to be.  This portion of defendants' brief is wholly speculative.  Moreover, to the extent defendants are attempting to suggest that the mere imposition of trial procedures mandates a recusal, such a suggestion is without merit.[76]

### Alleged Improper Contact with a Juror during Trial

The defendants' insinuation that the Court had an improper contact with a juror during trial is based upon an anonymous letter addressed to defendant Wittig.  The letter accuses this Court of improperly speaking with jurors and of arguing with a juror over legal rulings.  On its face, the accusation is spurious.[77]  Under what circumstances would a juror have the occasion to argue with the Court's legal rulings?  Under what circumstances would the Court have allowed a juror to argue with the Court's legal rulings?  Had this occurred, the defendants would have known, for the Court would have brought it to their attention, and undoubtedly would have sought to excuse this juror from further service on the jury.

---

[76]*See, e.g.*, *Liteky*, 510 U.S. at 556 (noting that a judge's "ordinary attempts at courtroom administration" provide no basis for recusal).

[77]As the government's brief points out, the author of this anonymous letter "just happen[ed] to know" defendant Wittig's home address, and the address of defendant Wittig's local counsel, who did not actively participate in the first trial.

The author of this anonymous letter also states, based on double hearsay, that the Court had improper conversations with the jury.[78]  The allegations made in this anonymous letter, that this Court improperly spoke with jurors, are false.  As previously discussed, this Court spoke with the jury, as it always does, after the trial was over, which in this case was after the Court had declared a mistrial and excused the jury from further service.

Furthermore, as all counsel know, this Court spoke with the jurors, out of the presence of counsel, on December 3, 2004, during the trial, to conduct an investigation into whether there had been juror misconduct, or whether the conduct of counsel had prejudiced and rendered the jury incapable of being allegiant to their oaths as jurors.  This contact was precipitated by an encounter between Mr. Hathaway and Mr. Little.

As addressed above, the Court had previously ordered Mr. Little to refrain from approaching or contacting Mr. Hathaway, after Mr. Little had falsely accused Mr. Hathaway of bullying him in open court.   Despite the Court's admonishment of Mr. Little for making this false accusation against Mr. Hathaway, and despite the Court's warning to Mr. Little and Mr. Hathaway to refrain from approaching each other, on December 3, 2004, as the jury filed out of the courtroom for a lunch break, Mr. Little approached Mr. Hathaway at the podium, who immediately threw up his hand and told Mr. Little to stay away from him.  Court staff then heard one of the jurors say, as he left the courtroom, "I thought I was about to see a fist fight."  Although the Court was exiting the courtroom at the same time as the jury, and did not personally witness this incident, some of the Court's staff witnessed it.  Mr.

---

[78]The author of the anonymous letter also indicates that he or she resides or is a part of the Topeka community, and thinks that defendant Wittig is innocent of the charges.  This of course belies the defendants' position that everyone in the Topeka venire has predetermined that defendant Wittig is guilty.

Little immediately complained to one of the Court's law clerks that he wanted something done about Mr. Hathaway's reaction, which indicated to the Court that Mr. Little sought a hearing.[79]

Therefore, over an extended lunch hour, concerned about whether this incident evidenced that jurors were or had been talking about the trial in violation of the Court's instructions to them, or whether the encounter between counsel had affected the jurors' impartiality, the Court interviewed each of the sixteen jurors. After conducting the interviews, the Court returned to the courtroom, out of the presence of the jury, and reported its findings to counsel.[80]

The Court began by announcing that it was concerned about the incident and that it understood Mr. Little to have demanded that it take some action. The Court then announced that it had determined, based on its investigation, that there had been no juror misconduct and that the jurors had not been tainted by this incident. The Court further admonished the two counsel to stay away from each other and directed Mr. Little to have no direct contact with Mr. Hathaway.[81] Since defendant Lake had, at that time, six other counsel of record, at least three of whom were always in the courtroom, this restriction presented no problem. The Court then asked counsel if they wanted any further steps taken. All counsel stated that they had no objection to the Court's procedure, and that they wanted nothing further done. This was the *only* instance of the Court speaking to the jurors outside the presence of counsel, and was, of course, incited by counsels' conduct.

