jms

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03-40142-JAR |
| | ) | |
| DAVID C. WITTIG and | ) | |
| DOUGLAS T. LAKE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER ON LIMINE MOTIONS

This matter comes before the Court on a number of limine motions filed by both defendants David C. Wittig and Douglas T. Lake and the government.  All motions are fully briefed.  On May 17, 2005, the Court held a hearing and the parties offered argument on some of the motions.  The Court has considered the parties briefs and argument and is prepared to rule.

At the outset, the Court wishes to stress that limine rulings apply to all parties involved.  Thus, if a party receives a limine ruling preventing the admission of certain evidence or facts, that party will not be permitted to later seek the admission of those very facts in order to aid its case.  Such a practice of using a limine ruling as a sword, rather than as the intended shield is improper and will not be countenanced.  If a party seeks to use the Court's protective limine ruling as a sword, the Court will take immediate corrective measures, including but not limited to, instructing the jury that such conduct is highly inappropriate and that they should disregard the evidence, as well as disciplining the responsibility

parties.

**A.    Defendant Lake's Motion Renewing Motion in Limine to Exclude References to Ratepayer Harm (Doc. 420) & Defendant Wittig's Motion to Renew Same Limine Motion (Doc. 422)**

In this limine motion, defendants seek to exclude references to alleged harm to ratepayers because the Indictment charges a fraud on the shareholders, not the ratepayers, and therefore, any reference to ratepayer harm is irrelevant and unduly prejudicial.  Defendants note that during the first trial, the Court precluded the government from mentioning ratepayer harm in its opening, and during its case in chief without seeking prior authorization.  Ultimately, though, the Court allowed the government to mention ratepayer harm through testimony and exhibits relating to the Kansas Corporation Commission's (KCC) disapproval of the split off of the regulated and unregulated businesses, because defendants had opened the door by offering evidence that rates decreased, without offering evidence that a request had been made by the company to reduce rates.  Defendants additionally claim that they "will endeavor not to 'open the door' for the government to introduce evidence of ratepayer harm."

The government responds that the Superseding Indictment alleges: "Wittig and Lake structured a subsidiary, Westar Industries, Inc., to loot assets from the utility and leave debt behind in the utility *for the ratepayers*." (emphasis added).  Thus, evidence of ratepayer harm is highly relevant.  In addition, the government argues that this is merely a litigation tactic to use as a sword against the government, as defendants would obtain limine orders against the government and then undermine these orders by opening the door in an attempt to create error.

The Court agrees with the government that the issue of ratepayer harm is highly relevant.  The Indictment charges a conspiracy and scheme to defraud Westar, that, at fruition, would have harmed,

among others, the utility customers.  Although the Court barred the government from mentioning ratepayer harm during the opening statement at the first trial, the relevance of this issue became apparent, during the government's case, as it presented evidence concerning the objectives of the conspiracy and the likely effect on Westar should the split merger and spinoff happen.  Of course, defendants, despite successfully moving the Court to preclude the government from mentioning ratepayer harm, mentioned and presented evidence concerning such.  It became clear to the Court then, and remains clear now, that the potential ratepayer harm is intrinsic to the charged scheme and conspiracy, as is defendants' effort to gain KCC approval of the split merger and spinoff.  Consequently, the Court denies defendants' limine motions to exclude references to ratepayer harm.

**B.      Defendant Wittig's Motion in Limine to Exclude References to Fiduciary Duties (Doc. 424)**

          In this limine motion, defendants maintain that any reference to fiduciary duties owed by defendants to Westar and/or its shareholders is irrelevant, unduly prejudicial, and would mislead and confuse jurors under Fed. R. Evid. 401, 402, and 403, respectively.  They argue that the concept of fiduciary duty is civil in nature, and has no bearing on the charges in a criminal indictment.  They maintain that in the first trial, the government attempted to imply to the jury that breach of fiduciary duty was a  criminal act.  Specifically, defendants reference statements made by the government in its opening statement, witness examinations, and closing argument.  Finally, defendants maintain that references to fiduciary duty are prejudicial because many of the potential jurors either held stock in publicly traded companies or are familiar with corporate scandals and that the government intentionally seeks to "exploit[] and pander[]" to stereotypical views of executives involved in corporate scandals.

The government did not specifically address this motion, but filed a general response to the renewed motions in limine.  It maintains that the Court should not revisit prior rulings, as a general rule. At the limine hearing, the government argued defendants intentionally violated a known duty to Westar and shareholders by not disclosing certain things.  In this way, fiduciary duty is relevant to the criminal case.

The Court agrees with defendants that fiduciary duty is a civil concept and thus will grant this motion in limine in part.  The Court will prohibit the parties from asking whether defendants breached a "fiduciary" duty, although it is permissible to present evidence that defendants had a duty or responsibility to accurately and fully present or disclose certain information to certain officers and/or directors of Westar and/or related companies.  Moreover, the fiduciary duty owed by the directors, particularly the outside directors, is highly relevant evidence.  Indeed, the government alleges that, in the process of conspiring or scheming to defraud Westar, defendants Wittig and Lake thwarted the efforts of the directors to act in accordance with their role as fiduciaries by, for instance, hiding or failing to report compensation.  Thus, the Court will allow directors to testify regarding their "fiduciary duties." The Court will further allow evidence concerning pertinent duties or responsibilities of defendants Wittig and Lake but will not allow evidence characterizing any such duties as "fiduciary."

