IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| vs. ) | Case No. 03-40142-01-02-JAR |
| ) | |
| **DAVID C. WITTIG and** ) | |
| **DOUGLAS T. LAKE** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM AND ORDER

On September 15, 2005, the jury returned a special verdict against defendants David Wittig and Douglas Lake on Count 40 of the First Superseding Indictment directing that certain property be forfeited as the proceeds of various crimes. On September 28, 2005, the government and defendant Lake entered into a Joint Proposed Preliminary Order of Forfeiture (Doc. 521). The government and defendant Wittig were unable to agree on a preliminary order of forfeiture, however, and this matter is now before the Court on the following matters: United States' Motion for Preliminary Order of Forfeiture as to David C. Wittig (Doc. 522); defendant Wittig's Motion to Stay Seizure and Disposition of Property Prior to Sentencing (Doc. 539); and defendant Wittig's Motion to Set Aside Special Verdicts of Forfeiture (Doc. 540), which defendant Lake has joined, in part (Doc. 543).

A hearing was held on December 12, 2005. The parties advised the Court that defendant

Wittig's motion to stay seizure and disposition of property had been resolved, and an agreed Occupancy Order would be submitted. After hearing argument and statements of counsel, the Court took the remaining matters under advisement. The Court has reviewed the parties' submissions and arguments, and is ready to rule.

*Procedural Background*

In this case, both defendants opted to have the jury determine whether the government has established the requisite nexus between the property and the offenses committed.[1] Although the Court denied the government's request to have the jury award a money judgment,[2] it did include an interrogatory in the special verdict forms asking the jury to quantify the value of the forfeited property, to the extent possible.[3] In addition, at defendants' request, the Court included an interrogatory asking the jury to identify from which offense or offenses the forfeited property was derived from or traceable to, giving three options: (1) conspiracy to commit wire fraud; (2) conspiracy to commit money laundering; and/or (3) wire fraud.

---

[1] Fed. R. Crim. P. 32.2(b)(4).

[2] *Id*. advisory committee's notes. Count 40 of the original Indictment included a request for a money judgment against both defendants for specific amounts relative to compensation and attorneys' fees; this request for money judgment was omitted from Count 40 of the First Superseding Indictment, which only requested forfeiture of specific property. During the first trial, the government submitted instructions requesting a money judgment for the defendants' compensation and attorneys' fees. The Court denied the government's request, and instead broke the items of compensation into the categories set forth in the First Superseding Indictment. The government did not renew its request for a money judgment at the retrial.

[3] This was done at the first trial out of an abundance of caution, as the decision in *Blakely v. Washington*, 542 U.S. 961 (2004), arguably raised the question of whether the jury should make this type of fact finding, as well as to help avoid any potential "double counting" that the defendants complained of. Although the *Blakely* issue was resolved by the retrial, the value quantification remained in the verdict forms at the retrial.

*Discussion*

**I.    Motion to Set Aside Special Verdicts of Forfeiture**

Wittig moves pursuant to Fed. R. Crim. P. 29(c), to set aside the special forfeiture verdicts with respect to six forfeited items on the grounds that the verdicts are inconsistent with the evidence presented at trial and must fail as a matter of fact and law.  Additionally, Wittig objects to the forfeiture verdict in its entirety based on the government's failure to prove the alleged crimes underlying Count 40, incorporating the defendants' joint renewed Rule 29 motions for judgments of acquittal (Docs. 493 and 541).  For purposes of this motion only, the Court will assume that there is sufficient evidence on the underlying crimes, and has advised the parties that it will defer ruling on those pending motions.

In reviewing a motion for judgment of acquittal, the court views the evidence in the light most favorable to the government.[4]  The court must uphold a jury's guilty verdict if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[5]  However, since the preponderance of the evidence standard applied to the forfeiture proceedings, the Court finds that this standard, as opposed to the reasonable doubt standard, should apply.[6]
Thus, the Court must inquire as to whether the evidence is sufficient to permit a reasonable jury to conclude that the government has proven, by a preponderance of the evidence, that certain property is subject to forfeiture.

