**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 02-40140-02-JAR** |
| **vs.** ) | **03-40142-01-JAR** |
| ) | |
| ) | |
| **DAVID C. WITTIG** ) | |
| **Defendant.** ) | |
| ) | |
| _____ ) | |

## MEMORANDUM AND ORDER GRANTING GOVERNMENT'S MOTION TO REVOKE DEFENDANT DAVID C. WITTIG'S RELEASE PENDING APPEAL

This matter is before the Court on the government's Motion to Revoke defendant David

Wittig's release pending appeal in these matters (Docs. 278 and 564). An evidentiary hearing

was held January 6, 2006, at which time the Court took the matter under advisement, directed

defendant to provide an accounting, restrained defendant from making all but ordinary living

expenses, and continued the hearing until January 17, 2006 (Doc. 581). On January 13, 2006,

defendant provided an accounting to the Court, the government and the United States Probation

Office. The government subsequently filed a Supplemental Motion to Revoke Bond (Doc. 585),

and defendant responded (Doc. 584).

At the conclusion of the January 17, 2006 hearing, the Court made oral rulings. For the

reasons set forth in the record as supplemented below, the Court grants the government's motion

and orders the defendant remanded to the custody of the United States Marshal.

## I.     Evidentiary Timeline

Because the circumstances of this case involves three trials over a span of three years, a detailed history is necessary to place the current matter into context.

### *Pre-March 26, 2004 Appeal Bond*

On November 7, 2002, defendant Wittig was indicted along with Clinton Odell Weidner in a bank fraud and conspiracy case, Case No. 02-40140 (the "bank fraud case").

Between April 14, 2003 and May 23, 2003, defendant Wittig sold 161,605 shares of Westar stock for approximately $2.2 million, with proceeds wired to his individual Smith Barney account, #09995 (Gov't Ex. 7).  Defendant Wittig and his wife, Beth, sold their New York apartment for $13,509,431.65 on April 29, 2003, splitting the net proceeds and depositing the same in their respective Smith Barney accounts (Gov't Ex. 16).  On May 15, 2003, Beth Wittig sold approximately 31,484 shares of Westar stock for $456,003.58, with proceeds wired to her individual Smith Barney account, #10015 (Gov't Ex. 8).

On July 14, 2003, David Wittig was found guilty on Counts 1 through 6, in the bank fraud case.

On August 11, 2003, the Wittigs open two accounts at Silver Lake Bank; a joint account, #579327, and Beth Wittig's individual account, #579319 (Gov't Exs. 4, 5).

On December 3, 2003, before sentencing in the bank fraud case, defendant Wittig and co-defendant Douglas Lake were indicted in Case No. 03-40142,  regarding the alleged looting of Westar (the "Westar case").  This Indictment included a forfeiture Count 40, which sought forfeiture of, *inter alia*, Westar stock, as well as four counts alleging that certain financial transactions involving the sale of Westar stock, the proceeds of which were deposited into Smith

Barney accounts, constituted wire fraud and thus money laundering (Doc. 1). Counts 30, 31 and 34 involve the sale of defendant Wittig's Westar stock in April and May 2003; Count 32 involves the sale of Beth Wittig's Westar stock in May 2003.

Between April 15, 2003 and December 2, 2003, defendant Wittig made withdrawals on his Smith Barney account totaling over $6 million, leaving a balance of $315,079.08.

On December 30, 2003, Magistrate Judge O'Hara released both defendants on their own recognizance in the Westar case, and declined the government's request to set a number of conditions of release (Doc. 20). On January 28, 2004, this Court granted in part the government's motion to amend conditions of release (Doc. 43). The government urged the Court to impose certain conditions that it contended were reasonably necessary to ensure the "continued economic safety of the community," and proffered evidence that Wittig had liquidated approximately $2.6 million in Westar stock, as well as his apartment in New York City and a Birger Sandzen painting worth $125,000. The Court ultimately denied the government's request that it prohibit Wittig and Lake from "engaging in any purchase, sale or transfer of any real or personal property of any kind, or engaging in any monetary transaction of a value of $10,000 or more," without prior notice to the government and the Court, as well as "an accounting of the purchase, sale or transfer of any real or personal property of any kind, since January of 2002, of a value of $10,000 or more," as there was no evidence that defendants continued to engage in the type of acts they are alleged to have committed. Instead, the Court imposed restrictions on defendants' travel and directed them to surrender their passports. In denying the government's request for restrictions on financial transactions, the Court noted:

To be sure, where the charges include criminal forfeiture that is an indictment of the property itself, the government has an interest in locating and tracing property related to or acquired through alleged criminal conduct. However, the government must rely on its investigative means, as well as its rights to discovery granted under the Federal Rules of Criminal Procedure.   As the defendants posit, the Bail Reform Act was never meant to be a discovery device.  **On the other hand, as defendants are undoubtedly aware, if they engage in transactions intended to dissipate or hide property subject to forfeiture, such acts will not be countenanced.   If the government were to make a convincing showing, the Court would revisit the conditions it imposes today.**  And, if the defendants were convicted and the jury rendered a verdict in favor of forfeiture, the Sentencing Guidelines require an enhanced sentence for any obstruction of justice or court process. (emphasis added)

On February 13, 2004, the Court granted the government's *ex parte* application for a restraining order in the Westar case (Doc. 50), regarding "all Western Resources, Westar and Guardian International stock held by David C. Wittig and/or Douglas T. Lake, or any person or entity on their behalf, and any proceeds from the sale transfer or disposition of said stock.."  The order further restrained defendants and

> their agents, servants, employees, attorneys, **family members** and those persons in active concert or participation with him, and those persons, financial institutions, or entities who have any interest or control over the subject property, from attempting or completing any action that would affect the availability, marketability or value of said property, including but not limited to selling, assigning, pledging, distributing, encumbering, wasting, secreting or otherwise disposing of, or removing from the jurisdiction of this Court, all or any part of their interest, direct or indirect, in the subject property. (emphasis added)

In February and March 2004, Beth Wittig transferred a total of $3,198,000 from her Smith Barney account to her individual Silver Lake Bank account.  Without the government's knowledge, on February 24, 2004, Beth Wittig opened a Rydex account with a $25,000 deposit from her individual Silver Lake Bank account, and transferred a total of $3,163,000 from her Silver Lake Bank account to the Rydex account during this same time frame.

On February 27, 2004, defendant Wittig was sentenced to 51 months of imprisonment in the bank fraud case. That day, defendant Wittig filed a Motion for Release Pending Appeal (Doc. 215). On March 15, 2004, the government sent a letter to Wittig's counsel, Jeff Morris, advising that if the Court granted bond pending appeal, and adopted conditions of release suggested by the government, the government would oppose any transfers of property by David Wittig to his wife, Beth Wittig, and would consider an accounting for the whereabouts of all property previously held jointly by the couple to be part of the conditions of release (Gov't Ex. 1).

On March 23, 2004, Paula Junghans, of the law firm Piper Rudnick, defendant's trial counsel in the Westar case, sent the Court a letter summarizing the accounting requested by the government (Gov't Ex. 14). Junghans noted that the Wittigs sold their apartment in New York in April 2003, and that the net proceeds were divided equally between them at the time of settlement. She further noted that 106,822 shares of jointly owned Westar stock was sold on May 30, 2003, and remitted to their joint Smith Barney account, then divided equally between them. The accounting details the withdrawals from defendant Wittig's Smith Barney account, and states, "There have been no other transfers between Mr. and Mr. Wittig." The accounting failed to disclose, however, that on March 18, 2004, while the parties were negotiating terms of the bond, defendant Wittig transferred $250,000 from his Smith Barney account to the joint Silver Lake Bank account.

The Court granted defendant Wittig's motion for bond pending appeal on March 26, 2004 (Doc. 249), finding: (1) defendant's appeal will raise substantial questions of law, which in some instances constitute questions of first impression in the Tenth Circuit; (2) defendant is not a

danger to the community; (3) defendant poses no risk of flight; and (4) defendant is not prosecuting his appeal for purposes of delay. In addition, the order noted that Wittig had agreed with the government on two additional conditions:

1.    Defendant Wittig shall not engage in any purchase, sale or transfer involving any real or personal property of a value of $25,000 or more, or engage in any monetary transactions of a value of $25,000 or more without first notifying the United States Attorney's Office and the United States Probation Office for the District of Kansas, and obtaining the approval of the United States District Court Judge presiding over the case.