---

[79]*See* Tr. 7070.

[80]Tr. 7070-7079.

[81] Tr. 7079.

## TRIAL PROCEDURES[82]

At the outset, the Court notes that many of the following rules and procedures are not unusual, and in fact, are unwritten rules of conduct that in this Court's experience, most counsel abide by without written order. In addition, the Court adopts some of the following rules in response to particular conduct exhibited by counsel, with the goal of conducting a retrial in an atmosphere of decorum, order and mutual respect of the Court, jurors, litigants and counsel.[83]  No one should expect or experience any less.

### *Evidentiary Objections*

Virtually all evidentiary objections in this and any trial can be efficiently handled by an objection raised from the floor. Bench conferences should be used sparingly, when counsel need to address legal arguments to the Court outside the hearing of the jury. From the Court's experience presiding over the first trial of this case, the vast majority of evidentiary objections did not warrant a bench conference. Bench conferences will be appropriate, for example: (1) when counsel is ready to examine on an area or issue that the Court has taken under advisement or not yet ruled on its admissibility; and (2) when the Court has rendered a limine ruling and the anticipated examination will be within the bounds of the

---

[82]The ABA Criminal Justice Standards, cited approvingly by defendant Wittig, provide: "The trial judge, preferably before a criminal trial or at its beginning, should prescribe and make known the ground rules relating to conduct which the parties, the prosecutor, the defense counsel, the witnesses, and others will be expected to follow in the courtroom, and which are not set forth in the code of criminal procedure or in the published rules of court." Standard 6-3.1.  Because at least defendant Wittig's counsel are aware of, and apparently countenance, the ABA Criminal Justice Standards, the Court will refer periodically to these standards in the Trial Procedures section of this Memorandum Order.  The Court will also cite to the American College of Trial Lawyers Code of Trial Conduct.

[83]*See* ABA Criminal Justice Standard 6-3.5(a) ("A trial judge should maintain order and decorum in judicial proceedings. The trial judge has the obligation to use his or her judicial power to prevent distractions from and disruptions of the trial.").

limine ruling, but counsel wants to make a record to ensure that he or she honors the Court's limine ruling, whether the limine ruling was in counsel's favor, or in favor of the opposing party.

Common evidentiary objections should be raised from the floor, except in extraordinary circumstances.  These common objections include: hearsay, foundation, leading, exceeds scope, argumentative, repetitive, Rule 609 and  Rule 404(b).  Counsel are ordered to raise objections by either stating the rule number or rule title.  Counsel are ordered to not raise speaking objections, nor any argument from the floor.  Thus, if counsel wish to object that a document is hearsay, they shall object by stating, "Objection.  Hearsay."  Or, they shall object by stating. "Objection.  Rule 801."  The objecting counsel shall state nothing else.  The counsel against whom the objection is lodged, shall state by rule number or title, their response to the objection, if counsel wishes to respond.  If counsel chooses to respond to "Objection. Hearsay," an appropriate response would be, for example, "business record," or "Rule 803."  Counsel shall state no other response or argument from the floor.  Argument or speaking objections in the presence of the jury will violate this order.[84]

When ordinary evidentiary objections are made from the floor, as this Order directs, the Court will ordinarily rule, "Sustained," or "Overruled."  It is a waste of resources and time, and accomplishes nothing other than disruption of the trial, for counsel to request bench conferences on these types of objections.  The parties can be assured, however, that if the Court believes that argument would be

---

[84]Thus, counsel may not make such speaking objections as: Ms. Junghan's objection that she did not know the purpose of a government exhibit (Tr. 222); Mr. Hathaway's objection that Mr. Little did not like a witness's answer (Tr. 1254); Mr. Little's objection that "The charter rates are not relevant to this case.  This is after the time when they no longer had planes, and this refers to charter rates." (Tr. 2890); Mr. Wilson's objection that "he put in a chart that is misleading." (Tr. 3994); and Mr. Wilson's objection that "the witness testified that upon a conversion of an RSU into in this instance a share, it's a taxable event." (Tr. 4010).

helpful, even on such garden variety objections, she will ask the parties to approach the bench for that purpose.