**C.     Government's Motion in Limine (Doc. 421)**

The Government asks the Court for a determination in limine of the admissibility of 15 categories of evidence.  Defendants respond that these 15 categories of evidence are not evidence at all, but rather defense arguments and themes.  The Court discusses each category in turn.

**1.  Pending arbitration brought by Westar against Defendants**

4

The government argues that the pending civil arbitration brought by Westar against defendants is irrelevant and arguably introduced solely to portray this criminal case as essentially a civil dispute. Thus, the only purpose furthered by mentioning the arbitration is to suggest to the jury that the illegal conduct alleged in the Indictment could be remedied elsewhere. The government stresses that the defendants' discussion of the arbitration in opening statements and closing arguments manifests the defense theme that Westar was running the show. If this evidence is relevant, the government asserts that its probative value is substantially outweighed by its potential to confuse the jury.

Defendants argue that they should be able to present evidence on the pending arbitration with Westar because it goes to the motive of government witnesses and eliminates confusion, created by the government's infusion of civil liability themes into its case, as to whether this is a civil or criminal matter. One defense theme in the previous trial was that the driving force behind the prosecution of this criminal case was Westar's desire, through a pending civil arbitration, to avoid millions of dollars worth of severance obligations owed to defendants Wittig and Lake.

The Court will grant this limine motion. The criminal trial is not the appropriate venue to try the civil arbitration proceeding. Moreover, injecting the civil arbitration into the criminal trial will confuse issues and the jury. The Court notes that it made a similar ruling in limine in the first trial regarding the civil arbitration. Nevertheless, defendants asked witnesses about the civil arbitration. Should defendants or the government violate the Court's limine order, all aspects of the civil arbitration will be admissible, including the amount Westar has expended and/or been billed for the internal investigation, the amount of compensation, severance and other benefits sought by defendants in the civil proceedings, and the amount of attorneys fees Westar has expended or been billed on behalf of the

defendants in this criminal action as well as in the civil proceedings.  Needless to say, evidence about the civil arbitration proceeding is potentially prejudicial to **all parties**, and the Court strongly cautions all parties to avoid any mention of the civil arbitration, the subject matters at issue, and/or the fees and costs accrued or expended in that civil proceeding or in this criminal proceeding.  Evidence concerning these matters is probative, and indeed central to trial on the forfeiture count; but the Court has bifurcated this trial because of the potential prejudicial effect of such evidence, and prohibits the introduction of this evidence, or even argument or suggestion of such evidence during the trial on Counts 1-39 of the Indictment.

### 2. Bias of Westar and Westar Employees

The government asks the Court to preclude defendants from attacking the credibility of witnesses who are Westar employees by asking them whether Westar would benefit from a guilty verdict.  The Court notes that if the jury convicts the defendants on Count 40, the forfeiture count, a conviction may well be a detriment to Westar.  The property would be forfeited to the government, not the victim Westar; and the Eighth Amendment would preclude a sentence that included both a judgment of forfeiture and an order of restitution.  Assuming *arguendo* that Westar has a financial interest in the outcome of the case, none of the **individual** witnesses can be charged with such an interest.

The government also asks the Court to prevent defendants from arguing that Westar has a financial interest for wanting defendants convicted.  This is improper as there is no evidence given to the jury on how legal concepts like collateral estoppel or res judicata might apply in a civil dispute.

Defendants state that an employer's and therefore an employee's possible interest in the outcome of the case is the very definition of bias, and thus plainly admissible.  The jury need not be

6

formally apprised of the technical legal concepts of res judicata and collateral estoppel to comprehend

that a criminal conviction of defendants will be beneficial to the company in a civil action against them.

The Court grants this motion in limine. Defendants will not be allowed to ask whether Westar

would benefit from a guilty verdict. However, cross-examination that Westar and its shareholders are

victims of the crime and that the witness is employed by the victim or is a shareholder of the victim, is

permissible impeachment evidence.

### 3. "Not like Enron"

The government asks the Court to preclude defendants from suggesting to the jury that this case

is "not like Enron." The government notes that the defense made reference to Enron in both opening

statements and closing arguments. In addition, defendants objected when the government attempted to

ask a witness if Arthur Andersen exists today and vociferously argued that the government was

improperly trying to mention Enron.

Defendants state such references are appropriate in the current climate, which is undeniably

hostile to well-paid corporate executives. Defendants must be able to argue the distinction between the

crimes charged in those cases and the crimes charged in this case to avoid confusion. Moreover,

during voir dire some jurors indicated that this case was similar to Enron, and defendants should be

allowed to dispel these notions in potential jurors.

The Court denies this motion in limine. It may be important, during voir dire, to ascertain

whether the venire has made such comparisons, favorably or unfavorably; and it is permissible for

counsel to argue during closing arguments that this case is or is not like Enron, World Com, or the like.