---

[4]*United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir.1999) (citation omitted).

[5]*United States v. Haber*, 251 F.3d 881, 887 (10th Cir. 2001) (quoting *United States v. Schluneger*, 184 F.3d 1154, 1158 (10th Cir. 1999)).

[6]*United States v. Loe*, 49 F. Supp. 2d 514, 517 (E.D. Tex.1999).

The government sought forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Under § 981(a)(1)(C), property is subject to forfeiture if it constitutes or is derived from proceeds traceable to at least one of the offenses for which the defendant has been found guilty, in this case conspiracy to commit wire fraud, conspiracy to commit money laundering, or wire fraud.[7] As the Court explained in its supplemental forfeiture instructions to the jury, property "derived from" the proceeds of an offense means money or other property obtained directly or indirectly using money or any other source of wealth gained as a result of the offense.[8] Property "traceable to" means property where the acquisition is attributable to the offense for which the defendant has been found guilty, rather than from untainted sources.[9] A preponderance of the evidence means proof that something is more likely true than not true.[10]

Defendant Wittig objects to the special verdicts of forfeiture with respect to six specific items; defendant Lake partially joins as to two items. The Court will address each item in turn.

**A. Item 6 (split dollar life insurance policies, imputed income and payout)**

The jury determined that "Split Dollar Life Insurance policies, imputed income and payout" in the amount of $28,033,952 should be forfeited because such property constitutes or is derived from proceeds traceable to the crime of wire fraud. Defendant Wittig objects to the

---

[7]The Court denied defendants' motion to dismiss Count 40 on the ground that 18 U.S.C. § 981did not authorize criminal forfeiture for wire fraud without the special circumstances that need to be present under § 982. Since then, another court has recently joined the debate, concluding as this Court did, that CAFRA authorizes criminal forfeiture for wire fraud without special circumstances. *See United States v. Schlesinger*, 2005 WL 2737051 (E. D. N. Y., Oct. 7, 2005). The Court also held that § 981 did not authorize criminal forfeiture for money laundering, as there is an existing criminal forfeiture provision found at 18 U.S.C.§ 982.

[8]Supplemental Forfeiture Jury Instruction (Doc. 532).

[9]Doc. 532.

[10]Doc.532.

4

jury's verdict on two grounds. First, while recognizing that the extent of Westar's interest will be determined in ancillary proceedings, defendant argues that Westar, not Wittig, owns the split dollar life insurance policy. What remains, if anything, is Wittig's rights under the split dollar life insurance *agreement*, which defined the relationship between Westar and Wittig with respect to the split dollar life insurance policy. But, Wittig argues, the government did not ask, and the jury did not order, any rights under that agreement to be forfeited. Instead, the government asked the jury to forfeit only an insurance policy that does not belong to Wittig, and in which he has no interest.

Second, defendant Wittig argues that no evidence was presented that identified what "imputed income" was, much less the amount of any such income. In its special verdict, the jury adopted the government's reference to the face value of the policy, but identified no value for "imputed income." Similarly, while there was evidence at trial that Wittig received $4 million when he exercised his "put" right under the split dollar agreement in 2002, the government never requested during the forfeiture proceedings or in the special verdict form that the jury make any findings as to this item. Because the jury made no findings in its special verdict with respect to the value of "imputed income" or "payout," Wittig argues the Court cannot enter an order for an unspecified amount with respect to either of these items, and this portion of the verdict must be set aside.