2.    Defendant Wittig shall provide to the United States Attorney's Office and the United States probation office for the District of Kansas, an accounting of the purchase, sale or transfer of any real or personal property of any kind since October of 2002, of a value of $25,000 or more, which accounting shall identify date of transaction, parties involved, value of transaction and the use or location of proceeds.

These conditions were incorporated with the conditions of release applicable to defendant Wittig in the Westar case.

### Post-March 26, 2004 Appeal Bond

On June 7, 2004, defendant Wittig wrote a check for $155,000 on an account at Capital City Bank and deposited the check into the joint account at Silver Lake Bank taking back $4,000 in cash (Gov't Ex. 4A). The Court does not agree with the government that the Capital City Bank account was tainted.[1] Nevertheless, this monetary transaction required disclosure and approval, regardless of whether it was a transfer from one joint account to another. No disclosure was made to the government, nor was Court approval obtained.

Jeff Morris, counsel for defendant Wittig, sent the Court a letter dated June 29, 2004,

---

[1] It appears that this account, which was a line of credit secured in part by Westar stock, was paid off, and the stock returned. That Westar stock was eventually sold and proceeds were deposited into defendant's Smith Barney account.

requesting the Court's approval for Mr. Wittig to accept a "gift" in excess of $25,000 for the purpose of using those funds to defray legal expenses (Doc. 579, Ex. 1). The letter stated that it was expected that the funds would be transferred directly to defendant Wittig's attorneys. That same date, the Court orally approved defendant's request and Beth Wittig transferred $750,000 from her Rydex account to her Merrill Lynch account, via wire. On July 1, 2004, Beth Wittig transferred $750,000 from her Merrill Lynch account to Piper Rudnick, via wire. On June 2, 2004, Beth Wittig paid Piper Rudnick $250,000 from her individual Smith Barney account, for a total payment of legal fees in the amount of $1 million. (Gov't Ex. 16).

On July 21, 2004, counsel for Wittig sent the Court a second letter requesting approval for defendant Wittig "to transfer unrestrained assets valued in excess of $25,000 to further facilitate payment of legal fees and expenses"(Doc. 579, Ex. 3). The parties had previously exchanged e-mails regarding transactions to pay legal fees, and the government indicated that it had "no problem," as long as the restraining orders were not implicated. Counsel for defendant Wittig represented to the government and the Court that the restraining order was not implicated. Again, the Court orally approved defendant's request, and there was no written order.

Between August 17 and 22, 2004, defendant Wittig transferred the following assets to Beth Wittig (Gov't Ex. 16 at 17-18):

- a $500,000 note and 2,066,965 shares of QuVis stock for $723,437.75, for a total transfer of $1,223,437.75;

- his one-half interest in the QuVis factoring pool partnership in the amount of $375,000;

- his $200,000 one-half interest in the Wittigs' jointly-owned

Scudder account; Beth Wittig opened an individual

Scudder account in the amount of $400,000;

- his one-half interest in the Wittigs' jointly-owned Deltec

account in the amount of $138,829.50; Beth Wittig opened

an individual Deltec account.

The total value of these assets transferred in August 2004 was $1,937,267.05. Neither

defendant's counsel nor the government were aware of the details or scope of these transfers.

On August 18, 2004, defendant Wittig transferred $60,000 from his individual Smith

Barney account to the joint Silver Lake Bank account. No disclosure was made to the

government, nor was Court approval obtained.

On August 23, 2004, Beth Wittig made a payment of $250,000 to Piper Rudnick from her

Smith Barney individual account. On August 31, 2004, she made a $250,000 payment to Piper

Rudnick from her individual Silver Lake Bank account. No disclosure was made to the

government, nor was Court approval obtained.

On October 15, 2004, Beth Wittig wired $300,000 from her individual Smith Barney

account to the joint Silver Lake Bank account. On October 27, 2004, defendant Wittig wrote a

check for $231,129.00 on the joint Silver Lake Bank account for payment of income taxes. No

disclosure was made to the government, nor was Court approval obtained for either of these

monetary transactions.