Furthermore, once the Court has ruled on a definitive evidentiary issue, the parties should not continue to raise that issue repeatedly. The Court will consider their objection a continuing objection.

### Arguments to the Court

The Court will entertain argument, if any, only from the counsel raising the objection or making a motion. And, counsel making an objection during direct examination must be the counsel who will conduct the cross examination of the witness. Other counsel will be considered to join in a motion or objection, unless they expressly state that they do *not* join in the motion or objection. If the Court entertains argument on a motion or objection, only the counsel making the motion or objection will be allowed to argue in favor of the motion or objection.

Counsel shall direct all argument to the Court, not to each other.[85]  Furthermore, the order and length of argument will be controlled and directed by the Court. When counsel approach the bench, or otherwise present argument outside of the jury's hearing, the Court will call on counsel by name. Counsel are prohibited from speaking until they are called on by name. When the Court determines that it has heard sufficient argument from a particular counsel, she will advise counsel that the Court has heard enough; the Court will then call on the opposing counsel to respond. Again, the Court will

---

[85]*See, e.g.*, ABA Criminal Justice Standard 6-3.3 ("The trial judge should make known before trial that, when court is in session, no colloquy, argument, or discussion directly between opposing counsel in the presence of the judge or jury will be permitted on matters relating to the case . . . ."); American College of Trial Lawyers Code of Trial Conduct ¶ 18(b) ("A lawyer should not engage in acrimonious conversations or exchanges involving personalities with opposing counsel.  Objections, requests and observations should be addressed to the court.").

determine when it has heard sufficient argument from that counsel and it will advise counsel that the

Court has heard enough.  The Court will then rule.  When the Court has finished ruling, the parties will

not be heard on any additional argument.  Any interruptions of the Court, any speaking before being

called on and any arguing with the Court after its ruling, will violate this order and may be the basis for

sanctions or other appropriate responses designed to deter future violations of this Order.

The Court will exert this degree of control because, as discussed above, counsel refused to

honor the Court's efforts to have orderly argument and rulings in the first trial.  Through repeated

instances of interrupting, arguing with the Court and with each other, counsel attempted to wrest from

the Court control of the order of these proceedings, causing disruption, obstruction, distraction, and

frustration of the judicial process.

### Limine Rulings

If a party obtains a limine ruling precluding an opposing party from offering or using evidence, in

whole or part, all parties are bound by the limine ruling, unless the Court expressly orders otherwise.

The practice of asking questions or making statements or offers of proof so as to present to the jury

evidence that the Court has precluded, violates Fed. R. Evid. 103(c) and is outside the bounds of

ethical, professional trial practice.[86]

Thus, if the Court precludes a party from offering evidence, or using evidence in a certain

manner or through a certain witness, or if the Court limits the scope of a witness's testimony or the

---

[86]*See* American College of Trial Lawyers Code of Trial Conduct ¶ 18(g) ("A lawyer should not attempt to get before the jury evidence which is improper.  In all cases in which a lawyer has any doubt about the propriety of any disclosures to the jury, a request should be made for leave to approach the bench and obtain a ruling out of the jury's hearing . . . .").

admissible scope of evidence, all parties are bound by the limine ruling, unless the Court expressly orders otherwise.  If a party desires to use, refer to, or offer evidence that was previously excluded, that party shall not proceed without first seeking express approval from the Court, out of the hearing of the jury.  In the event any party violates this rule, the Court may respond to the violation by cautionary instructions to the jury, and sanctions fitting the nature and severity of the violation.