But that is argument; and it is impermissible for counsel to even mention this during: (1) opening

statements; (2) direct examination; (3) cross examination; or (4) argument or objections in the hearing of the jury.[1]

### 4. Evidence of Selective Prosecution

The government also asks the Court to bar defendants from offering evidence that "others did it too" in an effort to show that they are being singled out for prosecution. Examples cited by the government include that others misused the corporate jets; others did not list airplane travel on the D&O questionnaires; and others obtained benefits from split dollar life insurance programs. The government argues that the "selective prosecution" defense has nothing to do with whether defendants committed the crimes charged in the Indictment, as the guilt or innocence of others not on trial is not an issue for the jury. This evidence also has the potential of needlessly confusing the jury.

Defendants state that the government's claim of a selective prosecution defense is erroneous. Evidence of airplane use by others is relevant to defendants' alleged personal use of corporate aircraft, a specific intent crime. Since there was no written airplane policy, use by others of the planes is relevant to establishing the permissible uses of the planes and defendants' state of mind. Similarly, evidence of D &O questionnaires answered by other officers that also failed to disclose their use of the aircraft is relevant to whether defendants knowingly failed to disclose their alleged use of the planes or whether, instead, the planes were a perk that did not need to be disclosed.

The Court agrees that this evidence was not presented in the first trial to show selective prosecution, but rather to show defendants' intent or lack thereof. Evidence of intent is certainly

---

[1]Counsel are reminded that the Court has prohibited **speaking objections.** See Court's April 4, 2005 Order (Doc. 345).

relevant evidence.  Thus, the Court denies this motion in limine.  Should, however, defendants use this evidence as a selective prosecution tactic, the Court will give a cautionary instruction to the jury, noting that such use of the evidence is highly improper.

### 5.  Evidence of "Good Acts"

The government seeks to prevent defendants from introducing evidence that it characterizes as "good acts" evidence, such as defendant Lake's Major Project Summary introduced at the first trial. "Good acts"evidence is not admissible to negate criminal intent.

Defendant Lake responds that the evidence referenced by the government was not offered as good acts evidence, but rather to rebut broad allegations leveled against him by the government, including that he intended to "loot" Westar from the moment he joined the company; acquired planes that were not necessary; and failed to sell his New York home.  In addition, Lake's projects and work ethic are relevant to rebut the government's money laundering charges, which allege that literally every penny earned by Lake is tainted.

The Court denies this motion in limine.  The evidence identified by the government is not "good acts" evidence, but rather evidence that is relevant to the charges against defendants.  Consequently, this evidence is admissible.

### 6.  Guardian Redemption Provision

The government asks the Court to bar defendants from suggesting to the jury that an acquisition of Guardian by Westar would not have triggered the mandatory redemption provision of the Guardian series D and E shares by using a superceded document.  During the first trial, defendants cross-examined Bruce Akin about a certification of the series C preferred shares containing an "exception"

that would not have triggered a change in control (Ex. 113-J).  However, this "exception" was eliminated in amendments to Guardian's Articles of Incorporation on December 31, 2000 (series D) and April 27, 2001 (series E).

Defendants respond that the government's motion is a distorted use of a limine motion as it asks the Court to adopt the government's theory of the evidence, over defendants' theory of the evidence. This usurps the role of the jury.  If the government believes that certain exhibits were superceded, the government is free to prove this on re-direct.

This motion in limine is denied.  Whether or not the mandatory redemption provision would have been triggered is an issue for the trier of fact, not an issue for the Court to resolve in limine.   Both defendants and the government can argue, based on the admissible evidence, that the provision would or would not have been triggered.  Ultimately, this is an issue that the jury must decide.

### 7.  Award of Guardian Restricted Stock Units

The governments asks the Court to bar any suggestion by defendants that Westar issued additional Guardian RSUs after defendant Lake left Westar in December 2002.  During defendant Lake's direct examination, he admitted that "the practice of giving RSUs in stock other than Westar has apparently continued at this company."  Yet, the document (Ex. 5087) that defendant Lake referenced during his examination shows that Messrs. Sterbenz and Irick received RSUs in 2002, not after defendant Lake left Westar.

The defendants respond that the above testimony merely rebutted government witness Frank Becker's testimony regarding his recollection of the Human Resources Board's decision to grant long term incentive compensation in Guardian stock and his own understanding of the grant process.  In

10

addition, defendants sought to prove that no illegal activity was committed because officers of the

company were still holding Guardian RSUs.

This motion in limine is denied.  Testimony regarding when Guardian RSUs were granted and to

whom involve factual issues for the jury to resolve.  Moreover, placing an implausible spin on evidence

is properly handled by impeaching witnesses on cross-examination, not in a motion in limine.  The Court

reminds all parties, however, that asking questions or eliciting testimony which counsel knows lacks any

evidentiary basis, is a violation of ethical rules.  Should the Court ascertain that counsel has violated this

ethical rule, the Court will give a cautionary instruction to the jury to disregard the evidence, as well as

issue sanction(s) commensurate with the gravity of the violation.