Neither argument has merit. The jury forfeited to the government defendant Wittig's interest in the split dollar life insurance policy, imputed income and payout. Defendant Wittig alleges that he had no ownership interest in the split dollar policy, but rather, an indirect interest derived from the split dollar agreement. Wittig's primary concern seems to be with the extent of

his interest in the split dollar policy. This argument is premature and not his to make. As the government points out, a defendant does not have standing to object to forfeiture on the grounds that a third party owns the property.[11] Although the jury assigned a value to the property listed in Item 6 in the amount of $28,033,925, the face amount of the split dollar policy, this does not amount to a finding by the jury of the *extent* of the defendant's interest in the forfeited property. Indeed, the jury was instructed by the Court to not concern itself with anyone's ownership interest in the property, as the jury's responsibility is solely to determine whether the government has adequately proven the nexus between the offenses and the property.[12] A determination of the extent of a defendant's interest in the property is deferred until the ancillary proceedings.[13] Because the jury found that the government established the nexus between the offense and the property, the Court will enter a preliminary order of forfeiture "of whatever interest a defendant may have in the property without having to determine exactly what that interest is . . . ."[14]

Regardless of what the extent of Wittig's interest in the split dollar policy turns out to be, he does not dispute that he has an interest in the imputed income or payout. Contrary to defendant's claim, there was evidence presented at trial regarding the imputed income and payout. The evidence showed that Wittig received a split dollar agreement from Westar, knowing that it varied materially from the program as originally anticipated by the Westar board

---

[11] Fed. R. Crim. P. 32.2(c)(2).

[12] Fed. R. Crim. P. 32.2(b)(4).

[13] Fed. R. Crim. P. 32.2 advisory committee's notes.

[14] *Id.*

6

of directors. This material variance was that Westar purchased a split dollar life insurance policy for a premium of $3.4 million, or more than twice the short term incentive bonus to which defendant Wittig was otherwise entitled. The evidence at trial established that Wittig had the right to sell the death benefits back to Westar *up to* the face value of the insurance policy, or approximately $28 million. The evidence showed that this option to "put" death benefits for cash had no true relationship to the split dollar life insurance arrangement, and was not honest and fair disclosure to the Westar board. The split dollar policy could be worth up to $28 million in "put" benefits, but in any event, no less than $14 million under the terms of the split dollar agreement. Defendant Wittig amended his agreement through the pretense that he could exercise his "put" rights in small increments, then sold or "put" $4 million of his death benefits to Westar, receiving $2 million in cash, days after receiving a grand jury subpoena. This $2 million is the payout that the jury determined was subject to forfeiture.[15] The government also presented evidence that Wittig received $200,570.24 of imputed income from the split dollar life insurance policy.[16] The $28 million maximum value of the split dollar policy would necessarily encompass the imputed income and payout of $2,200,570.24. The evidence presented in this case is sufficient to permit a reasonable jury to conclude that the government has proven, by a preponderance of the evidence, that this property constituted or was derived from proceeds traceable to the wire fraud.

  **B. Item 8 (Long Term Incentive)**

During the forfeiture proceedings closing argument, the government requested the jury to

---

[15](Gov't Ex. 615).

[16]*Id.*

determine that Wittig's long term incentive had a value in the amount of $52,086.42. Defendant Wittig argues that the jury evidently rejected this evidence, because it returned a special verdict identifying the property as subject to forfeiture, but valuing the property at zero. Defendant Lake joins in this objection, which was Item 7 on his special verdict form.

The government responds as above, that the jury found a nexus between the property and the crimes, checking off on all three boxes that the property constituted or is derived from proceeds traceable to conspiracy to commit wire fraud, conspiracy to commit money laundering and wire fraud, and the interest of defendant in that property is now forfeited, whatever that interest may be. The fact that the jury valued the property at zero is irrelevant at this point in the proceedings. The extent of defendant's interest will be determined in the ancillary proceeding.[17]

### C. Items 15, 16 and 17 (property funded in whole or in part by the Capital City Bank Line of Credit: the Landon Mansion, art and furnishings and Ferrari)

The government contends that any item that was funded, in whole or in part, through Wittig's line of credit at Capital City Bank constituted "proceeds" of wire fraud because the line of credit was collateralized with assets the government contended were fraudulently acquired. Defendant Wittig argues that the evidence shows that the factual predicate for this conclusion--Wittig pledging "tainted" collateral to Capital City Bank--is lacking, and therefore, the line of credit cannot support complete forfeiture of the Landon Mansion, $700,000 in art and furnishings, and the Ferrari. Wittig argues that the special verdict demonstrates that the government did not succeed in proving by a preponderance of the evidence that the Westar stock was obtained by fraud because the jury refused to order the forfeiture of this stock. At best,

---

[17]This item was omitted from defendant Lake's Preliminary Order of Forfeiture. The Court will leave to the government whether to amend the order to include this item.