On January 27, 2005, the Wittigs divided joint assets when they split their income

tax refund; Beth Wittig wrote defendant Wittig a check from her individual Silver Lake Bank

account for $224,601.62, which he deposited into their joint Silver Lake Bank account, taking

back $4,000 cash.  No disclosure was made to the government, nor was Court approval obtained.

On June 13, 2005, defendant Wittig wrote a check on the joint Silver Lake Bank account for $34,277.22 for payment of insurance on the Landon Mansion. No disclosure was made to the government, nor was Court approval obtained.

On June 14, 2005, defendant Wittig transferred his interest in FoxRun/WACO to Beth Wittig, who wrote defendant a check on her individual Silver Lake Bank account for $228,076.30, which defendant deposited into the Wittigs' joint Silver Lake Bank account.  There is no corresponding payment of legal fees in that amount from the joint account in June 2005; instead, on June 15, 2005, Beth Wittig made a payment to Berkowitz Oliver law firm for $285,000 from her individual Silver Lake Bank account.  No disclosure was made to the government, nor was Court approval obtained.

On June 23, July 13, and August 15, 2005, respectively, defendant Wittig made $29,000 payments to Weil Gotschal, his appellate counsel, for a total of $87,000.

The second Westar trial commenced on June 14, 2005, and defendant Wittig was convicted of Counts 1 through 39 in the Westar case on September 12, 2005 (Doc. 512).  The jury also returned a special forfeiture verdict on September 15, 2005 (Doc. 534), forfeiting defendant's interest in specific items of property, although Westar stock was not forfeited.

Milt Ruble, with the United States Probation Office, met with defendant Wittig and counsel Jeff Morris on September 29, 2005.  Defendant and counsel were provided financial information forms at that time, and were given the deadline of November 1, 2005, to provide this information needed for the presentence report.  No financial information was submitted by defendant, and the initial presentence report was submitted on December 5, 2005.

On December 14, 2005, the government filed a Motion to Revoke Release (Doc. 564) moving the Court for a hearing pursuant to 18 U.S.C. § 3148, to determine whether the Court should revoke defendant Wittig's release pending appeal. The government did not seek a warrant for Wittig's arrest at that time.

## II.    Applicable Standards

There is no absolute right to bail pending appeal. Under 18 U.S.C. § 3143, as amended by the Bail Reform Act of 1984, a defendant who has been found guilty, sentenced to a term of imprisonment and filed an appeal or a petition for a writ of certiorari shall be detained unless the court finds that: (1) the defendant is not likely to flee or pose a danger to the safety of the community, and (2) his appeal is not for the purpose of delay but raises a substantial question of law or fact likely to result in a reversal or order for new trial.[2]

A defendant's bond and release pending the appeal of his federal conviction and sentence may be revoked upon a showing by clear and convincing evidence that the defendant (1) violated any other condition of his release,[3] and (2) is unlikely to abide by any condition or combination of conditions of release.[4] "Clear and convincing evidence" is an intermediate standard of proof. Evidence is clear and convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it, and refers to the quality rather than the quantum of proof. [5]

---

[2]18 U.S.C. § 3143(b).

[3]*Id.* § 3148(b)(1)(B).

[4]*Id.* § 3148(b)(2)(B).

[5]*Deghand v. Wal-Mart Stores, Inc.*, 926 F.Supp. 1002, 1017 n. 3 (D. Kan. 1996) (citations omitted).

**III.    Analysis**

**A.    Violation of Conditions of Release**

The Court finds that the government has shown by clear and convincing evidence that defendant Wittig has violated his conditions of release.  It is undisputed that Wittig was required to disclose to the government and seek approval from the Court any purchase, sale or transfer involving any real or personal property of a value of $25,000 or more, or any monetary transactions of a value of $25,000 or more.  Moreover, both defendant Wittig and his wife were restrained from any transactions involving Westar stock or proceeds therefrom.  Despite these restraints and conditions, however, the evidence provided by the government as well as defendant himself in the January 13, 2006 accounting reveals repeated violations of the restraining order and conditions of release that were both knowing and intentional.  Defendant purportedly made these transfers for money management purposes as well as to facilitate the payment of legal fees.  As the Court stressed at the January 17, 2006 hearing, however, the multi-layered transfers and transactions, as illustrated by the government's flow chart (Gov't Ex. 17) make no economic sense unless defendant Wittig was trying to create a web to disguise the nature of the transfers and hide the origin of the proceeds.