### *Decorum and Order in the Courtroom*

The Court will direct that a deputy United States Marshal be present in the courtroom at all times, and that at least one deputy marshal or court security officer be stationed in the seating gallery, in a position to observe the conduct of all counsel in this case.   This deputy marshal or officer shall report to the Court or court staff if he or she observes any inappropriate nonverbal conduct, such as making faces, sneering, glaring, and the like.  This marshal or officer shall report to the Court or court staff any comments on the Court's rulings, or any comments about anyone else in the courtroom or associated with the case.

Counsel are to refrain from commenting on the Court's rulings, witnesses, jurors, opposing counsel, or the evidence, as such editorialization and verbal commentary is always inappropriate. Counsel shall also refrain from gestures, facial expressions, audible comments, or the like, manifesting approval, agreement, disapproval or disagreement with the Court's rulings, the testimony of witnesses or the evidence.  Counsel shall refrain from such conduct at all times during the trial proceeding, whether during a bench conference, or whether in or outside of the hearing and presence of the jury.[87]

---

[87]See American College of Trial Lawyers Code of Trial Conduct ¶ 17(b) ("During the trial, a lawyer should always display a courteous, dignified and respectful attitude toward the presiding judge, not for the sake of the judge's person, but for the maintenance of respect for and confidence in the judicial office.") and ¶ 17(d) (In

The Court orders that Paula Junghans will sit behind the defense table, in the middle chair, facing the jury.  The Court will direct any other seating arrangements of counsel if circumstances, such as inappropriate nonverbal or verbal conduct, require the Court to respond to maintain decorum, order and respect for the Court and the participants.[88]

Inappropriate, disrespectful verbal or nonverbal behavior may result in cautionary jury instructions, sanctions, barring violators from the courtroom, limiting the number of counsel per table,[89] or other appropriate measures, including citation for contempt, depending on the nature and severity of the conduct.[90]  Furthermore, all counsel shall refrain from making any comments, or moving around the courtroom, when the jury is entering or exiting the courtroom.  All counsel shall stand when the jury and/or Court enters or exits the courtroom.  All counsel shall stand when addressing the Court, for any purpose.

### Voir Dire and Jury Questionnaires

In keeping with the method of voir dire employed by the Court and lauded by the defense counsel at the first trial, the Court will again utilize thorough, intensive, individual voir dire of potential

---

performing these duties, a lawyer should conduct himself or herself according to law and the standards of professional conduct as defined in codes, rules and canons of the legal profession and *in such a way as to avoid disorder or disruption in the courtroom*.") (emphasis added).

[88]*See* American College of Trial Lawyers Code of Trial Conduct ¶ 18 (h) ("A lawyer should be attired in a proper and dignified manner in the courtroom, and abstain from any apparel or ornament calculated to call attention to himself or herself.").

[89]The government has moved to restrict the number of attorneys at counsel tables during opening statements and closing arguments (Doc. 288).  In light of the Court's imposition of these trial procedures, the Court denies this motion.  If, however, counsel's actions are disruptive, the Court may impose this, or other sanctions.

[90]*See* ABA Criminal Justice Standard 6-3.10(a) ("Any person who engages in conduct which disturbs the orderly process of the trial may be admonished or excluded, and, if such conduct is intentional, may be punished for contempt.").

jurors.  At the first trial, the Court did most of the questioning, and all counsel were allowed to ask

follow-up questions.  Typically, counsel asked only a few minutes of questions, because the Court

covered virtually all areas of interest.  At the retrial, the Court will conduct all voir dire examination;

counsel will not be permitted to ask any questions.  The Court allowed counsel the privilege of asking

questions, a privilege that was abused by defendant Wittig's counsel, Adam Hoffinger.[91]  Voir dire by

counsel is a privilege, not a right.  Rule 24(1) of the Federal Rules of Criminal Procedure provides that

the court may examine prospective jurors or may permit the attorneys to do so.  Consistent with Fed.