### 8.  Guardian is No Longer Traded on a Public Stock Exchange

The government asks the Court to bar defendants from eliciting testimony that Guardian is no

longer traded on the public stock exchange and that this removal from public trading was involuntary.

The fact that Guardian *voluntarily* de-registered itself from being publicly traded in March 2003 after

defendants left Westar is irrelevant.  Moreover, the Guardian shares that defendants obtained from

Westar allegedly through material misrepresentations and omissions to Westar's HR Committee were

preferred stock that were never publicly traded.

Defendants respond that the status of Guardian's common stock is indicative of its financial

health, which is relevant to allegations in the Indictment.  In order to fully appreciate the risks involved in

defendants' choosing to take Guardian RSUs instead of Westar RSUs, since the Guardian RSUs could

potentially be worth more, defendants must present evidence of Guardian's weak financial condition

over the lengthy relevant time period, extending to the present.

11

This motion in limine is granted.  Guardian's conduct or financial health after defendants took RSUs is not relevant, for it is the defendant's intent and state of mind at the time they took the RSUs that is probative, not whether the RSUs ultimately gained or lost value.  Consequently, the parties are prohibited from: (1) suggesting to the jury that Guardian is no longer traded on a public stock exchange; and (2) suggesting that the Guardian RSUs lost value later.

**9.  The Rights Offering Never Happened**

The government asks the Court to prevent defendants from arguing or suggesting that they are not criminally responsible for a conspiracy to illegally enrich themselves in connection with the proposed rights offering because the KCC prevented it from happening.  A criminal conspiracy only requires proof of an agreement and an overt act in furtherance of the conspiracy, not accomplishment of the purpose of the agreement.

Defendants respond that the KCC's quashing of the deal is evidence that tends to make it less probable that the scheme charged between defendants Wittig and Lake could have existed, given the tremendous public and regulatory scrutiny of the deal.  This is also relevant to other defenses to the conspiracy charge, such as that the layoffs of 600 people were not tied to Project X.

This motion in limine is granted in part.  The parties are prohibited from suggesting that no crime occurred because the rights offering never happened, as this suggestion is contrary to the law.  If the parties suggest or argue that they are not guilty of the conspiracy charge because the purpose of the conspiracy never came to fruition, the Court will give a cautionary instruction to the jury, which will include the elements of a conspiracy.  However, the Court agrees that the KCC's quashing of the deal is relevant to show that the layoffs at Westar were not tied to Project X.  Thus, the parties may elicit

testimony that the KCC rejected the proposed merger, split off and/or rights offering, as probative of the issue of the nexus between the layoffs and Project X.

### 10. Disagreement about Protection One Europe

The government asks the Court to bar defendants from introducing evidence that they disagreed over matters not alleged in the Indictment, including whether Protection One should have sold its interest in Protection One Europe to an unrelated third party. This is irrelevant as to whether defendants conspired to commit the crimes alleged in the Indictment. Any marginal probity of this evidence is outweighed by the likelihood of confusion to the jury.

Defendants respond that evidence that alleged conspirators had frequent disagreements is relevant to show that there was no criminal agreement between them. This disagreement is also relevant to disproving the charged overt act that defendants conspired to put assets in a subsidiary to be split off, saddling the utility with debt, as Protection One Europe was one of these assets.

The Court will grant this motion in part. The parties will be allowed to present evidence that defendants disagreed about matters in the Indictment, including the overt acts alleged therein. Because disagreement surrounding Protection One Europe is relevant to an overt act in the Indictment, this evidence is admissible. However, the parties shall not elicit testimony regarding disagreement about matters not alleged in the Indictment because such evidence is irrelevant to the crimes for which defendants are charged.

### 11. Loss on Lake's House

The government asks the Court to prohibit defendant Lake from introducing evidence that he lost money on the sale of his Topeka home. The Indictment alleges that defendant Lake caused assets

13

of the Company to be depleted by obtaining $262,000 (15% of his $1,700,000 residence in New

York) under the Company's relocation program even though he had no intention of selling his home.

The fact that defendant Lake apparently lost money on the sale of his house in Topeka in 2003 has

nothing to do with whether he illegally obtained benefits under the Company's relocation plan in 1998,

over four years earlier.

Defendants respond that this evidence tends to show that defendant Lake did subordinate his

interest to that of his employer, and therefore passes the relevance test.  In addition, there is no

conceivable prejudice to the government from admission of this evidence.

This motion in limine will be granted.  Whether defendant Lake lost money on the sale of his

home in 2003 is not relevant to the initial relocation program.  The Indictment charges that Lake

exploited the initial relocation program by receiving money, ostensibly to relocate to Topeka, while

retaining his residence in New York.  Defendant Lake's intent regarding the relocation program is

measured at the time sought or obtained benefits from the relocation program, not four years later when

he sold his Topeka home.

### 12.  Gain on ADT Transaction

The government argues that defendants should be barred from introducing evidence or arguing

that Westar realized a $900 million gain in its sale of ADT stock and this fact excuses illegal conduct.