Wittig argues, the funds from the line of credit were "tainted" only to the extent they were collateralized by $1 million of Wittig's split dollar benefit, and the "taint" cannot exceed the proportionate value the split dollar agreement bears to the entire collateral, or 13.5%.[18]

The Court disagrees. The fact that the jury chose not to forfeit the Westar stock during the forfeiture phase of the trial does not provide defendant Wittig with relief, as inconsistent verdicts do not impeach findings of guilt.[19] The evidence at trial showed that as part of the scheme to defraud, defendants used sophisticated means to deprive Westar and its shareholders of the right to honest services and obtain stock and other compensation, under false pretenses. As part of this scheme, defendant Wittig obtained Westar stock as part of his compensation as well as from the change in control scheme. The evidence also showed that as part of the scheme to defraud, defendants Wittig and Lake caused to be added to their employment agreements, without the knowledge and approval of the Westar board, that upon a change in control, Westar would purchase their residences from them at the higher of the appraised value or the purchase price, plus all improvements, plus 17%. Although his residence had never been appraised at more than $2 million, Wittig used Westar stock received from Westar and split dollar benefits as collateral for a line of credit at Capital City Bank. Both items of collateral were proceeds traceable to the scheme to defraud. Using this line of credit, defendant Wittig intentionally over-renovated the Landon Mansion, expecting that Westar would have to pay him upon a change of

---

[18]Defendant arrived at the 13.5% figure by dividing $1 million (split dollar policy benefits) by $7.4 (total collateral).

[19]*United States v. Powell*, 469 U.S. 57, 64, 67 (1984) (a jury acquittal may simply be the result of the jury's "mistake, compromise, or leniency," rather than a conclusion that the defendant is not guilty; "sufficiency-of-the-evidence review . . . . should be independent of the jury's determination that the evidence on another count was insufficient"); s*ee also United States v. Sims*, 144 F.3d 1082, 1084 (7th Cir. 1998) (inconsistent forfeiture verdicts are no more problematic than inconsistent verdicts on substantive offenses) (citation omitted).

9

control in the Company. Thus, the Court agrees with the government that all assets that were acquired or funded out of the line of credit are derived from proceeds traceable to the wire fraud.

Defendant Wittig contends that the Landon Mansion, art and interior furnishings, and Ferrari are not subject to forfeiture. The Court addresses each property in turn.

**1.** *Landon Mansion*

Defendant Wittig first takes issue with the government's theory seeking forfeiture of the Landon Mansion--that Wittig's scheme to defraud Westar included a plan to over-renovate his residence and have Westar purchase it from him upon a change in control. The evidence at trial established that the change in control never came about and Wittig never actually received any funds from Westar for the Landon Mansion. Wittig acknowledges that for purposes of criminal liability, a scheme to defraud need not succeed in order to constitute a crime. But, he argues, in order to trigger a forfeiture, a fraudulent scheme must generate property that can be identified as proceeds of that crime, or property that is "traceable to" a crime. "[P]roperty 'traceable to' means property where the acquisition is attributable to the . . . scheme rather than money from untainted sources."[20] If the scheme alleged by the government never progressed to the point of generating proceeds, there is no basis for ordering forfeiture of those non-existent proceeds. Thus, Wittig argues, the government failed to show that the Landon Mansion was acquired through the scheme it described, and the Landon Mansion does not constitute proceeds of the wire fraud.