Although the Court made detailed findings at the hearing, it will briefly address the following significant transactions:

### *Transfers of Property to Beth Wittig*

After the Court granted counsel's request for defendant Wittig to transfer property to facilitate the payment of legal fees and expenses, defendant embarked on a flurry of transfers of

jointly-held assets to Beth Wittig, totaling $1,937,267.05. These transfers included defendant's interest in QuVis stock and note, the QuVis Factoring Pool, Deltec Securities and the Scudder Money Market account. The evidence at both hearings revealed that neither the government nor counsel for defendant was aware of the details or scope of these transfers. Defendant offered by way of explanation that, as consideration for these transfers, Beth Wittig agreed to pay defendant Wittig's legal fees on an ongoing basis. There was no evidence of documentation of this agreement between the Wittigs, however, which is further belied by the lack of payments to lawyers commensurate with the transfers, either temporally or in amount.[6]

The summary accounting provided on January 13, 2006, gives the appearance that the transfer of assets from defendant Wittig to his wife equals approximately the total amount of attorney's fees paid by Beth Wittig. The summary accounting indicates that the total legal fees paid by Beth Wittig post-June 2004 is $1,835,000. Of that amount, $1 million was paid to Piper Rudnick on July 1 and 2, 2004, corresponding with the June 29, 2004 request to permit defendant Wittig to accept a "gift" of legal payments from his wife. This leaves a total of $835,000 paid by Beth Wittig for defendant's legal fees after the August 2004 transfers of assets valued at over $1.9 million. Of that $835,000, $500,000 was paid to Piper Rudnick on August 23 and 31 2004, contemporaneous with the transfers. The remaining $335,000 was not paid until almost one year later: $285,000 to Berkowitz Oliver on June 15, 2005 and $50,000 to that firm on January 4, 2006.

Moreover, yet another transfer of assets occurred almost one year after counsel sought

---

[6]Moreover, as the government points out, at a hearing on a separate forfeiture matter held December 12, 2005, Paula Junghans, counsel for defendant, represented to the Court that it would be necessary to lift the order of restraint to defendant's "First Boston" account so that defendant could pay his appellate counsel.

approval of the July 21, 2004 "requested transfer." On June 14, 2005, defendant Wittig transferred his interest in Fox Run/WACO to Beth Wittig for $228,007.30. Beth Wittig wrote defendant a check in that amount from her individual Silver Lake Bank account, which he deposited in their joint Silver Lake Bank account. Assuming, *arguendo*, that defendant thought he was authorized to make the August 2004 transfers to facilitate payment of legal fees, he certainly did not have carte blanche to continue to make future transfers as long as they ultimately facilitated payment of legal fees. In fact, there is no corresponding payment of legal fees in that amount from the joint account in June 2005.

Finally, although not technically a transfer, the summary accounting indicates that the $60,000 defendant transferred from his individual Smith Barney account to the joint Silver Lake Bank account on August 18, 2004, was used to make payment to Weil Gotschal, his appellate counsel. The three $29,000 payments to that law firm, however, were not made until June, July and August 2005, hardly contemporaneous with the August 2004 transfer.

### Smith Barney Accounts

The evidence shows that defendant Wittig's account exceeded $6.4 million in April 2003; by the end of that year, the balance was approximately $315,000. On March 18, 2004, one week prior to entry of the appeal bond, defendant transferred an additional $250,000 from this account in clear violation of the restraining order. On August 18, 2004, defendant Wittig transferred $60,000 from this account to the joint Silver Lake Bank account, without disclosing the transfer to the government or seeking prior Court approval. To date, the balance in defendant Wittig's individual Smith Barney account is approximately $5,000.