R. Crim. P. Rule 24(2), this Court will conduct all voir dire examination; when the Court completes its

voir dire examination, the Court will ask Counsel (out of the potential juror's hearing) if they have any

additional questions they would like the Court to ask.  If the Court deems any such additional questions

proper, the Court will ask these additional questions.

At the first trial, the Court, with the input of all counsel, drafted juror questionnaires for the

venire.  Counsel were given copies of these questionnaires approximately three weeks before trial.  The

Court will again utilize these juror questionnaires, but will not give these questionnaires to counsel prior

to voir dire.[92]  In fact, the Court is not going to mail the questionnaires to the venire, for several reasons.

First, a number of the venire who indicated familiarity with the case stated that they had first heard or

read about the case *after* they received these extensive juror questionnaires.  This indicated to the

---

[91]*See* ABA Criminal Justice Standard 15-2.4(f) ("It is the responsibility of the court to prevent abuse of voir dire examinations.").

[92]The Court notes that it need not even utilize questionnaires in light of its extensive voir dire examination. *See United States v. Phibbs*, 999 F.2d 1053, 1071-72 (6th Cir. 1993) (noting that the Court did not abuse its discretion in refusing to utilize defendant's proposed questionnaire).

Court that these venirepersons had a heightened interest in cases that they might potentially be called for jury service.  Absent their exposure to the jury questionnaires before trial, it is quite likely they would have not registered any familiarity with the case.

Second, in light of defense counsel's inappropriate, disrespectful and disruptive behavior during voir dire, it is the Court's solemn hope that they will focus their attention on the questionnaires and the venire during voir dire, without the luxury of having already made predeterminations about the venire.  It is the Court's view that defense counsel will necessarily focus their talents on studying the questionnaires and the answers to the voir dire examination at retrial, rather than exhibiting disrespectful and dismissive behavior apparently based on their pretrial evaluations of questionnaires and potential jurors.  After all, the Court has a solemn responsibility to maintain order and decorum in the courtroom.  And, good citizens reporting for jury service, at sacrifice of their time, convenience and personal responsibilities, should be honored and respected.  They should never be subjected to rude behavior or ill will of litigants or counsel.

Therefore, at the retrial, those reporting for jury service will fill out the questionnaires on the first morning they report for jury service.  The questionnaires will be copied and provided to counsel in small groups, as the individual voir dire proceeds rather slowly.  The Court will collect the copies of questionnaires and maintain control of them after voir dire, as well.

### *Court's Control of the Mode and Order of Presenting Evidence and Examining Witnesses*

As addressed above, defense counsel's conduct evidenced an attitude that they have of perceived control over the course and scope of the proceeding.  Rule 611 of the Federal Rules of

Evidence states otherwise:

> (a) Control by court.  The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time; (3) and protect witnesses from harassment or undue embarrassment.
> (b) Scope of cross-examination.  Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.  The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

The Court, not defense counsel, will control the mode of presentation of evidence and examination of witnesses.

### *No Direct Contact Between Edward Little and Richard Hathaway*

In light of Edward Little's accusation that Richard Hathaway had threatened and bullied him inside and outside of the courtroom, and the acrimony between these two counsel, Edward Little and Richard Hathaway shall have no direct contact during the trial.[93]  Since defendant Lake has a number of other counsel of record, and since the government is also represented by Assistant United States Attorney Christine Kenney, this restriction should not adversely effect the prosecution or defense of this case.