The government points to arguments during the first trial by defendant Wittig that "after ADT, Westar

could afford to do a number of things.  Like lease new airplanes."  Defendant Wittig also argued that

"The Company makes almost $900 million of profit.  And Mr. Wittig was rewarded for that."  That the

Company made a significant gain does not excuse defendant Wittig's split dollar life insurance policy

14

that exceeded his short term bonus, nor Wittig's waste of corporate assets by using the corporate jet for a European family vacation. Defendants cannot argue that something is not illegally obtained from Westar just because Westar made a lot of money.

Defendants respond that the ADT profits are relevant to show why John Hayes and defendant Wittig would recruit an investment banker like defendant Lake to work at a utility and why the Board of Directors would approve Lake's hiring on generous terms to induce him to take the job. Further, the profits are relevant to show why top executives deserve to be compensated in the millions of dollars, and are directly relevant to the split dollar life insurance policy.

The Court agrees that evidence of the ADT profits is relevant. Indeed, the ADT deal was the genesis of the split dollar life insurance policies. Any suggestion by defendants that the $900 million gain realized in the ADT deal excuses illegal conduct can be addressed preemptively or reactively by the government. Thus, this motion in limine is denied.

### 13. Cost of Westar Special Committee Investigation

The government asks the Court to preclude defendants from mentioning or seeking testimony on the cost of the Westar Special Committee investigation because it is irrelevant to all charges and potential defenses. Defendants respond that the 9.4 million dollar cost of the investigation bears on the degree of bias attributable to Westar employees testifying on the government's behalf, and is admissible for that purpose.

This motion in limine is granted. The cost of the Westar internal investigation is not proper impeachment evidence of Westar employees; the employees did not personally fund the internal investigation. This evidence is not relevant to any of the charges in the Indictment. Moreover, the

invocation of civil matters into this criminal case is potentially confusing to the jury. For these and the reasons stated in the afore section precluding evidence concerning the arbitration and civil proceedings, the Court prohibits evidence or argument about the cost of the internal investigation.

**14. SIFL and Aggregate Incremental Costs are Not Interchangeable**

The government asks the Court to prohibit defendants from arguing that SIFL and aggregate incremental costs are alternative methods of valuing the compensation to an executive for personal use of corporate aircraft. The Indictment alleges that part of the scheme to defraud and an overt act of the conspiracy, was that defendants avoided reporting of income on their tax returns. According to the IRS, the SIFL rate can only be used to value this personal use if a W-2 is timely issued for the year in which the benefit was received. If a taxpayer fails to timely report this use, then only the charter rate can be used. Incremental cost is not a method of calculating compensation for income tax purposes.

Defendants respond that the government's allegation requires the Court to pretend that there are no wire fraud allegations in this case and is contrary to the law. The government charges defendants with wire fraud based on SEC filings allegedly containing material omissions in the compensation tables relating to defendants' personal use of planes. According to the government, this is a material falsity, which constitutes wire fraud. Directly relevant to whether there was an omission, and if so, whether it was material, are specific SEC regulations governing the contents of corporate filings.

The Court takes this motion under advisement. The Court cannot definitively rule on the relevancy of the aggregate incremental cost valuation until the government presents its case. The Indictment charges, that as part of the scheme to defraud and among the overt acts of the conspiracy,

the defendants filed income tax returns that omitted income in the form of personal plane use.  The

Indictment further charges, that as part of the scheme to defraud, the defendants caused the company

to file proxies and other reports with the SEC.  Indeed, the wiring of the proxies is the basis (execution

and furtherance of the scheme) for a number of wire fraud counts.  To prove wire fraud, the

government must prove a scheme and artifice to defraud, which includes materially false statements,

representations or omissions.  The government must further prove that in execution and furtherance of

the scheme, documents or information was transmitted by wire.  The contents of the wires need not be

materially false, nor even false at all.   If the government's evidence is that the scheme to defraud

included false representations or omissions in the proxies themselves, then, the materiality of these

representations or omissions is at issue.  But, if the government's evidence is that these proxies were

wired in execution or furtherance of the scheme, the material falsity of these proxies is not at issue,

assuming that the government relies on other false representations or omissions as forming the scheme

and artifice to defraud.

 If the government relies on the proxies as including false representations or omissions that were

part of the scheme or artifice to defraud, then the SEC rules are admissible.   This is because the

proxies are statements, filed in public documents, and the value of the airplane usage is defined by the

SEC rules.  To the extent the value of the airplane usage is false, it is only materially false to the extent it

is not calculated in accordance with the SEC rules.  The public, in reading these proxies, is entitled to

disclosure pursuant to the SEC rules valuing airplane usage, no more and no less.

 But if the proxies are not presented as materially false representations or omissions, sufficient to

satisfy that element of proving the existence of a scheme or artifice to defraud, then the SEC rules are

not admissible.  In other words, even if the government presents the proxies as false or incomplete, so long as the government is not relying on the proxies as false representations or omissions underlying the scheme or artifice to defraud, then the SEC rules are irrelevant.  For, if the proxies are merely presented as information wired to effectuate the scheme, rather than as materially false representations or omissions, then the SEC rules are not probative, as the SEC rules are probative merely on the issue of the materiality element of proof.