The Court disagrees. As previously discussed, the evidence at trial showed that use of the line of credit to over-renovate the Landon Mansion was part of defendant Wittig's scheme to

---

[20]*United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) (dealing with money laundering under 18 U.S.C. § 1957).

defraud Westar, an offense for which defendant was found guilty beyond a reasonable doubt. That the change in control never materialized does not alter the fact that proceeds traceable to the scheme to defraud were used to renovate the Landon Mansion. The Court will not overturn the jury's verdict on these grounds.

Defendant Wittig also argues that the government's evidence does not support forfeiture of the entire Landon Mansion. Instead, Wittig argues, the government only proved that he spent $3,763,237.76 from the Capital City Bank line of credit, based on checks from that account payable to Fritzel Construction. The Court agrees with this argument, if not the math. The government does not contend that the Landon Mansion was purchased or obtained fraudulently, but rather, that the fraud stems from its over-renovation. Wittig testified before the grand jury that the Capital City Bank line of credit funded the acquisition of improvements of the Landon Mansion, and that he put approximately $6.5 million into the residence. The government's evidence at the forfeiture proceedings, however, showed that checks were drawn on this line of credit between August 11, 2000 and October 11, 2001, payable to Fritzel Construction, in the total amount of $4,013,719.40.[21] Although the government contended that defendant Wittig spent approximately $6.5 million to renovate the residence, it did not offer any proof of additional expenditures on the renovation from the line of credit. By the government's own characterization, all assets that were acquired or funded out of the line of credit are derived from proceeds traceable to the scheme to defraud. While defendant Wittig may have spent $6.5 million to renovate the Landon Mansion, the government's proof at trial regarding payment to Fritzel Construction from the line of credit account was limited to approximately $4 million.

---

[21](Gov't Ex. 612).

Because the preponderance of the evidence does not support the jury's forfeiture of the entire Landon Mansion, the Court will reduce the verdict to reflect the amount actually expended to renovate the residence from the line of credit, or $4,013,719.40.

### 2. *Art and Interior Furnishings*

Count 40 sought forfeiture of "$1,974,289.20 in art and interior furnishings," as detailed in an insurance inventory dated June 2003. At trial, the government introduced a letter indicating that on April 19, 2001, Wittig notified Capital City Bank that "The house expenditures are winding down. I expect to pay Fritzel an additional 1.2 million, $700,000 for furnishings and 600,000 for landscaping, for a total of 2.5 million."[22] The government argued that this letter was evidence that Wittig in fact paid $700,000 for furnishings, that the $700,000 was part of the payments to Fritzel Construction, and that the same $700,000 was somehow related to the list of items attached to the Indictment. The government also introduced as evidence the list of furnishings that was attached to the Indictment.[23]

Bob Kobbeman of Capital City Bank testified at the forfeiture proceedings that he had no personal knowledge of the list of art and furnishings, and that he was unable to state how or when any item on the list had been acquired or if any had been acquired at all. The witness was unable to correlate the listed items with the $700,000 figure estimated by Wittig in his April 2001 letter to Capital City Bank, or with any specific expenditure ever made by Wittig. Kobbeman also admitted that he had no knowledge of any connection between Fritzel Construction and the items on the list. The government argued in closing that it had "showed

---

[22](Gov't Ex. 131M).

[23](Gov't Ex. 601).

during the forfeiture phase of this case that the furnishings were being acquired by Fritzel as part of the overall construction of the residence." Wittig argues that the government failed to prove anything with respect to the furnishings, much less that they were proceeds of a crime.