With respect to Beth Wittig's Smith Barney account, the evidence shows that in

February and March, 2004, after the restraining order was in place, she transferred approximately $3.1 million to her individual account at Silver Lake Bank, and subsequently, to her Rydex account.  Beth Wittig then wired $750,000 from her Rydex account to her Merrill Lynch account, which then wired $750,000 to Piper Rudnick.  On October 14, 2005, Beth Wittig transferred $300,000 from this account to the joint Silver Lake Bank account.  Defendant argues that the $3.1 million represents the proceeds from the sale of the New York apartment and thus is not tainted.  As of December 31, 2005, the balance in Beth Wittig's Smith Barney account was approximately $1.5 million.

The evidence demonstrates that both of the individual Smith Barney accounts of defendant Wittig and Beth Wittig contained proceeds from the sale of Westar stock as well as proceeds from the sale of the couple's New York apartment.  The government contends that approximately $2.2 million in defendant Wittig's account and approximately $457,000 in Beth Wittig's account constitute the deposit of crime proceeds.  Because the Smith Barney accounts were tainted, the government argues, any further financial transactions from these accounts were tainted.  Defendant counters that the taint does not extend to the entire account balances, but only the extent of the tainted proceeds, and the government does not account for over $8 million in proceeds from the New York apartment sale deposited into the Wittigs' respective accounts.

Although the parties dispute whether all transactions from these accounts were tainted, it is undisputed that tainted assets were co-mingled with untainted assets.  Moreover, both defendant and Beth Wittig were familiar with the charges in the Westar case as well as the scope of the restraining order.  While the Court remains troubled by the co-mingling of tainted assets, it is neither required nor inclined to conduct a forensic accounting to unravel these transfers for

purposes of the pending motion for bond revocation. What is relevant to this hearing is that the determination of whether these assets were "tainted" or unrestrained was not for defendant or Beth Wittig to make. Instead, defendant was required to disclose and seek prior approval of *any* transfer or transaction from his Smith Barney account in excess of $25,000, which he failed to do on August 18, 2004, when he transferred $60,000 to the joint Silver Lake Bank account. Similarly, he was required to disclose any transfers in excess of $25,000 Beth Wittig made from her Smith Barney account to the couple's joint Silver Lake Bank account, which he failed to do on October 15, 2004, when Beth Wittig wired $300,000 to the joint account. This alone constitutes a clear violation of his conditions of release.

By so ruling, the Court does not mean to minimize the nature of the transfers by Beth Wittig from her individual Smith Barney account, which exceed $3 million and arguably violated the terms of the restraining order. Certainly, the routing of the transfers from account to account appears to have been made in an attempt to disguise the origin of the proceeds and is indicative of defendant Wittig's knowledge and intent. What is not clear is whether the transfers from Beth Wittig's individual account were in violation of defendant's conditions of release. Since the Court finds defendant violated these conditions by virtue of the above unauthorized monetary transactions, it need not reach this issue.

### B.     Unlikely to Abide by Any Condition of Release

The Court finds that the government has shown by clear and convincing evidence that defendant Wittig is unlikely to abide by any condition of release. Defendant has historically failed to make full disclosure of his financial information, whether in the context of seeking modification of the restraining order regarding advancement of attorney's fees, or in the context

of providing financial information to the United States Probation Office for purposes of its pre-sentence investigation. Defendant has repeatedly violated his conditions of release and the Court is not convinced that he will cease, despite counsel's assurances otherwise. Because defendant has accomplished precisely what both the restraining order and the additional conditions of his release were intended to avoid--the depletion and shifting of his assets--the Court finds that there are no additional condition or combination of conditions that will ensure the economic safety of the community against the intentional dissipation of assets by defendant Wittig to avoid the financial consequences of his crimes and to avoid the satisfaction of fines, forfeitures and restitution.

**IT IS THEREFORE ORDERED BY THE COURT** that the government's motion to revoke defendant David C. Wittig's release pending appeal, as supplemented on January 17, 2006 (Docs. 278 and 564) is GRANTED; defendant is remanded to the custody of the United States Marshal pending sentencing in Case No. 03-40142.

IT IS SO ORDERED.

Dated this  19th  day of January 2006.

 S/ Julie A. Robinson
Julie A. Robinson
United States District Judge