### *Christopher Wilson is Barred From the Courtroom*

In view of Mr. Wilson's blatantly hostile behavior directed at the Court and his blatant show of disrespect of the jury, the Court's order barring Mr. Wilson from the courtroom will continue

---

[93]See American College of Trial Lawyers Code of Trial Conduct ¶ 14(e) ("A charge of impropriety by one lawyer against another in the course of litigation should never be made except when relevant to the issues of the case . . . ." and preamble ("to opposing counsel, a lawyer owes a duty of courtesy, *candor in the pursuit of truth*, cooperation in all respects not inconsistent with the client's interests and scrupulous observance of all mutual understandings.") (emphasis added).

45

throughout the duration of the retrial and any related proceedings.[94]  Mr. Wilson is barred from

appearing in court in this case again.  It is important to note that Mr. Wilson played a minor role in the

first trial, and that defendant Lake, excluding Mr. Wilson, is now represented by eight counsel of

record.  It is also important to note that during the January 4, 2005 hearing, the Court placed defendant

Lake's counsel on notice that Mr. Wilson would be barred from the courtroom for the retrial, and that

if Mr. Little, or any other counsel acted contemptuously, other counsel should be prepared to proceed

with completing the trial.

### *Local Counsel*

On November 5, 2004, after a particularly egregious display by Mr. Little of his disrespect for

the Court,  the Court ordered him to contact local counsel, and advise them that the Court wanted

defendant Lake's local counsel present at all trial proceedings, commencing the next day, if possible.[95]

Although defendant Lake and defendant Wittig engaged local counsel who enjoy good reputations in

this Court, the presence of local counsel had no appreciable beneficial effect on the conduct of Mr.

Little and others.  As the Court noted,

> Mr. Robinson, Ms. Tibbets, I had them come up here how many weeks ago was  that?  It did
> not at all abate, unfortunately, which was my hope.  It did not at all abate Mr. Wilson's
> conduct.  And it didn't abate much either in terms of Mr. Little's inappropriate conduct either . .
> . . I've required the Hite Fanning law firm to sit here, and it still-- frankly, I don't know why I'm
> surprised, Mr. Robinson, that your presence didn't seem to make things any better.  Because if

---

[94]*See* ABA Criminal Justice Standard 6-3.10(a) ("Any person whose conduct in a criminal proceeding tends
to menace a defendant, an attorney, a victim, a witness, a juror, a court officer, the judge, or a member of the
defendant's or victim's family may be removed from the courtroom.").

[95]Tr. 1883-1885 (after Mr. Little effectively tells the Court that he does not believe her description of the
misbehavior of counsel sitting at the table with Mr. Little (Tr.  1774-1781)).

lawyers won't listen to me, I don't know why I thought they would listen to local counsel.[96]

Nevertheless, the Court orders that local counsel be present throughout the entire retrial proceedings.[97]

**IT IS THEREFORE ORDERED** that defendants' motions for recusal (Docs. 313 and 311) are DENIED.

**IT IS FURTHER ORDERED** that the government's motion to restrict the number of attorneys at counsel table during opening statements and closing argument (Doc. 288) is DENIED.

**IT IS FURTHER ORDERED** that the procedures and rules addressed in **TRIAL PROCEDURES** section of this order **shall** be followed by **all counsel**.

**IT IS SO ORDERED.**

Dated this 4th day of April, 2005, at Topeka, Kansas.

 S/ Julie A. Robinson
Julie A. Robinson
United States District Judge

---

[96]Tr. 7342-7343.

[97]*See* ABA Criminal Justice Standard 6-3.11, stating:

If an attorney who is not admitted to practice in the jurisdiction of the court petitions for permission to represent a defendant, the trial judge should grant such permission if the attorney is admitted to practice and in good standing in another jurisdiction. The judge may:
(a) grant such permission on condition that:
(i) the petitioning attorney associate with him or her as cocounsel a local attorney admitted to practice in the jurisdiction; [and]
(ii) the local attorney will assume full responsibility for the defense if the petitioning attorney becomes unable or unwilling to perform his or her duties . . . ."

47