Thus, the government may present evidence of the charter rate and SIFL rates, in conjunction with its evidence that Westar's past or developing policy required executives to disclose personal airplane usage using one of two options.  The government may present evidence of the charter rate and SIFL rates, in conjunction with its evidence that there were false representations or omissions on the Director and Officer Questionnaires.

The motion is limine will be granted to preclude evidence of the SEC rules, unless the government presents evidence that the proxies contained false representations or omissions.  Needless to say, until the Court hears the government's evidence, the Court cannot rule on this issue and takes this matter under advisement.  While this issue is under advisement, the parties **are precluded** from any mention, suggestion, or presentation of evidence concerning the SEC rules on calculating personal airplane usage using aggregate incremental cost.   The Court strongly cautions counsel that while this issue is under advisement, counsel shall not in any respect, attempt to inject the SEC rules or aggregate incremental cost, into the trial.  Any violation of this order will result in strong cautionary instructions to the jury and sanction(s) commensurate with the gravity of this violation.

## 15.  Use of Irrelevant Documents

18

The government asks the Court to prohibit defendants from introducing exhibits such as 10Ks, annual reports, and 14A proxy statements, unless they clearly go to defend against an allegation in the Indictment. Otherwise, use of these documents is simply an attempt to confuse the jury. For example, the Indictment alleges that Wittig caused his signing bonus to be accelerated and paid as a lump sum, which was not discounted for the present value of the money without the knowledge or approval of the board. The defense offered the public reports of Westar showing that the payment was disclosed; this is irrelevant evidence.

Defendants respond that this evidence is relevant under Fed. R. Evid. 401, which requires less than that the evidence "clearly go to defend against an allegation in the indictment." Moreover, objections such as this would be more appropriately handled by contemporaneous objections, so that the Court has the benefit of the context in which a particular document or filing is being offered into evidence.

This motion in limine is denied. The Court cannot rule whether a document is irrelevant without knowing the purpose for which the document is being offered. If the government or defendants believe that a document is irrelevant when offered in the context of the trial, the Court will entertain contemporaneous objections to the admissibility of the evidence at that time.

**D.    Government's Motion to Exclude Use and Reference to Matters Occurring After the Date of the Conspiracy Alleged in the Indictment (Doc. 432)**

In its motion, the government notes that defendant Lake recently provided a new exhibit list and new exhibits that were not previously marked or used in the first trial, including public filings of Westar

that describe events and transactions occurring within the Company after defendants resigned and after the date of the conspiracy alleged in the Indictment. These exhibits are: Lake Exhibit 5549, a form 8-K Report for Westar for the period April 12, 2005; Lake Exhibit 5550, a form Pre 14A for Westar for the period May 17, 2005; and Lake Exhibit 5551, a form 10-K for Westar Energy filed March 16, 2004, for the period December 31, 2004. Because the Indictment alleges a scheme that commenced in 1995, a conspiracy that commenced in 1998 and continued through February 2004, and defendants resigned in November and December of 2002, these exhibits are not relevant.

Defendants note that the government has marked a number of its own exhibits that fall beyond the arbitrary date set by the government, including Westar aviation policies from 2003 and 2004, years after defendants left the company. In addition, defendants assert that the Lake exhibits the government seeks to preclude are plainly relevant to allegations in the Indictment or matters that will be raised at trial. To defend their relevance now, however, would needlessly reveal defendants' litigation strategy. Thus, defendants urge the Court to address the admissibility of these documents as they are offered at trial.

The Court denies this motion in limine. It may be that some of the exhibits referenced by the government will ultimately be irrelevant to defendants' charges. However, the exhibits could just as easily become relevant in the course of the defense case. Objections to exhibits on relevancy grounds are most appropriately handled with contemporaneous objections at the time the exhibits are offered into evidence. Moreover, the Court notes that at the first trial, defendant Lake repeatedly asked the Court to instruct the jury that he left the company in 2002. Needless to say, if defendant Lake now takes the position that some matters occurring after he left the Company are relevant to his defense, the

Court is not inclined to give such a limiting instruction.

**E.      Government's Motion to Read Indictment to Jury (Doc. 433)**

The government moves to read the Indictment to the jury at the outset of the case.  By not reading the Indictment to the jury, the interests of justice are placed in a precarious position in that the finders of fact do not have any understanding of what they are receiving evidence on in respect to the allegations contained in the Indictment.

Defendants argue that there is no persuasive rationale for the Court to depart from its practice at the first trial and that there would be real prejudice to defendants if the Indictment is read to the jury at the commencement of the trial.  This would, in effect, give the government two opening statements.  Moreover, the Indictment is given an imprimatur to the grand jury's language, which cautionary language cannot cure, when read by the Court.

The Court will grant the government's motion to read the Indictment to the jury at the outset of the case.  The decision to read the Indictment to the jury at the outset of the trial is within the sound discretion of the Court.[2]  At the last trial, the Court declined to read the Indictment at all, largely based on the defendants' representations that there was *no* evidence supporting much of the lengthy narrative detailing the objectives of the conspiracy, the scheme and artifice to defraud and the many overt acts of the conspiracy.  Not only did the Court not read the Indictment, the Court provided the jury with very little information about the charges, given the defendants' assertions that this lengthy, narrative, "speaking" Indictment was prejudicial, and unsupported by evidence.