As discussed above, the evidence at trial showed that Wittig payed $4,013,719.40 to Fritzel Construction from the Capital City Bank line of credit. Of that amount, $1,215,025.70 was paid after April 19, 2001, the date of Wittig's letter to Capital City Bank. This is consistent with Wittig's representation that he expected "to pay Fritzel an additional $1.2 million." The government did not present evidence that Wittig paid an additional $700,000 for furnishings and $600,000 for landscaping from the line of credit, over and above the approximate $4 million discussed above with respect to the Landon Mansion. Notably, the government elected not to call any representative of Fritzel Construction or the home decorator to explain how these items were acquired. The only evidence offered was the list of items, dated June 2003, and the letter to Capital City Bank indicating Wittig expected to pay $700,000 for furnishings. Because the government did not prove by a preponderance of the evidence that Item 16, the art and interior furnishings, were derived from proceeds traceable to the wire fraud, the verdict with respect to this item is overturned.

3.  *Ferrari*

During the forfeiture proceedings, the government reduced its claim with respect to the Ferrari to $17,460, that part of the initial purchase price that the government showed was paid from the Capital City Bank line of credit.[24] Wittig characterizes the government's theory with respect to the Ferrari as essentially the same as the Landon Mansion. For the reasons stated

---

[24](Gov't Ex. 610).

above, the Court finds that the evidence with respect to the Ferrari is sufficient, and will not overturn the jury's verdict with respect to this property.

      **D.    Item 18 E (unpaid benefits claimed by the defendant as a result of a qualified termination) and Item 20 (any arbitration award)**

Under Item 18, subpart E of the special verdict form, the jury found that "unpaid benefits claimed by the defendant as a result of a Qualified Termination" constitutes or is derived from proceeds traceable to the offenses of conspiracy to commit wire fraud, conspiracy to commit money laundering, and wire fraud.[25] The jury was not asked to assign a value to the amount of these unpaid benefits. Under Item 20, the jury forfeited "any arbitration award granted to defendants Wittig and Lake, jointly or individually, arising out of their employment at Westar and any subsidiary or affiliate company," also linking this property to all three offenses, and assigning no value. Wittig argues that no evidence was presented at trial, either at the guilt or forfeiture phase, as to what those benefits are or whether any have been claimed. Lake joins in this objection, which relates to Item 14, subpart E and Item 16 of his special verdict form.

As evidence in support of these items, the government introduced a copy of the counterclaims prepared on defendants' behalf in an American Arbitration Association arbitration arising out of their employment with Westar.[26] Defendants argue that because the government failed to provide any evidence as to the nature or amount of these items, the effect of this deficiency, when read in the light most favorable to the government, is to assign the government an unspecified, and therefore worthless, interest in the property.

---

[25] Defendant does not take issue with the remaining subparts of Item 18.

[26] Defendants objected to admission of Government Exs. 254 and 255, on the basis that these counterclaims were submitted to Westar counsel, but not filed in the arbitration proceedings. The Court denied defendants' objection, finding this went to the weight of the evidence, rather than admissibility.

Defendants also argue that the jury did not accept the government's theory that everything that defendants Wittig and Lake obtained through their employment with Westar was "proceeds," because the jury specifically did not forfeit many items of their compensation, including short-term incentives, base pay, deferred pay, non-Guardian RSU's and other benefits. Thus, to the extent any arbitration award might encompass items specifically determined by the jury not to be proceeds, such items cannot be forfeited through the "back door" of the arbitration award. Instead, Wittig argues, to the extent any items were determined by the jury not to be proceeds, they are covered by the specific verdicts as to each item, and a general question on the special verdict form cannot circumvent those specific verdicts.

The Court finds that the evidence is sufficient to permit a reasonable jury to conclude that the government has proven, by a preponderance of the evidence, that this property is subject to forfeiture. The government alleged that defendants' employment agreements were fraudulently obtained. The jury heard extensive evidence regarding the terms of both defendants' respective employment agreements with Westar. The counterclaims prepared by both Wittig and Lake against Westar are detailed and comprehensive, clearly setting forth the amounts and basis of their claims against Westar in the arbitration proceedings. Defendants' claims stem from their respective terminations from Westar; Wittig's counterclaim amounts to $110 million and Lake's amounts to $220 million. Both defendants make specific claims against Westar for itemized payments and benefits required upon a "qualifying termination."[27] In addition to claims for compensation, both defendants assert multi-million dollar claims against Westar for violation of their right to privacy, deprivation of future earnings, and other causes of action. The fact that