---

[2]*United States v. Polizzi*, 500 F.2d 856, 876 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120 (1975); *United States v. Gomez-Pabron*; 911 F.2d 847, 859 n.6 (1st Cir. 1990) (noting that it is not absolutely required that the Court read indictments to the jury at the beginning of trial).

Today, having heard the evidence at the first trial, and having compared the evidence with the charges for purposes of the defendants' Fed. R. Crim. P. 29 motions for judgment, the Court is aware that there was evidence supporting virtually all of the allegations in the narrative and other portions of the lengthy Indictment. To be sure, this "speaking" Indictment contains some language that is loaded, and this Indictment is framed and written in a manner that could be characterized as persuasive. On the other hand, this Indictment includes 39 counts (plus a forfeiture count), that charge a number of different offenses, including a complex conspiracy, a complicated scheme to defraud, money laundering and other even less familiar charges.

In long complex cases, it is often necessary to read the indictment both at the beginning of the trial and during the instructions to avoid juror confusion.[3] Similarly, it is within the discretion of the Court to decline to read an indictment on the ground that the indictment would unduly prejudice defendants.[4] Because this case is a complicated one, the proper balance to be struck, is for the Court to read the Indictment to the jury at the outset in an attempt to combat any juror confusion. Given the lengthy narrative in the Indictment, and the occasional loaded language, the Court will excise any prejudicial surplusage appearing in the Indictment, and where appropriate, will paraphrase the Indictment.

**F.    Defendant Wittig's Motion to Renew Motions in Limine (Doc. 422)**

Defendant Wittig also filed a motion to renew all limine motions filed in the first trial, including

---

[3]*Polizzi*, 500 F.2d at 876.

[4]*Gomez-Pabron*, 911 F.2d at 859 n.6.

22

the motions discussed below.  The government responds that these motions should be denied summarily

because the Court previously ruled on these very issues.

### 1.  Motion in Limine to Exclude Evidence of Bank Fraud Conduct (Doc. 192)

In the prior trial, defendant Wittig filed a motion to exclude evidence of bank fraud conduct.

The Court granted this motion in part, ruling that the government was limited to eliciting evidence that

the agreement between defendant Wittig and Del Weidner included a 1.5 million dollar transaction, and

that the purpose of the agreement between the two was to avoid banking procedures.  The Court does

not intend to alter this ruling.

### 2.  Motion in Limine to Exclude Government Exhibits 41D, 51E and 262D (Doc. 193)

Defendant Wittig previously moved to exclude government exhibits that fall within a certain

Bates number range because it appeared that other documents in the same Bates number range were

"conspicuously missing."  The Court previously denied this motion, ruling that although documents were

not provided to defendants, this omission was an unintentional error charged to the vendor.  Moreover,

there was no prejudice to defendants because they had access to the documents since October 1,

2004.  The Court does not intend to alter this ruling.

### 3.  Motions in Limine to Exclude Certain Powerpoint Presentations and Portions of Other Presentations (Docs. 201 & 202)

Defendant Wittig objected to Powerpoint Presentations of the government which show

photographs of his personal residence, the renovated executive suites of Westar, and hotels and

destinations in which defendants stayed or visited.  The Court previously denied this motion.  However,

the Court ordered the government not to linger on pictures of hotels and gave a cautionary instruction to

23

the jury, explaining that the hotel pictures had been taken from promotional materials and were puffery. The Court does not intend to alter this ruling.

### 4. Sealed Motion (Doc. 248)

Defendant Wittig also filed a motion to exclude evidence under seal. The Court previously ruled on this motion and does not intend to alter this ruling.

### 5. Motion to Strike Evidence and Restrict Argument Regarding Tax Treatment of Plane Usage (Doc. 273)

In this motion, defendant Wittig asked the Court to strike all evidence regarding the tax treatment of plane usage and SIFL and charter rates, instruct the jury that it should disregard such evidence and that this is not a tax case, and preclude the government from further argument to the contrary during closing. In the alternative, defendant Wittig asked the Court to admit his tax returns into evidence. The Court previously ruled that the tax returns were an attempt to vouch for defendant Wittig's credibility without him testifying. Moreover, the amendment of the return was an after-the-fact effort to report his use of the planes and thus not relevant to intent to commit the crimes charged. This evidence also had the potential to confuse the jury. The SIFL and charter rate evidence, however, was relevant. Thus, the Court denied this motion. The Court does not intend to alter this ruling.

### 6. Motion to Strike Evidence and Restrict Argument Regarding Corporate Governance Issues (Doc. 274)

In this motion, defendant Wittig asked the Court to strike all evidence of corporate governance issues and restrict the government from referring to corporate governance in its closing. Most of this motion, however, involved argument by defendant Wittig that his expert witness on the issue of

24

corporate governance should have been allowed to testify. The Court ruled that this motion was simply

a rehashing of the *Daubert* hearing on defendant Wittig's expert witness and therefore denied this

motion. The Court does not intend to alter this ruling. Any determinations on expert opinion evidence

will be resolved at the *Daubert* hearing in this case. Defendant Wittig is free to proffer his expert at the

*Daubert* hearing and the Court will determine at that time, based upon the posture of the evidence,

whether the expert will be helpful to the trier of fact.