---

[27] Gov't Ex. 254 at 4-5 (Wittig); Gov't Ex. 255 at 29-31 (Lake).

these claims are unliquidated or inchoate is irrelevant, as property subject to criminal forfeiture includes "tangible and intangible personal property, including rights, privileges, interests, claims, and securities."[28] As the Court explained above, because the jury found that the government established the nexus between the offenses and the property, the Court will enter a preliminary order of forfeiture "of whatever interest a defendant may have in the property without having to determine exactly what that interest is . . . ."[29]

The Court is unpersuaded by defendants' concern that any arbitration award might encompass items determined by the jury not to be subject to forfeiture, specifically those found in Items 1-5, 7, and 10-13 in defendant Wittig's special verdict form, and those found in Items 1-6, 8, and 10-12 in defendant Lakes' special verdict form. Unlike defendants' claims in the arbitration proceedings, these specific items of compensation are for liquidated amounts already paid to defendants, e.g., all base pay, short-term incentives, and health and dental benefits. By contrast, most of the compensation claims in the arbitration proceedings are for unpaid payments and benefits, or those defendants claim Westar is required to provide as a result of the "qualifying termination." Moreover, to the extent there is any overlap, the Court will not read into the jury's verdict declining the forfeiture of certain items as a rejection of the government's theory; the inference drawn from the jury's verdict could also be that they wanted Westar to recover these assets from the defendants through the arbitration proceedings, rather than forfeit them to the government. As stated above, inconsistent verdicts do not impeach the jury's findings. The Court will not overturn the special verdicts on these grounds.

---

[28] 21 U.S.C. § 853(b)(2).

[29] Fed. R. Crim. P. 32.2 advisory committee's notes.

## II. Motion for Preliminary Order of Forfeiture

The government seeks entry of a Preliminary Order of Forfeiture as to Wittig, requesting, *inter alia*, that it be authorized to conduct discovery and seize the specific property subject to forfeiture, whether held by defendant or a third party. Upon issuance of the Preliminary Order, the government will publish notice of the order and its intent to dispose of the property in such a manner as the Attorney General shall direct and notice that any third-party having or claiming a legal interest in the property must file a petition with the Court within 30 days, for a hearing to adjudicate the validity of the petitioner's interest in the forfeited property. The government also requests the Court enter an order continuing the restraining order previously entered on February 13, 2004 and April 5, 2004, with the exception of payments for attorneys' fees, until entry of a final order of forfeiture and the resolution of any appeals from the final order. Citing Rule 32.2(b), the government contemplates that the Court may include in the Preliminary Order conditions reasonably necessary to preserve the property's value pending an appeal, and that a hearing may be necessary to determine such conditions. Defendant Wittig responded to this motion with his motion to set aside special verdicts, *supra*, and a motion to stay seizure and disposition of property prior to sentencing (Doc.539). This latter motion dealt specifically with the Landon Mansion. The parties have indicated that this issue is to be resolved by an agreed Occupancy Order.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Wittig's Motion to Set Aside the Special Verdicts of Forfeiture (Doc. 540) is GRANTED in part and DENIED in part, and defendant Lake's Motion to Set Aside Forfeiture (Doc. 543) is DENIED.

**IT IS FURTHER ORDERED** that the Government's Motion for Preliminary Order of

17

Forfeiture as to David C. Wittig (Doc. 522) is GRANTED; the Court will enter a separate Preliminary Order of Forfeiture as to defendant Wittig reflecting the findings set forth herein. Defendant Wittig's Motion to Stay Seizure and Disposition (Doc.539) has been resolved by agreed order, and is DENIED as moot.

    IT IS SO ORDERED.

    Dated this  3rd  day of January 2006.

                                            S/ Julie A. Robinson
                                           Julie A. Robinson
                                           United States District Judge