**G.      Defendant Wittig's Designation of Expert Witnesses (Doc. 425)**

Defendant Wittig has filed his designation of expert witnesses, placing the government on notice

that he intends to call three experts in his defense: Robert Downs; Michael Lew; and Keith Swirsky.

The government has filed a response in opposition to defendant Wittig's designation, in which it asks for

an order barring the testimony of these experts because defendant Wittig has not complied with the

Court's General Order of Discovery and Scheduling, nor with Fed. R. Crim. P. 16. Essentially, the

government claims that it is entitled to more information about defendant's expected expert witness

testimony.

On December 30, 2003, this Court filed its General Order of Discovery and Scheduling.

(Doc. 18). This Order required both the government and the defendants to comply with Rule 16 of the

Federal Rules of Criminal Procedure on a reciprocal basis. Specifically, the Order

required disclosure of any written summary of testimony that the government intended to use

under Rules 702, 703 or 705 of the Federal Rules of Evidence. Under the General Discovery Order,

the defendants are to reciprocally comply. The government suggests that it has complied with the

General Discovery Order and Rule 16 as it does not intend to call any expert witnesses. Assuming that

the government provided such notice to defendants, defendants now have a reciprocal obligation to provide Rule 16 information to the government.

"Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure requires that a 'defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if--... the defendant requests disclosure under subdivision (a)(1)(G) and the government complies.' "[5]  "In other words, so long as the government complies with its own disclosure obligations, Rule 16(b)(1)(C) . . . requires that the defendant disclose to the government a written summary of an expert witness's proposed testimony."[6]

Rule 16(a)(1)(G) clarifies the type of notice to which a requesting party is entitled.  Pursuant to the rule, a written summary of the expert testimony is required.[7]  Further, the summary . . . must describe the witness's opinions, the bases and reasons for these opinions and the witness's qualifications."[8]  The 1993 Advisory Comments stress that a requesting party is entitled to a summary of the expected testimony and a summary of the bases of the expert's opinion.[9]  The summary of the bases of the opinion must be provided even if no formal written expert report exists and "should cover not only written and oral reports, tests, reports and investigations, but any information that might be

---

[5]*United States v. Sarracino*, 340 F.3d 1148, 1170 (10th Cir 2003).

[6]*Id.*

[7]Fed. R. Crim. P. 16(a)(1)(G).

[8]*Id.*

[9]*See* Fed. R. Crim. P. 16 Advisory Committee Notes (1993).

recognized as a legitimate basis for an opinion under Federal Rules of Evidence 703, including opinions of other experts."[10]

The Court has reviewed defendant Wittig's expert designation and finds that it complies with Rule 16.  Moreover, the Court notes that two of defendant Wittig's experts testified in the first trial so the government should be aware of the testimony these individuals will proffer.  Of course, if the experts are offered for testimony beyond the scope of their prior testimony, the government is not on notice unless such notice was otherwise given in accordance with Rule 16. The government also states that this expert testimony will not be helpful to the trier of fact and will consist of impermissible legal opinions. The Court believes that these issues must be resolved at a *Daubert* hearing, which will be scheduled as the case progresses.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Lake's Motion Renewing Motion in Limine to Exclude References to Ratepayer Harm (Doc. 420) is DENIED.

**IT IS FURTHER ORDERED BY THE COURT** that defendant Wittig's Motion in Limine to Exclude References to Fiduciary Duties (Doc. 424) is GRANTED IN PART.

**IT IS FURTHER ORDERED BY THE COURT** that the Government's Motion in Limine (Doc. 421) is GRANTED IN PART and DENIED IN PART.

**IT IS FURTHER ORDERED BY THE COURT** that the Government's Motion to Exclude Use and Reference to Matters Occurring After the Dates of the Conspiracy Alleged in the Indictment (Doc. 432) is DENIED.

---

[10]*Id.*

27

**IT IS FURTHER ORDERED BY THE COURT** that the Government's Motion to Read Indictment to Jury (Doc. 433) is GRANTED.

**IT IS FURTHER ORDERED BY THE COURT** that defendant Wittig's Motion to Renew Motions in Limine (Doc. 430) is DENIED.

**IT IS FURTHER ORDERED BY THE COURT** that defendant Lake's Motion to Join in Defendant Wittig's Motions in Limine (Doc. 419) is GRANTED.

**IT IS FURTHER ORDERED BY THE COURT** that defendant Wittig's Motion to Join Douglas Lake's Motions in Limine (Doc. 427) is GRANTED.

**IT IS FURTHER ORDERED BY THE COURT** that the government's request to bar the testimony of defendant Wittig's experts (Doc. 431) is DENIED.

IT IS SO ORDERED.

Dated this 23rd day of May 2005.

 S/ Julie A. Robinson
Julie A. Robinson
United States District Court

*Memorandum & Order on Limine Motions*