jar/ams

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 03-40142-JAR** |
| | ) | |
| **DAVID C. WITTIG and** | ) | |
| **DOUGLAS T. LAKE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM ORDER AND OPINION DENYING
## MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

At the close of the government's evidence, defendants jointly moved for judgment of

acquittal pursuant to Fed. R. Crim. P. 29(a) (Doc. 493); and at the close of the trial defendants

orally moved for judgment of acquittal. This Court took the motions under advisement.

Defendants Wittig and Lake subsequently filed a Joint Motion for Judgment of Acquittal (Doc.

541) on October 26, 2005.[1] Defendant Wittig filed a Motion for New Trial (Doc. 538); and

defendant Lake filed a motion to join in the motion for new trial (Doc. 544).

On March 27, 2006—over five months past the deadline for filing post-trial motions, and

on the eve of the sentencing hearing in this case, defendant Lake filed a Motion for Leave to File

a Supplemental Memorandum of Law in Support of Defendants' Pending Rule 29 Motions,

---

[1]The defendants also filed motions for judgment of acquittal on the forfeiture count (Docs. 540, 543). The
Court was required to rule on those motions before it could issue a Preliminary Order of Forfeiture. This Court
issued a Memorandum Order and Opinion (Doc. 575) denying the motions for judgment of acquittal on the forfeiture
count, while noting that should this Court subsequently grant the defendants' motions for judgment and new trial on
Counts 1 through 39, the Court might necessarily have to set aside its order denying the motions for judgment of
acquittal on the forfeiture count.

attaching the memorandum to his motion (Doc. 658). Defendant Wittig filed a motion to join in the motion for leave to file the same supplemental memorandum (Doc. 670), and the government objects to any consideration of this supplemental memorandum. Although the Court will grant defendant Lake's motion for leave and consider the memorandum in this order, the Court notes the extreme untimeliness of the motion. The October 26, 2005 original deadline for submission of post-trial motions was set in response to a request by defendants for an extension of time (Doc. 517). Additionally, the Court accommodated defendants' request to continue the sentencing hearing in this case from January 9 to April 3, 2006. Despite providing these extra months to defendants to prepare their post-trial motions and sentencing filings, the defendants waited until five months past the original deadline to add arguments that do not rely on new evidence or recent developments in the law. Nevertheless, the Court will consider the defendants' most recent filing along with the other post-trial motion briefs previously filed. For the reasons set forth in this opinion, the Court denies the motions for judgment of acquittal and new trial.

## I. INTRODUCTION

The first trial commenced on October 12, 2004 and concluded on December 20, 2004 when the Court declared a mistrial after the jury was unable to reach a unanimous verdict. The retrial of this case began with voir dire on June 14, 2005 and lasted over two months. The jury began deliberating on August 24, 2005 and returned its verdicts in the guilt phase of the trial on September 12, 2005 (Docs. 512, 515). The jury found defendant Lake guilty on Counts 1 (conspiracy), 3 through 15 (circumvention of internal controls), 16 through 18 and 20 through 22 (wire fraud), and 30 through 39 (money laundering). The jury found Lake not guilty on Count 2

(circumvention of internal controls), 19 (wire fraud), and 23 through 29 (money laundering). The jury found defendant Wittig guilty on Counts 1 through 39.[2]  The forfeiture phase of the trial began the next day and the jury returned split verdicts as to both defendants on September 15, 2005 (Docs. 534, 535).[3]

Most of the grounds asserted in these post-trial motions are either: (1) unsupported, "shotgun" challenges to evidentiary rulings; (2) rehashes of oral or written motions raised before or during trial and ruled on by this Court orally or in writing; or (3) challenges to the sufficiency of the evidence, based on the defendants' recitation of the facts or evidence viewed in the light most favorable to the defendants.  The Court has considered each and every ground raised in these motions, whether or not the Court had previously ruled on the same objection or motion. While the Court will not distinctly address each of the numerous points raised by defendants, the Court has considered them and concludes that no errors necessitating a new trial were committed and that the jury's verdict was reasonable and supported by sufficient evidence.  This lengthy order thus addresses the most salient arguments.

Notably, the defendants often couch their grounds for a new trial or judgment of acquittal by comparing certain pretrial and evidentiary rulings made by the Court before or during their first trial, with such rulings made before or during the retrial.  The Court observes at the outset, that with respect to evidentiary rulings, a comparison with rulings made in the first trial is not dispositive; rather the Court will evaluate the substance of the rulings made in the retrial, in light

---

[2]The conspiracy as charged against both defendants, included three objectives: conspiracy to commit wire fraud; conspiracy to circumvent internal controls; and conspiracy to commit money laundering (Doc. 126 at 7).  The jury's verdict included a special interrogatory, in which they unanimously found that the government had proven beyond a reasonable doubt all three of these charged objectives of the conspiracy as to both defendants.

[3]The Court has already ruled on defendants' motions to set aside the forfeiture verdicts (Doc. 575).

of the evidence presented in the retrial. The evidentiary rulings in the retrial were contemporaneous with the presentation of the evidence, and made in the context of the evidence presented at that time.

While the evidentiary rulings at the first trial are irrelevant, for evidentiary rulings are to be analyzed in the contemporaneous context in which they are made, limine rulings from the first trial were largely adopted by the Court upon retrial. There are a few exceptions; however, where the Court either excluded evidence it did not exclude at the first trial, or admitted evidence that it did not admit at the first trial. To the extent there are differences in the limine rulings in the first trial and second trial, it does not change the analysis, to wit: whether the limine rulings in the second trial were erroneous, and if so, prejudicially erroneous.

Notably, the second trial was not a mirror or carbon copy of the first trial; there were differences in witnesses, substance and scope of testimony, objections, arguments, evidence, strategies of counsel and order of proof. And, although many of the Court's limine orders continued in effect after the first trial, the Court ruled differently on some issues raised in limine motions filed before the retrial. Needless to say, pretrial rulings on limine motions are generally anticipatory of the evidence, and reliant on statements of counsel as to what the evidence will be. But in this case, this Court heard over two months of evidence during the first trial, which gave it a frame of reference beyond that available to a court ruling on limine motions in anticipation of evidence.

Moreover, the Court's frame of reference included the fact that in the first trial, defendants repeatedly abused the Court's rulings on limine motions. This Court granted a number of limine motions of the defendants, thus precluding the government from presenting

certain evidence, or placing parameters on the government's use of certain evidence.  These limine rulings were intended to protect or shield the defendants; instead the defendants repeatedly used these rulings to their tactical advantage.  Again and again, the very evidence this Court had precluded the government from offering was offered by the defendants in cross-examining the government's witnesses.  Often, the evidence was offered by the defendants in a manner suggesting that the government had not offered the evidence because they were trying to hide the truth from the jury.  This tactic was repeatedly employed by both defendants and was one of many ethical breaches and abusive tactics this Court attempted to prevent at retrial.[4]  The Court's limine rulings at the second trial necessarily took into account the defendants' abusive tactics with respect to certain limine rulings.

Thus, to the extent the defendants are challenging this Court's rulings on the basis that they were different than a ruling made during the first trial, such challenges are overruled and denied as improper.  The proper analysis is what error, if any, this Court made in its pretrial, limine and evidentiary rulings at the retrial.

## II.  MOTIONS FOR JUDGMENT OF ACQUITTAL

At the close of the government's evidence the defendants moved for judgment of acquittal and the Court took those motions under advisement.  The defendants moved for judgment of acquittal at the close of all the evidence and again in post-trial motions based on insufficiency of evidence on a number of grounds.

When considering a motion for acquittal under Fed. R. Crim. P. 29, the court may not

---

[4]*See* Memorandum and Order Denying Recusal and Memorandum Order of Trial Procedures (Doc. 345), in which this Court noted that defendants had secured favorable limine rulings, and then used those favorable rulings as a sword, suggesting to the jury that the government was improperly or sinisterly withholding certain evidence.

weigh the evidence or consider the credibility of witnesses.[5] The Court looks to the record and determines "only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find [defendants] guilty beyond a reasonable doubt."[6] Moreover, "while the evidence supporting the conviction[s] must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt."[7] The Court must defer to the jury's verdict so long as the government's proof meets this standard.[8] The Court denies the defendants' motions for judgment of acquittal, substantially for the following reasons.

## A.  *Evidence of Wire Fraud*

In order to establish wire fraud under 18 U.S.C. section 1343, the government must prove (1) a scheme or artifice to defraud, and (2) use of interstate wire communications to facilitate that scheme.[9] To prove a scheme to defraud, the government must show that the "conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension."[10] A wire is used in furtherance of the scheme if it "is incident to an essential fact of the scheme, or a step in the plot."[11]

---

[5]*Burks v. United States*, 437 U.S. 1, 16 (1978).

[6]*United States v. Vallejos*, 421 F.3d 1119, 1122 (10th Cir. 2005) (internal quotations omitted); *see United States v. Weidner*, 437 F.3d 1023 (10th Cir. 2006).

[7]*Id.* (quoting *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994)).

[8]*Id.* (citing *United States v. White*, 673 F.2d 299, 302 (10th Cir. 1982)).

[9]*United States v. Dowlin*, 408 F.3d 647, 658 n.5 (10th Cir. 2005).

[10]*United States v. Janusz*, 135 F.3d 1319, 1323 (10th Cir. 1998) (internal quotation omitted).

[11]*Id.* (citing *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989)).

### 1.      Nexus between the Scheme and the Wires

There was sufficiently strong evidence of a nexus between the scheme, as charged and the wires, as charged.  Not only were the wires used prior to and as one step toward the receipt of the fruits of the fraud; but, they were also used to maintain the ongoing viability of the fraud, by presenting a deceitfully rosy picture and a tellingly silent voice concerning the executives' management and compensation.

Here the wires at issue were: the 1998 and 1999 Form 10-K annual reports, and the 2000– 2001 10-Ks and proxies, as well as the 2002 proxy for Westar.[12]  The fruits of this fraud, as charged against defendant Wittig, spanned everything from Wittig's relocation and signing bonus provisions, obtained in 1995, to his causing Westar to prop up the KMF hedge fund, in which Wittig had a personal, undisclosed interest, with an investment by Westar in KMF in April 2000. The fruits of the fraud charged against defendant Wittig also involve the February 2002 falsification of the 2001 proxy statement, which omitted the $267,000 short term incentive bonus he had been awarded in 2001, as well as the split dollar provisions, as finally amended in June 2002, allowing a lump sum "put" of $4 million in death benefits to receive $2 million in cash.  The fruits of this fraud, as charged against defendant Lake, spanned everything from his use of the relocation provision in 1998 to Lake's abuse of the company loan program and receipt of a $1 million dollar loan in December 2001.

---

[12]Western Resources, Inc. was renamed Westar Energy, Inc. in 2001 (hereinafter "Westar" or "the company").  Westar operates as a public utility, and as a public company, is required to file periodic reports with the Securities and Exchange Commission ("SEC"), including: the 10-K annual report ("10-K"), the 8-K current report ("8-K"), and the 14A proxy statement ("14A" or "proxy").  The 10-K is required to be filed after the end of the company's fiscal year and is the most detailed of the reports.  8-Ks are filed after important events or changes in the life of the company occur.  Proxies contain compensation tables for the chief executive officer of a company and at least the next four most highly compensated executive officers.  These are required to be filed electronically with the SEC's Electronic Data Gathering, Analysis and Retrieval system ("EDGAR"), which makes the report available to the public.

The fruits of this fraud, as charged against both defendants, spanned everything from Wittig and Lake's personal use of corporate aircraft during the entire course of their respective tenures, to Wittig and Lake's obtaining additional compensation in early 2002 despite agreeing to salary reductions in 2001, to Wittig and Lake's manipulating the Board into agreeing to their receipt of Guardian International, Inc. ("Guardian") restricted share units ("RSUs") in January 2002, allowing a double dip of dividends and setting the stage for massive premiums upon the redemption of these into Series D and E shares, triggered by the change-in-control provision, *i.e.*, Richard Ginsburg's sale of one share of stock. The fruits of this fraud spanned Wittig and Lake's manipulating the Board of Directors, in April 2002, to approve an exchange offer of Westar RSUs to undervalued Guardian Series C shares, to Wittig and Lake's causing Westar to invest in QuVis in December 2001, a company in which they had personal financial stakes through themselves or their wives.

In short, the fruits of this fraud predated and antedated the charged wires, which spanned the time period of April 14, 1999 to May 6, 2002. Moreover, the charged wires—10-Ks and proxies, presentations to the investing public, the shareholders, and the outside directors—were critical to maintaining the ongoing viability of the fraud. There is substantial evidence that this fraud was intended to continue long past 2002. There were hurdles and obstructions in the way, such as the Kansas Corporation Commission ("KCC"), the outraged shareholders, dissident outside directors, Public Service Company of New Mexico ("PNM"), a New Mexico utility, backing out of a merger, and pesky internal auditors. Yet, the picture painted through annual filings masked the ugly and covered the lead with foolsgold.

## 2. Victims of the Fraud

Incumbent in the defendants' motions is an argument that the government failed to prove that the wired materials furthered the fraud, by failing to prove actual fraud, harm or loss, to specific victims. But it is important to note that while the government is required to prove a scheme to defraud, it is not required to prove actual fraud,[13] actual loss to a victim,[14] or actual harm.[15] Nor must the government prove the identity of a fraud victim, for that is not an essential element of the crime of wire fraud.[16] Thus, reference to the investing public in the Superseding Indictment does not rise to the level of an impermissible amendment of the Superseding Indictment. There is a distinction between an amendment and a variance to an indictment. A variance occurs when the evidence at trial differs materially from the facts alleged in an indictment. A defendant's right to adequate notice is not prejudiced where the defendant was not misled by such a variance. Prejudice occurs only when the variance creates a substantial likelihood that the defendant may have been convicted of an offense other than that charged by the grand jury.[17] Based upon the evidence submitted at trial and the record before the Court, defendants were not prejudiced in any way by a reference to the investing public as a victim in

---

[13]*United States v. Curtis*, 537 F.2d 1091, 1095 (10th Cir. 1976) (explaining that the success or failure of the scheme is immaterial under the mail fraud statute), *cert. denied*, 429 U.S. 962 (1976); *United States v. Reid*, 533 F.2d 1255, 1264 n.34 (D.C. Cir. 1976) (stating actual fraud is not required to prove mail fraud).

[14]*United States v. Pollack*, 534 F.2d 964, 971 (D.C. Cir. 1976) (stating that to hold that actual loss to a victim is required "would lead to the illogical result that the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim."); *accord United States v. Maxwell*, 920 F.2d 1028, 1036 (D.C. Cir. 1990).

[15]*United States v. Cochran*, 109 F.3d 660, 668 (10th Cir. 1997) ("where actual harm exists as a natural and probable result of a scheme, fraudulent intent may be inferred"); *United States v. Rybicki*, 287 F.3d 257, 262 (2d Cir. 2002) (finding the government need not prove either intent to cause the victim economic or pecuniary harm or that such harm actually resulted from the scheme to defraud), *rehearing en banc* 354 F.3d 124 (2d Cir. 2003), *cert. denied*, 543 U.S. 809 (2004).

[16]*United States v. Ruedlinger*, 990 F. Supp. 1295, 1297 (D. Kan. 1997).

[17]*United States v. Moore*, 198 F.3d 793, 795–96 (10th Cir. 1999), *cert. denied*, 529 U.S. 1076 (2000).

the Superseding Indictment.

### 3. Evidence in Support of the Government's Theories of False Statements and Lulling

Defendants argue that the proxies and annual reports were not false, or if false, not false to the "requisite material degree" to further the fraud, citing *Parr v. United States*.[18] This issue was raised in the defendants' pretrial motions, and addressed at length in the Court's pretrial rulings on these motions.[19] The Court will not reiterate its analysis and findings here, but incorporates the same in denying these motions for acquittal.[20] The government presented evidence establishing a nexus between the wires in question and the scheme to defraud. Notably, the defendants now acknowledge that the "bar is not high," for the government need only show that the wire be "incident to an essential fact of the scheme, or a step in the plot.[21]

---

[18]363 U.S. 370 (1960).

[19]*See* Docs. 181; 197 at 45–48.

[20]Viewed in the light most favorable to the government, there was sufficient evidence that the proxy statements and 10-Ks, which incorporated the respective year's proxy, included false statements, by commission or omission. The proxies included: "Information Concerning the Board of Directors;" "Executive Compensation;" "Compensation Plans;" and "Human Resources Committee Report."

There was evidence showing a number of other false statements or material omissions, including: (1) falsification of personal and corporate records and reports concerning personal use of aircraft; (2) misrepresentations that Wittig and Lake would be awarded only Guardian D series shares, when they actually arranged to receive Guardian D and E series shares; (3) misleading the Human Resources Committee and Board of Westar to authorize an exchange of Guardian RSUs, by representing that they would receive Westar shares or that the Guardian shares would vest as Westar shares, when in truth, they intended to receive Guardian shares; (4) Wittig's omission to Westar that he had a personal investment in QuVis and that his wife served on the Board, a potential conflict of interest, causing Westar to invest $4 million in QuVis; (5) falsification of the proxy for 2002, by failing to disclose that Wittig had been awarded a $267,000 short term incentive bonus for 2001; and (6) material omissions to the Westar Board and investing public of the various benefits and payments that the split, merger and rights offering would bring to Wittig and Lake, by virtue of a number of change-in-control provisions in a number of documents and by virtue of their plan for the new company to own Protection One, which in turn would own Guardian which in turn would trigger a change-in-control provision providing for substantial payment, as well as would trigger a redemption of undervalued Guardian shares. In short, the Superseding Indictment charges false statements and material omissions in a number of communications, oral and written, including the proxy statements and 10-Ks that are the subject of the substantive wire fraud counts.

[21]*Schmuck v. United States*, 489 U.S. 705 (1989); *United States v. Cardall*, 885 F.2d 656, 680–82 (10th Cir. 1989).

The requisite nexus exists if the mailings or wirings were necessary in maintaining the ongoing viability of the fraud.[22]

The defendants maintain that the government's theory on this element is "confused" in that the government has argued both that the proxies and annual reports were false, and that they "lulled" the investing public. Indeed, at the stage of pretrial motions and at the early stages of the government's case, this Court observed that it was unclear which theory the government was pursuing. The evidence demonstrated, subsequently, that the government was pursuing both theories.

The evidence suggested that the proxies and annual reports omitted items of compensation, or more often, failed to accurately describe or disclose the nature and extent of compensation. For example, defendant Wittig misrepresented to the Board of Directors the value of the "put" provision of the split dollar life insurance policy and how it operated. And, because the defendants disclosed no personal use of the airplanes, and defendant Wittig blocked an audit of personal use of the airplanes, the company did not disclose any executive compensation attributable to personal airplane usage. Nor did the company receive the benefit of a deduction for income attributable to executives' personal use of the planes, as discussed in detail, *infra*.

The proxies were based on incomplete, inaccurate, and fraudulently withheld information. Indeed, the jury heard a number of witnesses testify to this very issue, including David Schneweis who testified to his efforts to persuade the executives to claim the personal airplane usage as income to take advantage of the more favorable valuation. In fact, the

---

[22]*Schmuck*, 489 U.S. at 710–12; *Cardall*, 885 F.2d at 681–82; *see also supra* Part II.A.1.

defendants' expert Keith Swirsky also testified to this, bolstering the government's evidence on this issue.

Furthermore, a reasonable jury could find that these proxies were vehicles to lull the investing public, including Westar shareholders and investors. Courts have addressed this lulling aspect in the mail fraud context and have held these mailings are within the mail fraud statute "if they were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendant less likely than if no mailings had taken place."[23] Thus, mailings that do not include false information are no less part of the scheme if they are intended to be lulling.

Defendants argue that the government offered no evidence supporting a "lulling" theory. But there was evidence that while the proxies and annual reports purported to provide a complete picture of executive compensation to the investing public, they did not. Indeed, Jane Sadaka, a director, testified that although the Board of Directors should have had a complete picture of executive compensation, she attempted to ascertain the situation by examining the proxies and public filings, but could not determine the complete compensation package of the defendants. In addition, the defendants used these transactions to lull Westar, its shareholders and the investing public into the false sense of security that they could rely on the completeness of the information.

Further, the wires gave the defendants the added protection of deterring any complaints regarding their level of compensation, and therefore made the discovery of the defendants' scheme less likely than if the wires had not occurred. To the extent the value of the airplane

---

[23]*United States v. Pierce*, 400 F.3d 176, 180 (10th Cir. 2005).

usage did not trigger the SEC disclosure requirement, the proxies still "lulled" the investing

public into thinking that the company made an informed business judgment as to how to treat

personal use of the airplanes. But, these defendants schemed to defraud the company in a

manner that precluded the company from making any such informed business judgments.

In short, these theories are not mutually exclusive. A filed proxy can be false. Needless

to say, a false proxy can also lull the investing public through false statement or omission of

adverse information. A filed proxy can be true, yet lull the public because it does not represent

the statement of an informed company, but instead represents the statement of a company that

has been deluded and defrauded. There was evidence in this case that the proxies included both

false statements by commission and omission, as well as statements or information that lulled the

investing public.

Defendants further argue that the government should have been precluded from arguing a

"lulling" theory or seeking a "lulling" instruction, as either would constitute an impermissible

constructive amendment to the Superseding Indictment. Yet the Superseding Indictment does

mention lulling. Although the Superseding Indictment and jury instructions focused on the fraud

on Westar and its shareholders, there was no constructive amendment in presenting evidence

that the proxies defrauded or lulled the investing public. In fact, the investing public includes

Westar shareholders, and there was substantial evidence that Westar shareholders received

proxies by mail, and of course, like the rest of the investing public, had access to the EDGAR

system website as well.

To be sure, the defendants have always been on notice, through the extensive description

of the scheme and conspiracy in the Superseding Indictment, that the wired materials underlying

the wire fraud counts were electronically filed, publicly accessible proxies and annual reports. The defendants cannot have been surprised or prejudiced by evidence or argument that the proxies served to defraud or lull those who read them, in furtherance of the defendants' scheme to defraud the company and shareholders in many ways, including obtaining compensation unknown to the company, and/or obtaining compensation through misrepresentation, omission and false pretenses. Moreover, the defendants' argument that these filings were routine and required by law does not negate the fact that they could have been vehicles to lull the investing public, the Board of Directors and shareholders of the company.

Moreover, as noted hereinafter, there is no requirement that any particular victim or recipient relied upon the information. The information only must be material, or have a natural tendency to influence or be capable of influencing a decision.[24] Thus, the wires furthered the scheme and conspiracy by concealing the compensation of personal use of the corporate aircraft that should have been imputed to Wittig and Lake.[25]

### 4. Evidence of Interstate Commerce Element

Finally, there was sufficient evidence for a reasonable jury to find that the wires crossed into interstate commerce, thus satisfying the jurisdictional element of wire fraud. James Zakoura testified that since 1996, 10-Ks and proxies have been filed with the SEC, and that interested parties can access these reports online through the SEC's EDGAR system. Cynthia Couch, a Westar employee, testified that she was personally involved with the SEC filings and that since 1996, Westar's 10-Ks and 14As have been submitted electronically to the SEC. Couch explained

---

[24] *See Neder v. United States*, 527 U.S. 1, 16 (1999).

[25] *See Schmuck*, 489 U.S. at 715 ("The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time").

that the public reports were wired electronically from Kansas to a contract vendor located in Lancaster, Pennsylvania who put them in final form and then wired them from New York to the SEC in Washington, D.C.  Beth Forry, a representative of the contract vendor, R.R. Donnelley and Company, also testified corroborating Couch's testimony.

Moreover, the reports themselves show that they are pulled down from the EDGAR website, thus proving circumstantially that the interstate communication is involved in filing these reports.[26]  Clearly, these documents were in interstate commerce, as they were electronically transferred, several times, through the internet, which means they not only crossed interstate lines, they may have crossed international and intercontinental lines, as cyberspace has no "lines" at all.

### 5.        Proof of Reliance

In addition to arguing that there were no false or fraudulent statements in the wired documents, defendants argue that neither Westar nor its shareholders relied upon the electronically filed proxies and annual reports, such that these filings could not have furthered the fraud, nor been essential to the fraud.  Many of the defendants' arguments revolve around identifying the type of victim in this case and the victim's reliance.  But common law fraud requirements of justifiable reliance and damages have no place in federal mail fraud, wire fraud, and bank fraud statutes.[27]  Nor is the government required to prove the identity of a crime victim as an element of the crime.[28]  Accordingly, all of the defendants' challenges premised upon these

---

[26]*See, e.g.*, Gov't Ex. 205-CT18, which shows at the bottom that the record was pulled down from the government website of the SEC: "www.sec.gov/Archives/edgar/data."

[27]*Neder v. U.S.*, 527 U.S. 1, 24–25 (1999).

[28]*United States v. Ruedlinger*, 990 F.Supp. 1295, 1297 (D.Kan. 1997).

arguments must fail. Defendants' argument that there was no identified Westar shareholder who relied on the EDGAR filings instead of the mailed proxies and reports, is wholly without merit. As already discussed, identifying a victim is neither necessary to the proof, nor an element of the crime.

**B.** ***Evidence in Support of Conspiracy to Circumvent Internal Accounting Controls and Underlying Circumvention Counts***

    **1.    Conspiracy Liability**

The Superseding Indictment alleges a conspiracy between defendants Wittig and Lake to violate 15 U.S.C. sections 78m(b)(5) and 78ff by circumventing internal controls of Westar designed to account for use and disposition of assets to ensure accurate reporting as required by law.[29] Under 18 U.S.C. section 371, "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

Defendant Lake, joined by defendant Wittig, now argues that the circumvention of internal accounting controls statute may not serve as an object of the conspiracy, because a conspiracy to violate that statute is not an offense. Specifically, defendants argue that a plain reading of the circumvention statute and its legislative history support their contention that there is "a unique prohibition against the imposition of criminal liability" for conspiracy to circumvent internal accounting controls. Defendants argue for the first time in their most recent supplemental memorandum, that under the terms of section 78m(b)(4) and (5), no criminal liability may lie

---

[29]In addition to the money laundering and wire fraud objects of the conspiracy.

except for the "direct" violation described in section 78m(b)(5). Subsection (b)(4) provides: "No criminal liability shall be imposed for failing to comply with the requirements of paragraph (2) of this subsection except as provided in paragraph (5)."[30] Defendants argue that since subsection (5) does not explicitly provide for conspiracy liability, the government fails to allege a valid offense in the Superseding Indictment.

The Court disagrees. The plain language of section 78m(b)(4) and (5) does not prohibit liability for conspiracy to circumvent internal accounting controls.[31] And the general conspiracy statute applies to a conspiracy to commit any federal offense. Furthermore, none of the caselaw cited by defendants supports this proposition. In *Gebardi v. United States*, the United States Supreme Court held that when a statute explicitly exempts a class of defendants from criminal liability, a person in that class cannot then be prosecuted for conspiracy to violate the same statute.[32] This line of cases does not apply to the conspiracy charged in this case, nor does it support defendants' interpretation of the circumvention statute. Here, defendants assert that no person could be charged with conspiracy to violate the circumvention statute. But, *Gebardi* and its progeny concern the *class* of defendants allowed to be charged in the underlying statutes, necessarily acknowledging that certain classes of defendants may be charged in the underlying

---

[30]15 U.S.C. § 78m(b)(4).

[31]The Court additionally does not find support for defendants' argument in the legislative history of section 78m(b). Defendants' distinction between "direct" and "indirect" theories of liability under the statute is misplaced, as they do not explain how this language equates to a distinction between liability under the circumvention statute versus liability under the conspiracy statute. In contrast, conspiracy liability does create direct liability. The government correctly points out that most federal criminal statutes do not mention "conspiracy" or "aiding and abetting," yet this is not evidence that Congress did not intend to criminalize conspiracy or aiding and abetting for all of those statutes.

[32]287 U.S. 112, 121–23 (1932); *see also United States v. Castle*, 925 F.2d 831, 834 (5th Cir. 1991); *United States v. Bodmer*, 342 F. Supp. 2d 176, 181 (S.D.N.Y. 2004).

crime.[33]

Finally, defendants urge that neither may be convicted as a co-conspirator on the basis of a substantive circumvention violation by the other under a *Pinkerton*[34] conspiracy theory. Defendants state that because this form of conspirator liability is even more indirect than conspiracy liability itself, under this statutory analysis, neither defendant may be liable. For the reasons already discussed, the Court does not find that the circumvention statute prohibits liability on any type of conspiracy theory.[35]

Moreover, the government presented sufficient evidence of a conspiracy; thus, with respect to the circumvention counts as well as the other substantive counts (wire fraud and money laundering), the defendants can be found guilty on either an aiding or abetting or a *Pinkerton* conspiracy theory, particularly if there was sufficient evidence to prove the charged conspiracy and to link the substantive offenses to it.[36] There is evidence that personal usage of airplanes by one defendant was reasonably foreseeable to the other. This evidence includes evidence of flights in which the defendants, together with their families, flew together to Palm Beach and other

---

[33]*See, e.g.*, *Gebardi*, 287 U.S. at 121–23 (holding that Congress' clear intent, based on the plain language of the statute, to exempt transported women from all Mann Act prosecutions also exempts them from prosecution for conspiracy); *Castle*, 925 F.2d at 834 (holding that Congress' displayed clear intent to exempt foreign officials from the FCPA is not overcome by the general conspiracy statute). In *Castle*, for example, the court and government acknowledged from the outset that the foreign officials could not be prosecuted under the FCPA itself. Defendant Lake does not and cannot make such an assertion here.

[34]*See Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946) (holding that an overt act of one conspirator may be the act of all conspirators even if there is no new agreement).

[35]Defendants assert in their most recent supplemental memorandum to the Rule 29 motion that this argument, along with their "prior arguments that there was insufficient evidence to support the wire fraud and money laundering convictions, leaves no valid objective to support the conspiracy count." The Court takes this opportunity to point out that this, along with some argumentation on the money laundering conspiracy objective, is the extent of defendants' "prior arguments" addressing the conspiracy convictions.

[36]*United States v. Torres*, 162 F.3d 6, 10 (1st Cir. 1998).

recreational venues, without any apparent business purpose for a week or longer stay, except a sporadic, short meeting, if any. There is evidence that defendant Wittig flew to the Hamptons on flights that were shared, or linked to similar personal usage flights by defendant Lake to White Plains, New York. There is sufficient evidence of defendant Wittig's knowledge and wilfulness and the reasonable foreseeability of that to defendant Lake. Conversely, there is sufficient evidence of defendant Lake's knowledge and wilfulness and the reasonable foreseeability of that to defendant Wittig.

2. **Evidence that Defendants Knowingly and Wilfully Responded Falsely to the Director and Officer Questionnaires**

As addressed in connection with the defendants' motion for new trial, there was substantial evidence justifying a deliberate ignorance instruction with respect to the scienter element of the circumvention counts. Not only was there evidence that both defendants deliberately avoided and ignored the rules governing disclosure of their personal use of airplanes, much of that same evidence circumstantially showed that the defendants omitted this information from the Director and Officer ("D&O") questionnaires, with knowledge that such omission rendered the questionnaires false. D&O questionnaires were an annual filing that recorded transactions necessary to permit preparation of financial statements and to maintain accountability of assets (*i.e.*, use of assets, value received). For example, both defendants signed off on Westar's Ethics Code each year, which forbade any personal use of the corporate airplane.[37] The evidence established that Wittig and Lake falsified or caused to be falsified plane reservation logs, which always showed that trips were for business although Lake later acknowledged that a substantial

---

[37]Gov't Exs. 226; 226-1.

number of these trips were personal by his own definition.

Further, Wittig testified falsely before a Grand Jury that executives tended not to use the company plane for personal purposes, when he knew that he used the planes for personal purposes. The evidence showed that Wittig used the planes to shuttle he and his family, their nanny and their dog, to their Hamptons vacation home, his sons to summer camp, he and his family for a two week vacation in Europe, and he and his family to Texas to catch a connecting commercial flight for a vacation in Costa Rica. Lake was overseer of the airplane logs after Carl Koupal, the former Chief Administrative Officer of Westar, left the company. Lake was sufficiently concerned about Wittig's glaring personal use of the plane for a ten day European trip that he refused to initial the logs for that month.

Defendants further argue that the subject D&O questionnaires for Western Resources, Protection One, Westar Energy, or Westar Industries, ask about use of property of the particular corporate entity identified in the D&O, yet there was no evidence that use of aircraft should have been disclosed on any of these D&Os because there was no evidence that any of these entities owned or held a leasehold interest in the aircraft. Defendants contend that the sole lease in evidence was Westar Capital, Inc.'s ("Westar Capital") lease for the Citation X plane, but that lease does not show that there was a property interest conveyed. Defendants further argue that even if there was evidence that Westar Capital received a property interest in the aircraft, there is no evidence that any of the corporate entities, other than Protection One, made any lease payments. Defendants further posit that even with respect to Count 15, the evidence is insufficient, because while the 2002 proxy reflects that Protection One compensated Westar Aviation for the use of the aircraft in 2001, there is no evidence that Lake flew on an aircraft

leased by Westar Aviation and paid for by Protection One during that period. Thus, defendants argue that there is no proof that defendants' omissions on the D&Os were with knowledge that the particular entity had an interest in the aircraft used for personal trips.

But the government did produce leases and purchase agreements for two of the corporate aircraft, showing that Westar Capital had a leasehold interest in the two planes. The government also produced a purchase agreement on the third airplane, showing Westar Aviation, Inc. as the buyer. Moreover, there was evidence, including the testimony of Paula Cox, Westar flight coordinator, that despite the leases and purchase agreements held in the names of the subsidiaries, these were company aircraft, in light of the company's consolidated corporate structure, as well as its manner of treating the planes. There was evidence presented that Western Resources owned 100 percent of Westar Industries and more than 85 percent of Protection One. And Koupal testified that both Westar Capital and Westar Aviation, Inc., were wholly owned subsidiaries of Westar. These were related or affiliate companies, so the defendants had no reason to distinguish or differentiate this disclosure. These various entities were simply subsidiaries of a consolidated corporation. Westar included the financial results of these companies in its financial statements, including Protection One, which was not wholly-owned.

Finally, irrespective of which entity held the lease or purchase agreement for the planes, the tax department factored in plane usage on Westar's corporate tax returns. Thus the defendants' receipt of value in form of personal usage of the aircraft, the evidence suggests and a reasonable jury could find, required disclosure on each of these D&O questionnaires. A reasonable jury could find that given the consolidated financial statement, disclosure was required on each of these D&Os.

It is disingenuous for defendant Wittig, the CEO, and defendant Lake, overseer of the flight reservation logs, to disclaim knowledge as to which D&O for which entity required disclosure of plane use. Notably, both defendants were directors of Protection One and Westar Industries, as well as officers of Westar. Also, there was evidence that Westar Capital, the company that held the leasehold interest in the planes, was later called Westar Industries for purposes of the split merger and spinoff.

Furthermore, defendants' control over the corporate aircraft also belies the argument that they did not know what company "owned" the planes. Defendant Wittig's extensive involvement with the corporate aircraft was evidenced by the fact that he made all critical decisions regarding aircraft acquisition and use. Wittig also determined who could use the plane and what rate would be charged to other companies for plane usage. Wittig gave Annette Beck, President of Protection One, permission to use the corporate aircraft for Protection One business by telling her that they would be available for her use. He further determined that Protection One would be billed for use of the plane and he determined the rate. According to Beck, Wittig asked her to continue using the corporate aircraft for Protection One business so that he could justify purchasing another plane. And according to testimony of Cox, Beck, and Koupal, Wittig's assistant was in charge of receiving requests to use the plane. In addition, defendant Lake was responsible for the records; he began reviewing the flight logs in October 2001 after Koupal left the company.

In short, a reasonable jury could either find that defendants deliberately ignored the requirement to disclose their personal use of the airplane, or that the defendants actually knew about such disclosure requirements. The defendants were extensively involved with the corporate

22

aircraft, exerted control over the acquisition and use of the aircraft, or monitored and reviewed the use of the aircraft.  Their argument that the D&Os did not list the entity that held the lease or purchase agreement does not test the reasonableness of the jury's verdict, for a reasonable jury could find that irrespective of the ownership or interests of these related entities, defendants' knowledge or deliberate ignorance is evidenced by an important fact: the defendants did not list personal use of the corporate aircraft on *any* of the D&O questionnaires.  A reasonable jury could find that the defendants wilfully denied personal use of airplanes on all the questionnaires, because to do otherwise would have exposed their fraudulent conduct.

### 3.  Proof of Circumvention of a "System of Internal Accounting Controls"

Defendants argue that while the government presented evidence of circumvention of an "internal audit function," that is not a cognizable violation of 15 U.S.C. section 78m(b)(5),[38]

---

[38]15 U.S.C. § 78m(b)(5) provides:
> (b) Form of report; books, records, and internal accounting; directives
> . . .
> (5) No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2).

Paragraph (2) provides:
> (2) Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall—
> (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
> (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that--
> (i) transactions are executed in accordance with management's general or specific authorization;
> (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
> (iii) access to assets is permitted only in accordance with management's general or
> specific authorization; and
> (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any

which proscribes circumvention of a system of internal accounting controls. The government responds that there is no legal distinction between internal accounting *controls* and internal accounting *functions*, for "[i]nternal controls, whether labeled audit or accounting, are intertwined issues and serve the same purpose."

As the government posits, the purpose of the statute is to make certain that companies subject to SEC regulation keep accurate records regarding the use and maintenance of corporate assets so that such information will be accurately reported in the companies' financial statements submitted to the SEC and the public.[39] When assessing the adequacy of a system of internal controls, the investigating authority considers the following factors: (i) the role of the Board of Directors; (ii) communication of corporation procedures and policies; (iii) assignment of authority and responsibility; (iv) competence and integrity of personnel; (v) accountability for performance and compliance with policies and procedures; and (vi) objectivity and effectiveness of the internal audit function.[40]

The government proved through the testimony of Jenny Tryon, the company's Audit Director, that monitoring internal controls is a function of the auditing department, and that for most audits her office performed, they evaluated internal controls to make sure such controls

---

differences; and
**(C)** notwithstanding any other provision of law, pay the allocable share of such issuer of a reasonable annual accounting support fee or fees, determined in accordance with section 7219 of this title.
15 U.S.C. § 78m(b)(2).

[39]*See* 15 U.S.C. § 78m(b); Walter Perkel, *Foreign Corrupt Practices Act*, 40 Am. Crim. L. Rev. 683, 687–91 (2003) ("The purpose of the internal control provision is to ensure that issuers use accepted methods of accounting when recording economic transactions or protecting assets.").

[40]Perkel, *supra* note 39, at 690; *see also* David M. Willis and Susan S. Lightle, *Management Reports on Internal Controls*, J. Acct. Online (Oct. 2000), *at* http://www.aicpa.org/pubs/jofa/oct2000/willis.htm ("The most frequently cited functions of the internal audit department were monitoring compliance with the internal control structure and assessing its effectiveness.").

existed and were operating properly. Essentially, internal audit function and internal controls are synonymous terms referring to the same concept. Because the purpose of the statute is to maintain accurate books and records for the company, the charged conduct—disallowing the Audit Director to conduct an audit of the use of the corporate aircraft (an asset)—falls within the purview of the statute.

The statute defines "system of internal accounting controls" as a system sufficient to provide reasonable assurances that transactions are executed in accordance with management's general or specific authorization, that transactions are recorded as necessary to permit preparation of financial statements, and to maintain accountability for assets.[41] A "book, record or account" are those which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company.

Internal audit records are also records that are used for internal controls, and that fairly reflect transactions and dispositions of assets and maintain accountability for assets. Defendants argue to the contrary, that "internal audit records" are a part of a "system of internal accounting controls." The fact that defendant Wittig rejected Tryon's attempt to perform an internal audit recommended by Arthur Anderson, an outside accounting firm, does not mean that there was no system of internal accounting controls. Internal audits are in fact a system of internal accounting controls. And the fact that Wittig refused an audit does not mean that there was no system. In fact, the evidence showed that there was a system, of flight logs and plane logs, which was the system that Tryon was attempting to audit, and that defendant Wittig circumvented by refusing her request to audit.

---

[41] 15 U.S.C. § 78m(b)(2); *see also* § 78c(37) (defining "records").

### 4.    Proof of Circumvention on Count 9

Defendants further argue that Wittig could not have prevented Tryon from performing an internal audit. Tryon testified that she had an independent right and duty to perform audits but that Wittig, nonetheless, prevented her from conducting an audit, by thwarting her efforts. Despite Tryon's authority to conduct an audit, she did not have access to the flight logs and she did not know who was in possession of them. Other evidence showed that for most of the subject period, defendant Lake oversaw the flight logs. When Tryon asked defendant Wittig for access to the flight logs, he refused, despite her repeated explanations to him that she needed them for an audit. Defendant Wittig repeatedly rebuffed her attempts and finally ordered her not to conduct the audit. Notably, although she had survived an earlier restructuring and had been assured that her job was secure, one or two days after Tryon asked Wittig for the flight logs, Westar management presented Tryon with an "offer" for a severance package, under terms that made it unreasonable for her to do anything other than resign. A reasonable jury could thus conclude that although Wittig was not supposed to have authority to refuse Tryon permission to conduct the audit, he effectively denied her the ability to do so. A jury could reasonably conclude that Wittig circumvented the company's internal controls by blocking an internal audit, and by getting rid of the Audit Director.

*C.    Evidence of the Money Laundering Objective of the Conspiracy Charge and Underlying Money Laundering Counts*

### 1.       Interdependence

Defendants argue that they should be granted judgment on the money laundering objective of the conspiracy, for there was insufficient evidence of the essential element of interdependence with respect to this charge.  Defendants further argue that the government offered no evidence that any of Lake's monetary transactions underlying the money laundering charges furthered either the conspiracy or Wittig's goals.[42]

Interdependence is not an element of 18 U.S.C section 1957, and thus the government is not required to prove interdependence with respect to the underlying money laundering counts.  But, defendants correctly posit that in the Tenth Circuit, interdependence is an essential element of the conspiracy charge.[43]  As long as there is evidence of interdependence with respect to the conspiracy, there is no requirement that interdependence be shown with respect to any substantive offense, simply because that was an object of the conspiracy.  To establish the interdependence element of conspiracy, "[a] defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role . . . ."[44]  The government only needed to prove that the defendant "knew at least the essential objectives of the conspiracy, and . . . knowingly and voluntarily became part of it."[45]

---

[42]Counts 33 and 35 through 39 are the money laundering counts surrounding Lake's sales of Westar stock. Counts 30 through 32 and 34 are Wittig's sales of Westar stock.  Counts 23 through 29 do not involve sales of Wittig's Westar stock; rather, these counts are Wittig's transactions relating to a line of credit he had at Capitol City Bank and a loan at that institution.  Counts 23 through 29 do involve defendant Wittig's pledge of Westar stock to Capitol City Bank, however.

[43]*United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005); *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992), *cert. denied*, 507 U.S. 922 (1993); *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990), *cert. denied*, 498 U.S. 874 (1990).

[44]*Small*, 423 F.3d at 1182.

[45]*Id.*

The government provided substantial evidence that Lake and Wittig were interdependent with respect to this objective of the conspiracy (as well as with respect to the other two objectives of the conspiracy). Defendant Lake certainly depended on defendant Wittig to cause the production of various agreements and documents triggering, generating, accelerating and maximizing various components and types of compensation for Lake and Wittig. Defendant Wittig depended on defendant Lake to oversee the investigation of suspected dissident employees, officers and directors, and adversaries in the KCC proceedings.

Additionally, the objective of the conspiracy was to engage in monetary transactions with criminally derived property. Even before the particular monetary transactions that are the subject of the substantive money laundering counts, there is evidence that shows the interdependence of these defendants in the money laundering objective of the conspiracy. For example, the PNM split merger and rights offering contemplated that the defendants would buy significant amounts of stock in Westar Industries. Of course the plan never culminated, as the KCC rejected the split merger and rights offering. But, buying stock is a monetary transaction and money laundering was an objective of the conspiracy, as the documents and testimony evidences that the defendants intended and planned to buy shares in the new company.

It is important to note that the objective of the conspiracy, money laundering, is evidenced not only by the evidence supporting the substantive money laundering counts, but by other evidence of plans, objectives, goals, and anticipated monetary transactions from criminally derived property. One example is the planned redemption of Guardian stock,[46] which was derived

_____

[46]The evidence is that the defendants, together, and with interdependence, arranged for the exchange of Guardian shares, misleading the Board into approving it; and planning to have Protection One acquire Guardian, in the second half of 2003. At the time of that acquisition, the change-in-control provision would have been triggered, resulting in a redemption of stock awarded at a value of approximately $2.7 million, redeemed at $6.3 million, for

from criminal activity, to wit: undisclosed or false information in proxy filings that were wired in execution of a scheme of fraud. The point is that interdependence, with respect to the conspiracy to commit money laundering is supported by more than the evidence underlying the substantive money laundering counts. There is a great deal of circumstantial evidence showing that the conspiracy to commit money laundering was much broader than the transactions set forth in the substantive money laundering counts.[47]

### 2. Venue for Money Laundering Counts 33 and 35 through 39

On August 23, 2005, at the close of all of the evidence, defendant Lake orally moved for judgment of acquittal for lack of venue on Counts 33 and 35 through 39, which concerned his sale of Westar stock from his Bear Stearns account. The Court took this oral motion under advisement. Under Fed. R. Crim. P. 29(b), if the court reserves ruling on a motion, it must decide the motion on the basis of the evidence at the time the ruling was reserved. Defendants moved for judgment of acquittal regarding venue on August 23, 2005, at the close of the guilt phase of the trial. The court reserved ruling on the issue on the same day. Thus, the government may rely on any evidence presented in the record during the guilt phase of the trial, including the evidence presented during the defendants' cases.

The statute providing venue for a violation of 18 U.S.C. section 1957 states:

(i) Venue.—(1) Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in—

(A) any district in which the financial or monetary transaction is conducted; or

---

Wittig; and stock awarded at a value of $1.6 million, redeemed at $3.7 million for Lake.

[47]Circumstantial evidence is often the strongest evidence of conspiracy. *United States v. Brown*, 200 F.3d 700, 708 (10th Cir.1999).

> (B) any district where a prosecution for the underlying specified unlawful
> activity could be brought, if the defendant participated in the transfer of the
> proceeds of the specified unlawful activity from that district to the district
> where the financial or monetary transaction is conducted.[48]

The Tenth Circuit has held that "[v]enue in federal criminal cases is a question of fact which is part of the prosecution's case."[49]  But the Tenth Circuit has treated venue differently from other substantive elements of offenses, requiring proof of this element by a preponderance of evidence, not beyond a reasonable doubt.[50]  To establish venue under section 1956(i)(B), the money laundering counts may be brought in the district where a prosecution of the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction occurred.[51]

Money laundering Counts 33 and 35 through 39 concern defendant Lake's sale of Westar stock held in his Bear Stearns account.  The evidence at retrial showed Lake acquired the Westar stock in several ways.  Defendant Lake testified that he used his proceeds from his employment at Bear Sterns to purchase Westar stock in September or October 1998.  He continued to purchase

---

[48]18 U.S.C. § 1956(i).

[49]*United States v. Miller*, 111 F.3d 747, 749 (10th Cir. 1997); *United States v. Rinke*, 778 F.2d 581, 584 (10th Cir. 1995) (quoting *Wilkett v. United States*, 655 F.2d 1007, 1011 (10th Cir. 1981), *cert. denied*, 454 U.S. 1142 (1982)).

[50]*Miller*, 111 F.3d at 749–50; *Rinke*, 778 F.2d at 584.

[51]18 U.S.C. § 1956(i)(B).  *Compare United States v. Shephard*, No. 01-10116-02-JTM, 2004 WL 1752592, at *1 (D. Kan. Aug. 4, 2004) (finding that venue for money laundering counts was proper because government also charged the specified unlawful activity, which is the "anterior criminal conduct that yielded the funds allegedly laundered"); *and United States v. Aronds*, 210 F.3d 373, 2000 WL 303003, at *11 (6th Cir. Mar. 14, 2000) (unpublished table case) (same); *with United States v. Cabrales*, 524 U.S. 1, 4-9 (1998) (noting that venue was improper because the government did not charge the defendant with conspiracy and did not allege that defendant transported the funds to the district where the money laundering occurred, but exclusively charged with money laundering).

stock through the various programs offered at Westar and also received Westar stock as part of his compensation. Lake testified that he acquired Westar Stock through the following means: (1) he used Westar's loan program; (2) he invested almost 100 percent of his 401K Plan in Westar stock; (3) he purchased Westar shares in the "stock for comp" program, where he allocated half of his salary to the purchase of Westar shares; and (4) he utilized the direct stock purchase plan. He also received some RSUs that vested while he was employed.

Most importantly, defendant Lake testified that he acquired this Westar stock in Kansas and transferred it to his Bear Stearns account in New York. By Lake's own admission, he transferred the Westar stock to New York, the district where the charged transaction occurred. Thus, even based solely on the testimony of defendant Lake, there was sufficient evidence in the record to establish that defendant Lake participated in the transfer of funds from Kansas to New York. A witness from Bear Stearns also testified that the account holder, in this case, Lake, directed the transfer of stock from the place of purchase to the domicile of Bear Stearns, where it was held. The Court finds that the venue element of these money laundering counts was supported by substantial evidence in the record.

### 3. Tracing Dollars Used to Acquire Westar Stock under the Money Laundering Counts

Defendants argue that there is insufficient evidence supporting the money laundering charges, Counts 30 through 39, because the government failed to prove that every dollar of Westar compensation was fraudulently obtained, and alternatively failed to trace the defendants' acquisition of stock underlying these money laundering counts to the proceeds of the wire fraud.

But there is no requirement that the acquisition of the stock transacted in the money laundering counts be traced to proceeds of the wire fraud. Proceeds of wire fraud can be acquired

prior to and independent of the actual execution of the scheme and can occur at any time during the scheme. 18 U.S.C. section 1957 prohibits "monetary transaction[s] in criminally derived property." A "monetary transaction" is defined as "the deposit, withdrawal, transfer, or exchange . . . of funds or a monetary instrument . . . by, through, or to a financial institution,[52] and "criminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense."[53] According to the Tenth Circuit:

> The government had the burden of showing that the criminally derived property used in the monetary transactions was in fact derived from specified unlawful activity. *This does not mean, however, that the government had to show that funds withdrawn from the defendant's account could not possibly have come from any source other than the unlawful activity.* Once proceeds of unlawful activity have been deposited in a financial institution and have been credited to an account, those funds cannot be traced to any particular transaction and cannot be distinguished from any other funds deposited in the account. The "tainted" funds may be commingled with "untainted" funds, with the result being simply a net credit balance in favor of the depositor. The credit balance gives the depositor a claim against the bank and allows him to withdraw funds to the extent of the credit. In the context of a withdrawal, the portion of § 1957 requiring a showing that the proceeds were in fact "derived from specified unlawful activity" could not have been intended as a requirement that the government prove that no "untainted" funds were deposited along with the unlawful proceeds. Such an interpretation would allow individuals to avoid prosecution simply by commingling legitimate funds with proceeds of crime. This would defeat the very purpose of the money-laundering statutes.[54]

---

[52] 18 U.S.C. § 1957(f)(1).

[53] § 1957(f)(2).

[54] *United States v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992) (citations omitted) (noting the absence of a legal requirement that the government trace the funds constituting criminal proceeds when they are commingled with funds obtained from legitimate sources); *see also United States v. Sokolow*, 91 F.3d 396, 409 (3d Cir. 1996) (same), *cert. denied*, 519 U.S. 1116 (1997); *United States v. Moore*, 27 F.3d 969, 976 (4th Cir. 1994) (same), *cert. denied*, 513 U.S. 979 (1994).

Thus, these money laundering transactions, as long as they involved money or property acquired at some time during the wire fraud scheme, are legally sufficient.

Moreover, there was sufficient evidence for a reasonable jury to conclude that the wire fraud scheme began when Wittig joined the company, armed with the knowledge he had about the financial affairs and operations of the company. There was evidence that prior to joining Westar, Wittig had done work for the company, and was well aware of the company's assets, liabilities and general operations. There was evidence that at or soon after joining the company, Wittig began effectuating his scheme to obtain various types of compensation, by not disclosing, or by misrepresenting to the Board, the nature, means and potential payout of such compensation. The split dollar life insurance agreement, with the novel "put" provision, was one such compensation vehicle, which Wittig negotiated with the former CEO, but failed to obtain Board approval of, for several years. And, when Wittig finally presented this form of compensation to the Board for approval, he misrepresented the value of the compensation and what would trigger the payment of the compensation.

There is evidence that the split dollar life insurance was not fully or truthfully disclosed in proxies and/or 10-K discussions, for the forms failed to disclose that this "put" provision was essentially a mode of compensation that had no real economic relationship to the insurance policy. The executives who benefitted from this policy could draw down cash value, even before accrued and never pay it back. This would reduce the death benefit payable to the company, which had paid a sizeable premium supposedly in exchange for collecting at the executive's death. But, the company essentially fronted a sizeable premium, and only stood to collect the death benefit, while the executive could skim off the cash value, even before accrued, without

having to pay the company back.

There was also evidence that as early as 1998, there was an effort to avoid or minimize proxy disclosure of compensation obtained through fraud or false pretenses, such as the split dollar policy with "put" provision. In a 1998 meeting in Chicago between Arthur Anderson consultants and company executives, there was in fact discussion on how to avoid or minimize proxy disclosure of this scheme. The fraudulent nature of this scheme is revealed in the Arthur Anderson records, which also reference that Wittig was not being candid or truthful with the Board about the particulars of the split dollar policy.[55] This is consistent with the testimony of Frank Becker, who was a director and Chair of the Compensation Committee of the Board, that Wittig gained this split dollar policy by subterfuge and deceit.

There was also evidence that in 2002, Wittig caused the policy to be amended to even more favorable terms, gaining Board approval by falsely representing that the amendment was merely to allow the executive to exercise the "put" in small increments. As soon as he got approval, Wittig exercised the entire "put," obtaining $2 million in one lump sum. Thus, the transactions with Capital City Bank are loan proceeds obtained with collateral that was criminally derived from a specified unlawful activity, wire fraud.

The split dollar policy was derived from wire fraud, because, as is charged in the wire fraud counts, there were false or fraudulent proxies and 10-Ks filed to effectuate the wire fraud scheme, which included the fraudulent acquisition and approval of this split dollar life insurance policy. Acquisition of the split dollar policy preceded the Capital City Bank money laundering counts. With respect to the stock transactions, which commenced on June 8, 2001, these

---

[55] *See* Gov't Ex. 41-D.

transactions preceded Wittig obtaining the split dollar policy with "put" provision by fraud, the fraudulent relocation fee scenario,[56] and the undisclosed acceleration of the signing bonus, among other things.

There was also sufficient evidence that defendant Lake joined the conspiracy and scheme to defraud contemporaneous with joining the company. In fact, there was evidence that even before Lake joined Westar, Wittig placed him on the Board of Guardian as the putative representative of Westar. Guardian was integral to the defendants' conspiracy, in that they used Westar's relationship with this company as a vehicle to increase their compensation through: (1) misleading Westar to award RSUs and shares of Guardian, tied to Guardian's performance, rather than Westar's performance, without the approval of the Board;[57] (2) misleading the Human Resources Committee of Westar's Board to authorize an RSU exchange to convert previously awarded Westar RSUs into undervalued Guardian shares; and (3) manipulating the timing of the exchange so that Wittig and Lake could "double dip" on Guardian dividends.

Finally, as defendants point out, the jury determined not to forfeit all compensation and benefits ever received. Yet, this Court is not called to speculate on the jury's basis for its split verdict on Count 40; but rather, this Court must determine whether a reasonable jury could believe that the defendants committed money laundering as charged in Counts 30 through 39. This Court concludes that a reasonable jury could find that there was fraud at the inception of each defendant's commencement at Westar. Yet a reasonable jury need not fully agree with that

---

[56]*See* Doc. 126 at 9; Gov't Exs. 20-B, 22-B.

[57]In fact, Becker testified that he specifically and expressly told Wittig on many occasions that the Board would not approve any incentive compensation tied to performance of an outside company, and would only approve incentive compensation tied to performance of Westar.

theory to convict the defendants of Counts 30 through 39, for there is no requirement that the laundered monies be traced.

Defendants have offered no authority that precludes the employment benefits obtained as a result of this fraudulent scheme from being considered criminally derived property. Because the government provided sufficient evidence that Wittig and Lake began their employment under false pretenses, all compensation obtained by Wittig and Lake is criminally derived property, including compensation in the form of stock. Any sale or further disposition of that stock comes within the prohibitions of 18 U.S.C. section 1957. The Tenth Circuit has explicitly determined that the government is not required to show that no "untainted" funds were part of the transaction or that the funds used in the transaction were exclusively derived from the specified unlawful activity.[58]

These verdicts may or may not be inconsistent. Because the government's theory of fraud at the inception was not specifically decided by the jury, this Court would merely be speculating what the jury thought about that theory. It is possible that the jury did not believe the government's "fraud at the inception theory." On the other hand, the jury decided against forfeiting a number of other company-awarded benefits. It is possible that the jury decided not to forfeit stock because it was, at least in part, company-awarded compensation available not just to these defendants but to other management at the company. On the other hand, there were components of compensation that these defendants received that were either not received by other management, or not received under the favorable terms or to the same extent that these defendants received. Notably, it was these types of compensation, such as the split dollar life insurance

---

[58]*Johnson*, 971 F.2d at 570.

agreement with the "put" provision and the relocation benefits, that the jury decided to forfeit. Moreover, to the extent the convictions on the money laundering counts are inconsistent with the nonforfeiture of Westar stock, inconsistent verdicts are not the basis for a judgment of acquittal.[59]

### III. MOTIONS FOR NEW TRIAL

Defendants assert 41 grounds they say individually and collectively deprived them of their right to due process and a fair trial, requiring a new trial in the interest of justice pursuant to Fed. R. Crim. P. 33(a). Many of these grounds for a new trial were ruled on by the Court, in lengthy memorandum opinions filed prior to trial, or in detailed oral rulings from the bench.[60] Nothing occurred during the retrial that alters the efficacy or appropriateness of those rulings. Thus, the Court will not reiterate its basis for denying defendants' motions for severance and for recusal.[61] Additionally, the Court will neither address defendants' motions to strike Westar ratepayer jurors for cause, nor the basis for its order for trial practices and procedures for the retrial.[62] And, the Court will not reiterate its basis for overruling defendants' repeated objections to the

---

[59] *See, e.g.*, *United States v. Powell*, 469 U.S. 57, 65 (1984); *United States v. Lynn*, 178 F.3d 1297, 1999 WL 97244, at *4 (6th Cir. Feb. 19, 1999) (unpublished table case) (discussing potentially inconsistent verdicts of forfeiture and guilt), *cert. denied*, 527 U.S. 1006 (1999).

[60] *See, e.g.*, June 30, 2004 Mem. Order Den. Change of Venue (Doc. 111); August 13, 2004 Order Memorializing August 10, 2004 [Bench] Rulings (Doc. 152) (ruling on various motions including Motions to Sever); Sept. 13, 2004 Order Memorializing September 13, 2004 [Bench] Rulings (Doc. 181) (ruling on various motions, including Wittig's Motion to Dismiss Counts 24 through 29); Oct. 6, 2004 Minute Entry and Text Entry (Docs. 223–24) (ruling telephonically on various motions in limine, including motion to exclude evidence of bank fraud conduct); Apr. 4, 2005 Mem. Order Den. Change of Venue (Doc. 344); Apr. 4, 2005 Mem. Order Den. Recusal and Mem. Order of Trial Procedures (Doc. 345); May 23, 2005 Mem. Order Granting Def. Lake's Mot. to Preclude Govt's Use of Rule 902(11) Procedure ( Doc. 451); May 23, 2005 Mem. Order on Limine Mot. (Doc. 453); Aug. 9, 2005 Mem. Order Op. Den. Joint Mot. for Evid. Hr'g (Doc. 496) (concerning witness Zakoura); Aug. 19, 2005 Mem. Order Op. Den. Mot. to Strike (Doc. 504); Sept. 13, 2005 Mem. Order Den. Mot. to Require Disclosure of *Giglio* Materials (Doc. 513).

[61] After this Court denied their pretrial motions to recuse (Doc. 345), the defendants filed petitions for a writ of mandamus. On May 3, 2005, the Tenth Circuit Court of Appeals denied both petitions for a writ of mandamus, finding no basis for this Court's recusal (Doc. 435).

[62] Mem. Order Den. Recusal and Mem. Order of Trial Procedures (Doc. 345).

government's use of Power Point to present opening and closing arguments, as well as to present demonstrative charts and aids or reading portions of the Superseding Indictment during voir dire and reading the redacted Superseding Indictment, as part of the jury instructions. Nor will the Court again address defendants' objections to the "intangible right of honest services" instruction to the jury,[63] nor their legal motions and evidentiary objections concerning the government's theory that they effectuated wire fraud in part through "lulling" communications.

Among defendants' 41 itemized grounds for a new trial are such summary, unexplained and unspecified bases as "[a]llowing government witnesses to offer improper hearsay testimony"[64] and "[f]ailure to grant the relief requested in Mr. Wittig's motions to dismiss." This Court finds no reason to address these "shotgun" types of arguments. The Court now turns to arguments that are more substantive in nature, many of which this Court has previously ruled on, but again addresses, primarily to address certain misrepresentations of evidence, rulings and events.

## A.  *Venue*

For the reasons given in the previous orders denying motions for change of venue, the Court finds that denial of defendants' motion for change of venue, does not justify a new trial.

---

[63] The Court gave an instruction concerning the "intangible right of honest services." (Doc. 528, Instruction 24). There is no pattern instruction on this in this Circuit, but the instruction given has been used in other circuits, and is based on the statutory definition of scheme and artifice to defraud found in 18 U.S.C. § 1346. *See* Fifth Circuit Pattern Jury Instructions: Criminal (2001). The "intangible right of honest services" is unequivocally an element of the offense of wire fraud, as it is included in the statutory definition of "scheme or artifice to defraud." § 1346.

[64] A district court has broad discretion to determine the admissibility of evidence. *United States v. Talamante*, 981 F.2d 1153, 1155 (10th Cir. 1992), *cert. denied*, 507 U.S. 1041 (1993). The appellate court reviews evidentiary rulings for abuse of discretion, *United States v. Tan*, 254 F.3d 1204, 1207 (10th Cir. 2001), not disturbing a trial court's decision absent "a definite and firm conviction that the [trial] court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *Talamante*, 981 F.2d at 1155 (quoting *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)) (alterations in original).

The constitutional requirement of impartiality does not limit jury membership to persons completely ignorant of the facts and issues of a case.[65]  Yet, having moved the trial from Topeka, Kansas to Kansas City, Kansas, the venire at the retrial, much like the venire at the first trial, included significant numbers of people who had never heard of the case, the defendants or Westar.  Moreover, this Court liberally excused, without request by either party, Westar shareholders and anyone else expressing detailed knowledge, or any hint of impartiality or prejudice against any party.  The trial jurors were selected, only after extensive vetting, with individualized voir dire by the Court, supplemented by individualized voir dire by counsel, who had the advantage of extensive juror questionnaires asking general and case specific questions, as well as questions about the person's background, specialized knowledge or training, and awareness of the case through media coverage, personal experience or otherwise.

**B.**  **Westar Witnesses Bias and Interest in the Outcome of Case**

Defendants complain that this Court's limine ruling precluded them from examining Westar witnesses about their bias and interest in the case, or Westar's bias and interest in the case.  This Court ruled that, "[a]ssuming *arguendo* that Westar has a financial interest in the outcome of the case, none of the individual witnesses can be charged with such an interest."  But, the Court did not preclude the defendants from cross-examining witnesses about their own personal bias or prejudice against the defendants.  The Court's limine ruling simply excluded testimony about Westar's financial interest in securing convictions of the defendants—that is, testimony about how convictions might be to Westar's favor in the pending arbitration proceedings.  Nonetheless, at least one witness, a current Westar officer, testified that the company had an interest in a

---

[65]*Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

conviction.

Moreover, as the government posits, a challenge on such restrictions is tenable only where the restriction is manifestly unreasonable or overbroad.[66] Even assuming, *arguendo*, this Court erred in curtailing cross-examination about Westar bias and interest, the error is subject to a harmless error analysis.[67] This necessarily entails considering "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case."[68] Here, the defendants make general conclusory claims of prejudice without attempting to identify witnesses they claim they were denied effective cross-examination of, or articulating the significance of the testimony of such witnesses within the matrix of the entire case. The relationship between personal bias of a witness and some unexplained bias of a witness based upon the fact that the witness's current or former employer might recognize some benefit from an interest or outcome in the criminal case is too attenuated to pass muster as permissible impeachment.

**C.      *Testimony and Documents Concerning the Civil Arbitration Proceeding***

 The Court precluded evidence in the guilt phase of the trial about the pending arbitration proceeding between Westar and defendants. This Court excluded evidence about the pending

---

[66]*See, e.g.*, *United States v. Gomes*, 177 F.3d 76, 81–82 (1st Cir. 1999) (finding also that trial court had discretion to exclude evidence of bias that would distract from the main issues and have little practical value to the defense), *cert. denied sub. nom*, *Quadros v. United States*, 528 U.S. 911 (1999).

[67]*United States v. DeSoto*, 950 F.2d 626, 630 (10th Cir. 1991).

[68]*United States v. Bindley*, 157 F.3d 1235, 1240 (10th Cir. 1998) (quoting *DeSoto*, 950 F.2d at 630–31 (quoting *Delaware v. VanArsdall*, 475 U.S. 673, 684 (1986)); *see Olden v. Kentucky*, 488 U.S. 227, 483–84 (1988).

arbitration proceeding, primarily to protect the defendants from prejudicial evidence about the sizeable claims the defendants had made in the arbitration proceeding. Moreover, the arbitration proceeding concerned employment issues not squarely at issue in the criminal proceeding. The Court's evidentiary ruling was not prejudicial error and was in fact designed to protect defendants.[69]

## D.    *Testimony and Documents Concerning the KCC Proceeding*

The defendants claim prejudicial error in the Court allowing testimony concerning certain administrative proceedings before the KCC[70] during the time period of the conspiracy and scheme to defraud. But the Court allowed such evidence only within certain parameters. The Superseding Indictment alleged that the defendants conspired or schemed to defraud Westar by promoting and attempting to cause a merger with PNM, a New Mexico utility, and a spinoff of a new company, Westar Industries. The Superseding Indictment alleged that Westar Industries would then own virtually all of the assets of Westar, while Westar was left with virtually all of the debt used to acquire those very assets. Because Westar, a utility, was a company subject to regulation by the KCC, the proposed merger and spinoff were the subject of extensive investigation and hearings by the KCC.

The fact that there were KCC proceedings concerning the proposed split merger and spinoff was an integral part of the charged scheme and conspiracy. The fact of the proceedings,

---

[69]In the bifurcated trial on forfeiture, however, this limine ruling was lifted, since the government sought to forfeit "any arbitration award." For an extensive discussion of the arbitration award as used in the forfeiture proceedings, see the recently filed Final Order of Forfeiture as to defendant Wittig. Doc. 673; *see also* Doc. 453 at 4–6.

[70]As a utility and monopoly, the company was subject to regulation by the KCC whose function is to protect public interest through impartial and efficient regulation of rates, service, and safety of public utilities.

the defendants' response to the proceedings, and their plans or attempts to circumvent the proceedings were integral to the charges and were demonstrated through the evidence.[71]  For example, there was evidence that defendant Wittig attempted to influence a legislator to influence the chair of the KCC.  There was evidence that both defendants directed a New York law firm to hire a private investigator to investigate the personal lives of people who were opposing rate hikes and the proposed PNM split merger and spinoff, as well as a newspaper reporter who was covering these issues.

The KCC proceedings were relevant to the case because they were part of the progression of activities that defendants Wittig and Lake attempted to circumvent to achieve the goals of their conspiratorial conduct.  Part of the defense in this case was that the proposed split merger was "dead in the water" after the KCC orders.  But the efforts by Wittig and Lake to circumvent the KCC actions by filing a lawsuit challenging the KCC's jurisdiction over the split merger, and by attempting to legislate around the KCC actions, went to the heart of the defendants' intent in the case.  Thus, this Court ruled that the probative value of this evidence far exceeded its prejudicial effect.

The Court still placed significant limitations on the scope of the evidence concerning the

_____

[71]Notably, at the first trial, the Court precluded most of the evidence about the KCC proceeding, persuaded by defendants' arguments that this evidence was more prejudicial than probative.  But, during the first trial, the evidence showed that the conspiracy and scheme to defraud included an effort by Wittig and Lake to thwart the KCC process.  Thus, the probative value of this evidence became apparent during the first trial, and part of the context for the Court's limine ruling at the retrial.  Moreover, at the first trial, after obtaining this critical ruling which substantially limited the government's case, the defendants then cross-examined the government's witnesses about the KCC hearings and the fact that the KCC stopped the PNM merger and the split and merger.  This was one example of ethical breaches by defense counsel: offering evidence precluded by the Court at their request, thus using the Court's limine rulings that were meant to protect the defendants, in a tactical, but abusive manner.  This, too, provided context for the Court's analysis of this limine issue at retrial, and determination that the probative value of this evidence far outweighed any prejudicial effect.

KCC proceedings. While allowing the government to present certain KCC orders, the Court

heavily redacted those orders, allowing the jury to see only the conclusions of the KCC

underlying its orders. The Court redacted the KCC orders and precluded the parties from

presenting to the jury any evidence concerning the *findings* of the KCC, to avoid the fact findings

of this administrative adjudicatory body from directing the jury's verdict. The Court carefully

circumscribed the evidence that could be admitted before the jury to protect the defendants.

**E.      Evidence that the PNM Transaction was Never Consummated**

Defendants maintain that the Court erred in precluding them from presenting evidence that

the PNM transaction was never consummated as a defense. To the contrary, this Court did not

preclude evidence that the PNM transaction was never consummated; indeed, both the

government and the defense presented evidence that the KCC ordered Westar to cease

continuation with its proposed merger with PNM, and that the merger never happened. Rather,

the Court's limine order precluded the defendants from presenting evidence or argument *that no

crime had been committed* because the PNM transaction was never consummated.[72] To argue, or

elicit testimony that no crime could have been committed because the PNM transaction, an overt

act of the conspiracy, had not reached fruition, was excluded as an improper statement of the

law,[73] and an inappropriate attempt to invade the exclusive province of the Court to instruct on

the elements and parameters of the law.

---

[72]At the first trial, the defendants continually presented such evidence or argument, ignoring the Court's ruling that this was improper and inadmissible evidence, for no party is allowed to present opinion evidence that goes to the ultimate issue, whether a crime had been committed. *See* Fed. R. Evid. 701, 704.

[73]*See United States v. Curtis*, 537 F.2d 1091, 1095 (10th Cir.1976) (explaining that the success or failure of the scheme to defraud is immaterial), *cert. denied*, 429 U.S. 962 (1976).

## F.     Defendant Wittig's Amended Tax Returns

Defendant Wittig claims that the Court erred in not allowing him to introduce into evidence his amended tax returns. But Wittig's amended tax returns were not admissible for several reasons. First, evidence that when he filed tax returns claiming no income from personal use of corporate aircraft, he later amended those returns, is not probative of his intent at the time of the commission of the crimes. And, to the extent there was some probative value, this was not presented to the Court. Indeed, defendant Wittig did not testify and in offering his tax returns made no showing of their probative value.

Furthermore, it is disingenuous for defendant Wittig to argue that the admission of certain witnesses' amended tax returns justifies admission of his amended returns. The defendants injected this evidence in the trial, and defendant Wittig cannot bootstrap his own return into evidence simply because he injected this issue and evidence in the case in cross-examining certain witnesses. These witnesses' amended tax returns were admitted only after the defendants cross-examined them about their failure to claim their personal use of corporate aircraft as income.

In contrast, the government presented no evidence about defendant Wittig's original tax returns. The only evidence presented in that regard was that defendants Wittig, Lake and others disclosed no personal use of aircraft on their D&O questionnaires,[74] and that Westar did not issue W-2s reflecting the value of any personal use of aircraft.[75] But there was no evidence that defendants were *required* to report their personal use of planes on their tax returns. Rather, the

---

[74]Counts 2 through 8 and 10 through 15.

[75]Relatedly, there was also evidence that Westar did not take a deduction for income paid in the form of personal use of airplanes.

evidence was that the Westar tax department, through Schneweis and others, repeatedly tried to convince defendant Wittig to comply with their directive to claim personal use of planes as income in the year of the plane usage, which would allow Westar to take a tax deduction. Schneweis urged that this method was more beneficial to the executives and to Westar, than the alternative, claiming personal use at the Standard Industry Fare Level ("SIFL") or charter rate. Because the defendants were not charged with tax crimes, however, the Court precluded any evidence about tax fraud. Also, paragraph 13 on page 5 of the Superseding Indictment was partially redacted to exclude the first sentence, which stated that the defendants were required to report plane use to the IRS. Likewise, paragraph 8 on page 3 of the Superseding Indictment was similarly redacted.[76]

## G.      *Fraud on Westar Ratepayers*

Defendants claim that the Court improperly allowed the government to argue that the defendants had engaged in a scheme and conspiracy to commit fraud on the Westar ratepayers, which was a constructive amendment of the Superseding Indictment. The Superseding Indictment charged a conspiracy and scheme to defraud Westar and its shareholders. The Superseding Indictment did not charge fraud on ratepayers; and the government did not argue fraud on the ratepayers. Defendants are really referring to the evidence and argument related to paragraph 22(f) of the Superseding Indictment, which alleges that Wittig and Lake "structured a subsidiary, Westar Industries, Inc., to loot assets from the utility and leave debt behind in the utility for the ratepayers." Because the Superseding Indictment alleged that the defendants' conspiracy and scheme could operate to cause harm to Westar, leaving debt behind in the utility

---

[76]These and other redacted portions were not read to the jury, and were not included in the jury instruction that otherwise quoted the Superseding Indictment verbatim.

for the ratepayers, there was no constructive amendment of the Indictment when the government presented evidence and argument of ratepayer harm.[77]

Defendants make a corollary argument that the Court erred in failing to strike for cause potential jurors who were Westar ratepayers. Without reiterating this Court's rulings on this issue during the first trial and the retrial, the Court notes that both jury selection processes demonstrated that one's status as a ratepayer did not render one partial or biased against defendants. Indeed, in the first trial, the defense fought to keep one juror who was a Westar ratepayer, but who asked to be excused because service on a lengthy trial would impair his ability to perform his work responsibilities. The jury in the first trial included some ratepayers; yet this jury could not reach a unanimous verdict and a mistrial was declared. Furthermore, voir dire at the first and second trials revealed that although most ratepayers recognized the name Westar as a provider of their utilities, the mere commercial relationship did not result in any greater degree of prejudice, impartiality, awareness of the case or media coverage. In fact, a number of ratepayers had no knowledge of the case or the defendants. Some ratepayers were not even sure if Westar was their utility company as another member of their household paid the bills. Defendants have made no showing that they did not receive a fair trial because the Court declined to strike Westar ratepayers from serving on the jury.

## H. Special Legal Duties of Officers and Directors

The Superseding Indictment alleged that officers and directors have certain fiduciary duties and that the defendants violated these duties. Because "fiduciary duty" is a civil law concept, this Court sustained the defendants' motions in limine and precluded the government

---

[77] *See supra* Part II.A.2.

from presenting evidence or argument using the term "fiduciary duty" and redacted the word "fiduciary" from the Superseding Indictment. The Court allowed the government instead to elicit testimony and make argument that officers and directors had special legal duties to the corporation and defendants argue this was in error. Integral to many of the charges was that as officers and directors, the defendants had a duty to act in the best interests of Westar and its shareholders rather than in their own personal interests, to the detriment of Westar. A number of the witnesses were current or former officers and/or directors of Westar, and whether or not these witnesses had carried out their duties or responsibilities was evidence probative to both the government's case and the defendants' defense. In fact, many of these witnesses acknowledged, without objection, that they had a fiduciary or special legal duty to the corporation and its shareholders as officers and directors. Thus, the defendants can hardly claim, or establish, prejudice from this evidence. The defendants simply offer no showing of how it was prejudicial for the jury to hear that officers and directors, including the defendants and many of the witnesses, had certain duties and responsibilities to the company.

## I.    *James Zakoura's Testimony and Documents Relating to his Testimony*

### 1.    **Zakoura's Testimony**

At retrial, this Court ruled orally and in writing on repeated objections to the use of James Zakoura as a witness, as well as the scope and nature of his testimony.[78] Despite this extensive record, the Court addresses these issues again, primarily because the use, nature and scope of Zakoura's testimony is mischaracterized by the defendants in their post trial motions. Zakoura is a lawyer who represented a group of industrial customers of Westar. Zakoura represented their

---

[78]Aug. 19, 2004 Mem. Order Op. Den. Mot. to Strike (Doc. 504).

interests throughout a number of hearings before the KCC concerning rate increases, as well as Westar's efforts to merge with PNM, spin off a new company, Westar Industries, and engage in a rights offering for Westar Industries. Zakoura was thus a percipient witness to some events and facts about which he testified about. Additionally, in his capacity as an attorney for this group of customers, Zakoura discovered a substantial number of Westar documents that were admitted into evidence in this case; and Zakoura gained familiarity with these documents, based on his prior extensive reading. Zakoura was familiar with the documents and thus was called as a witness who could identify the documents, highlight certain passages in the documents, and compare language between certain documents.

In the course of his testimony, Zakoura pointed out a number of probative passages in a series of voluminous documents.[79] In this way, he guided the jury through a myriad of documents

---

[79]In a remarkable session of testimony, Zakoura walked the jury through a number of provisions in multiple admitted Westar documents, illustrating how Wittig and Lake's continued plan to effectuate the Westar Industries rights offering would inure to their great benefit. Zakoura outlined a seven-step process, gleaned from a review of many passages in a number of documents, that would result in Wittig and Lake obtaining another round of golden parachutes, triggered by "change-in-control" provisions in the rights offering, even after the KCC rejected the split merger with PNM. These seven steps were, in summary:

1. Assets of Western Resources would be conveyed to Westar Industries, including stock in Westar.

2. Westar Industries would then own 28% of shares in Westar.

3. If more than 30% of Westar was owned by another company- change-in-control was triggered.

4. This 30% ownership exception did not apply if the other company was a subsidiary. A subsidiary was defined as a company in which Westar owned at least 50%.

5. Westar owned at least 50% of Westar Industries, such that Westar Industries was a subsidiary of Westar.

6. Page 12 of the Rights Offering stated that if Westar sold Westar Industries stock in order to fund or complete the split and merger, then Westar ownership would drop to less than 50% of the shares of Westar Industries.

7. This would then deconsolidate Westar Industries as a subsidiary of Western Resources, and the 50% subsidiary exception would not apply. Thus the change-in-control provisions would be triggered as outlined above at Step 3. Therefore, either way, the change-in-control provisions would be triggered, benefitting defendants.

with which he had great familiarity.  The documents were admitted during Zakoura's testimony, and he identified the documents, but the admission of the documents was not otherwise dependent on Zakoura's testimony.  Zakoura was not the author or custodian of these documents, so the documents were not authenticated nor rendered admissible through him.  Rather, these documents were authenticated and admitted through foundation provided elsewhere.  Most of the documents were admitted as party admissions, for most of the documents were either admissions by defendants Wittig and Lake, or agents or authorized representatives acting on their behalf.  Thus, these documents were admissible and not within the definition of hearsay, so not subject to the Confrontation Clause implications on admission of hearsay statements.[80]

Nevertheless, defendants repeatedly objected to Zakoura testifying from these documents, in actual or feigned confusion about the evidentiary rules on authentication and foundation.  As the Court repeatedly ruled, at times in lengthy bench conferences, if a document is admitted, any witness can be asked questions about the document.  Indeed, any witness can be asked to read from or highlight portions of the documents.  It does not matter whether that witness wrote the document, or whether that witness was present during the events described in the document.[81]

---

[80]This Court is entirely cognizant of the Supreme Court's ruling in *Crawford v. Washington*, that defendants have rights under the Confrontation Clause that preclude the admission of certain types of hearsay evidence.  541 U.S. 46, 68 (2004).  But here, virtually all of the documents at issue were admitted as party admissions, or as some other non-hearsay type of document.  To be sure, the government's ability to admit many of these documents without calling custodians of records was demonstrably frustrating to the defendants, causing them to make repeated objections.  Because this was the second trial and the defendants had had the chance to confront witnesses about most of these documents in the first trial, even had these documents been within the hearsay rules, they would have largely been admissible despite *Crawford*.  Moreover, at the second trial, the government was able to identify and lay foundation for many of the documents based on the testimony of defendant Lake at the first trial.  Defendant Lake's testimony about these very documents was admissible evidence as a party admission, and served to lay the requisite foundation for the admission of these documents.  The government effectively used the testimony of Lake, as well as the testimony of other witnesses at the first trial to admit most of the documents admitted at the second trial.

[81]Indeed, with respect to some witnesses, there may be probative value in their testimony that they *never saw* a particular document.

Here, the witness served to assist the jury in finding and highlighting significant portions of the documents. Defendants have not shown how they were prejudiced by Zakoura testifying about portions of admitted documents.

Defendants also repeatedly objected, as well as moved to strike Zakoura's testimony as undisclosed and unauthorized expert testimony. But Zakoura's testimony was not expert testimony.[82] Although he assisted the trier in identifying and highlighting passages in voluminous documents, he offered no opinions or expertise on which a jury might rely. Thus, the government did not, as defendants posit, violate the rules on prior disclosure and qualification of Zakoura as an expert.[83]

Defendants further characterized Zakoura as a "summary" witness and argued that he was improperly allowed to "summarize" before any evidence had been presented; but this mischaracterizes the evidence. Although Zakoura was called as the first witness, he testified to documents that were admitted into evidence, albeit during the course of his testimony. He did not testify to evidence or documents that were not admitted during his testimony or admissible independent of his testimony. Thus, he was not a "summary" witness, but properly called as a lay witness as this Court repeatedly has ruled.[84]

### 2. Relief Accorded for Jencks Act Violation

Defendants also claim the Court erred in refusing to strike Zakoura's testimony as a sanction for the government's failure to disclose certain information to the defendants in violation

---

[82]*See* Fed. R. Evid. 702; Doc. 504.

[83]*See* Fed. R. Crim. P. 16(a)(1)(G); *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 590–92 (1993).

[84]*See* Doc. 504.

of the Jencks Act. After the government had completed its direct examination of Zakoura, it disclosed to the defendants and the Court that it had improperly failed to disclose to the defendants certain materials possibly discoverable as Jencks Act material. The Court conducted a hearing, and accorded the defendants relief. The defendants characterize the materials as "over 200 pages" of Jencks Act materials. But their objection misstates the nature, import and effect of the government's Jencks Act violation. First, the 200 pages were mostly pages of documents discovered by the defense long before the first trial, and indeed admitted as exhibits at the first trial. On some of these pages, Zakoura made handwritten notes, including suggestions to the government about the relevance and probative value of the document. It is this handwritten material that was not disclosed to the defendants; the documents on which the handwritten notes were made, had been previously disclosed to the defendants. When one considers the number of pages of Zakoura's handwriting on these pages, coupled with the pages of original writings and notes he made in reviewing these documents, "200 pages" of Jencks material is an inaccurate description; rather there were only about 30 pages of Jencks materials comprising Zakoura's handwritten notes.

Not only do the defendants overstate the nature and import of the violation, they overstate the effect. Upon discovering this violation, the Court gave the defendants extra time to prepare for cross-examination of Zakoura. Because of a long intervening weekend and the Court's grant of additional time, the defendants had six days to prepare for Zakoura's cross-examination.[85] Given that, the defendants have not and cannot show that they were prejudiced by this late disclosure of Jencks Act material.

---

[85]On June 30, 2005 the Court granted a five day continuance, such that trial did not resume until July 6, 2005. *See* Doc. 496.

**J.      Admission of Government's Summary Charts**

Defendants claim that the Court erred in admitting summary charts offered by the government, without first determining what documents were relied upon and whether those documents were admissible.  On the contrary, this Court undertook to determine what documents were summarized in the charts and whether the documents were admitted or admissible.[86]  It should be noted that the retrial did not occur in a vacuum, as the Court spent considerable time vetting these objections in the first trial.  Needless to say, in the retrial, the Court did not reinvent the wheel, nor discard its accumulated knowledge of the documents from the first trial.  Although there were some different charts, as well as modified charts, presented at the retrial, the underlying documents were much the same.  Moreover, while defendants claim error in the Court's admission of summary charts, they do not identify these exhibits.  Defendants have the obligation of providing sufficient record references to support their claims.

**K.      Subsequent Remedial Measures**

Defendants claim that the Court erred in admitting documents that postdate defendants' departure from Westar and that detail subsequent remedial measures adopted by Westar, particularly concerning personal use of corporate aircraft.  Defendants' reliance on Rule 407 of the Federal Rules of Evidence is misplaced, for it applies only to civil cases.  Rule 407 precludes the admission of evidence of subsequent remedial measures, but is only applicable to tort and product liability cases, as the rule speaks to measures taken "after an injury or harm allegedly caused by an event . . . ."  This rule rests upon the "social policy of encouraging people to take, or

---

[86]*See* Fed. R. Evid. 1006; *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) ("The materials upon which the summary is based need not themselves be admitted into evidence . . . [but] must be admissible.").

at least not discouraging them from taking, steps in furtherance of added safety."[87]

More importantly, the government did not present evidence of subsequent remedial measures taken by the company. Rather the government presented evidence that before the defendants' departure, management and outside accountants had repeatedly tried to enforce a policy on the personal use of corporate aircraft and its tax treatment by the individual officer and the company.[88] The evidence defendants complain of showed that after defendants departed, Westar was finally able to adopt and enforce a corporate aircraft policy without obstruction or interference by the defendants.

Furthermore, the 2003 and 2004 Aviation Policies were not entirely new, but referenced older documents created or in existence during the scope of the charged wire fraud and/or conspiracy. These policies were not irrelevant, nor highly prejudicial, for the evidence was that they were a continuation of previously existing policies, which the defendants evaded or ignored. These exhibits were offered to corroborate the testimony of Schneweis, a manager in the tax division of Westar, who testified to his repeated attempts to convince defendant Wittig to follow and enforce an appropriate policy on personal use of corporate aircraft. Schneweis testified that he repeatedly attempted, through memoranda and conversations, to get management to account

---

[87]Fed. R. Evid. 407, advisory committee's notes.

[88]Exhibits 10-A, 11-A, 12-A and 17-A evidenced the company's procedure, if not policy, in 1988 and 1989 and in 1999 and 2000 concerning employee's personal use and the personal use by their families of corporate aircraft. These exhibits consistently relate that employees with personal or primarily personal use flights must either claim it as income on their W-2s, at the SIFL rate (with the company receiving a corresponding deduction on its tax return) or failing that, the employee must treat it as income at the charter rate. At least one of these internal memoranda relates that some companies require the executives to reimburse the company at the charter rate, other companies have the executive treat the value of the flight, per the charter rate, as income. There was also evidence that the company and employees/officers often did not follow the directed procedures and practices. When officers and employees brought this to defendant Wittig's attention and expressed concern about the employees and company's failure to follow the practice, Wittig refused to follow the practice and refused to allow an internal audit.

for personal use of corporate aircraft in the correct fashion, which was to issue W-2s to executives, imputing income at the SIFL or mileage rate.  Schneweis testified that he repeatedly advised the defendants and/or upper management that if W-2s were not issued to executives for the year in which the benefit was received, there were additional IRS implications in that the imputation would revert to a charter rate.  Exhibits were also admitted during trial that corroborated his testimony regarding his concerns about exposing executives to a higher imputation of income.[89]  Moreover, this evidence related to paragraph 15 of the Superseding Indictment, which spoke to the overall efforts of the defendants to prevent the company from developing internal programs that would bring attention to personal use of the airplane.[90]

## L.      John Meara's Testimony

The government called John Meara as a witness to testify to calculations he made concerning the value of the non-business flights that defendants took on corporate aircraft. Meara's calculations were based on published charter rates for flights between airports, and an assumption that certain flights were not for business, based on identified criteria, such as the destination of the flight and whether the defendants' business calendars demonstrated a business meeting in conjunction with the flight.  These assumptions were based on readily identified criteria, allowing the defendants to cross-examine Meara on the assumptions, as well as on the published charter rates he used in making the calculations.

The defendants claim that this was improper summary testimony and that Meara was

---

[89]For example, government exhibit 19-A advises that: "a failure by the Company to properly record, report, and impute income for non-business travel can result in the IRS imputing income to the employee in an amount comparable to charter aircraft rates" (Gov't ex. 19-A at 5).

[90]"It was not until after this subpoena that Wittig and Lake ever undertook to prepare and put in place a comprehensive internal control procedure to avoid the extravagant personal use of corporate aircraft."

essentially used as an undisclosed, unqualified expert.[91]  But this Court precluded Meara from offering any opinions and specifically precluded him from testifying about what is proper business use or personal use of the corporate aircraft.  In fact, when the government indicated its intent to call Meara as an expert witness in the government's rebuttal case to counter expert witness testimony offered by the defense, the Court sustained the defendants' objections to using Meara as an expert  witness during the rebuttal case.  Moreover, the Court specifically precluded Meara from testifying that he was a fraud examiner, so as not to suggest to the jury that he had expert knowledge.  Meara was only allowed to testify that he was an accountant.[92]  Given the parameters this Court imposed on Meara's testimony, defendants have not established any error, and certainly no prejudicial error.

## M.     *Testimony Concerning "Charter Rates" and IRS Regulations*

Related to their claims of error in allowing Meara' testimony, are defendants' claims that the Court erred in allowing any testimony concerning "charter rates" attributed to travel on corporate aircraft, and in allowing any evidence concerning IRS regulations or tax treatment of executives' personal use of corporate aircraft.  As discussed above, this is not a tax case and the Court redacted from the Superseding Indictment and excluded evidence concerning tax law and any suggestion of tax fraud.  Yet, integral to the charges was evidence that the defendants used corporate aircraft for personal trips, failed to claim the value of these trips as income, which in

---

[91]Notably, during the retrial, the defendants took the position that Meara was a summary witness, not an expert.

[92]During the first trial, the Court's limine order setting tight parameters on Meara's testimony was another one of many the favorable rulings that defendants then used to their tactical advantage, eliciting on cross-examination the very information that the Court had precluded the government from eliciting from the witness.  *See supra* note 4 and accompanying text.

turn caused the corporation loss, in that it could not claim a corresponding tax deduction for the value of the executives' personal use of the planes. The Superseding Indictment charged, and the Court admitted, evidence that the defendants' undisclosed and unclaimed personal use of the aircraft constituted a fraud on Westar and its shareholders. The Superseding Indictment further charged, and the Court admitted, evidence that the defendants circumvented internal controls by failing to reveal on D&O questionnaires and related filings, that they had gained personal use of the corporate planes in a number of years. Evidence concerning the appropriate disclosure and valuation of personal use of corporate aircraft was highly probative of the defendants' fraudulent intent, and properly admitted at trial.[93]

In short, the evidence was that defendants evaded or deliberately ignored Westar's tax department directives about disclosing and claiming personal use of airplanes; and any reference to IRS or SIFL rules pertained to the defendants failure to disclose personal use and the harm or loss to Westar as a consequence of that.[94] This evidence was probative of the defendants' fraudulent intent in not disclosing their personal use of airplanes, for it tended to show that it made no economic sense for the defendants not to claim their personal use as income, unless they had no intention of disclosing their personal use of planes at all.

---

[93]Moreover, the evidence concerning the valuation of their personal flights based on charter rates was probative of materiality as well. Indeed, the defendants' expert, Swirsky, also testified that charter rates were defaulted to in the event a company did not issue W-2s to executives for imputed income for personal travel in the year in which the benefit was received. The evidence was undisputed that defendants were simply not going to allow W-2s to be issued to draw attention to personal travel of executives. This was the subject of extensive cross-examination and argument, and was relevant to the theory that defendants received the value at the charter rate (under SIFL rules), since they did not claim the value of their personal use as income on their tax returns.

[94]Schneweis testified that it was to the defendants' financial advantage to claim the value of personal use of planes in the tax year, as failing to do so effected valuation at the higher charter rate. For this reason, and because they were also effectively depriving the corporation of a tax deduction, he and others in the tax department repeatedly attempted to get Wittig, Lake and upper management to claim personal use on W-2s for the tax year in which the flights were taken.

## N.    Scope of Cross-Examination of Defendants' Expert Witness

In a related claim of error, defendants argue that the Court erred in allowing the government to cross-examine the defendant's expert, Swirsky, about charter rates.  But there was nothing improper about asking Swirsky about charter rates.  Unlike the government's witness Meara, Swirksy was qualified in part as an expert on tax issues relating to corporate aircraft.  And, IRS regulations were relevant to issues in this case because of the testimony of Schneweis about exposure of company executives to charter rate imputation of income due to the failure to abide by rules relating to a proper accounting for and imputation of SIFL rates by issuance of W-2s.  The Court did not err in allowing the government to cross-examine Swirsky about the business reasons for corporate aircraft, for the use by their executives, by inquiring into how personal use might or might not be an appropriate cost for such companies to bear and how companies treat such personal use for tax purposes.[95]

## O.    Closing Argument References to "Fraud in the Inducement"

Defendants claim that they were prejudiced by the government's closing argument that they committed "fraud in the inducement," or fraud at the inception of their employment with Westar because there was no evidence of such.  On the contrary, there was evidence that defendant Wittig negotiated extremely favorable terms in his employment agreement and soon after his arrival at Westar, began a campaign of increasing the number, types and value of his compensation and benefits.  There was also evidence that long before he brought defendant Lake on Board, defendant Wittig was engaging in planning and discussions about transactions that would trigger "golden parachutes" and compensation items that he had designed or structured for

---

[95]Swirsky testified that personal use is typically treated as income to the executive.

himself (and later for Lake). This included placing Lake on the Board of Guardian as the representative of Westar's interests, although Lake was employed at Bear Stearns and was neither an officer, director nor employee of Westar at the time. In short, there was evidence supporting the government's closing argument on this point.

## P.     Evidence Related to Political Contributions

Defendants claim they were prejudiced by the Court admitting, without prior notice to the defendants, Rule 404(b) evidence that they had made political contributions to seek legislative assistance with their efforts to effectuate the split merger deal.[96]  But this was not Rule 404(b) evidence, because it was evidence intrinsic to the conspiracy and scheme to defraud.  Moreover, the Court specifically precluded the government from mentioning "Tom Delay" or any other names of national legislators, as the Court concluded their identity was more prejudicial than probative, pursuant to Fed. R. Evid. 403.[97]  Defendants fail to show prejudicial error in the Court's decision to admit certain evidence of political contributions with limitations.

## Q.     Deliberate Ignorance Jury Instruction

There was sufficient evidence supporting, and a legal basis for giving, the deliberate indifference instruction.[98]  Both defendants deliberately blinded themselves to facts which

---

[96]See Fed. R. Evid. 404(b).

[97]The Court also allowed the government to present evidence that defendant Wittig had attempted to gain influence with a state legislator, in order to influence the KCC.  Again, defendants fail to show how this amounts to prejudicial error since the evidence was intrinsic to the conspiracy and scheme to defraud.

[98]The Court gave the following instruction:

An essential element of the conspiracy charge is that the acts must have been done "'knowingly'" and "'wilfully'" or in other words, that the defendant under consideration acted with specific or criminal intent.  An act or a failure to act is done "'knowingly'" if it is done voluntarily and intentionally, and not because of mistake, or inadvertence, or other innocent reason.  Although knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant

provided notice that personal use of the corporate plane was required to be disclosed on their D&O questionnaires so that Westar could determine whether to impute it as income. Defendant Wittig was approached by CAO Koupal about personal use of the plane on at least two occasions. Koupal also testified that when the former CFO, Kitchen, left the employ of Westar, he negotiated a provision into his Agreement and Release requiring the company to provide him "tax protection" for any assessment of taxes by the IRS for personal use of the company plane. In addition to this evidence that the former and present CFOs were aware of the imputation issues and that the present CFO had discussed this with defendant Wittig, there was also evidence that defendant Wittig had thwarted all efforts by the internal auditor to audit personal use of the plane. Additionally, after Koupal left the company, defendant Lake was tasked with reviewing the airplane reservation logs; and Lake refused to sign off on one log that recorded defendant Wittig's use of a plane for a primarily personal trip to Europe. When Lake was cross-examined about the parameters and scope of his review of the plane reservation logs, he replied that he did not know what he was supposed to be reviewing, as no one had ever told him. The evidence was that defendant Lake never made any effort to educate himself on the proper method to account for and report personal travel although he had primary responsibility for that role after Koupal left the company. Thus, a deliberate ignorance instruction was well justified in light of the evidence.

## R.    *Denial of Jury Instruction on SEC "Materiality"*

Defendants claim that the Court erred in failing to give their proffered instruction on "SEC

---

deliberately blinded himself to the existence of a fact. Knowledge can be inferred if the defendant was aware of the high probability of the existence of the fact in question, unless the defendant did not actually believe the fact in question. An act or failure to act is done "'wilfully'" if it is done voluntarily and purposely, with specific intent to do something that the law forbids.

(Doc. 528, Instruction No. 14.)

materiality," taken from the SEC regulations on the threshold value of personal use of corporate property that must be reported in proxies or SEC filings.[99]  But, the Court not only rejected the defendants' proposed instruction based on the SEC rules, the Court refrained from any regulation-based instruction on materiality.  The Court's decision was based on the fact that there were competing theories as to materiality under the SEC rules and the IRS rules.  Moreover, the government's theory was not necessarily that the proxies were false in failing to disclose personal aircraft usage.[100]  Rather, the government's theory, and in fact the circumvention counts of the Superseding Indictment, were that the D&O questionnaires were false in omitting any use of aircraft.  Had there been disclosure of any use of aircraft, the company could have then analyzed the records to determine whether the usage was of a sufficient value that it needed to be reported in SEC filings.  The government further asserted and the Superseding Indictment alleges, that the SEC proxies and filings lulled the investing public into thinking that the requisite disclosures and analysis had been made; when in fact there had not been any such disclosure or analysis.  In fact, when Tryon tried to analyze the records, she was blocked from doing so by defendant Wittig;

---

[99]The defendants urge that it was error for the Court to fail to instruct that "materiality is defined as the lesser of $50,000 in aggregate incremental cost or 10% of the total annual salary and bonus of an executive."  But, as the government posits, even if such an instruction would be appropriate, it would be difficult for the Court to provide a definition under this SEC regulation since "there is no formal definition of aggregate incremental cost."  Richard L. Handley & Stewart H. Lapayowker, *Corporate Aircraft: Four Common Compliance Issues*, 10 ACCA Docket 19, 29 (Nov./Dec. 2003).

[100]Notably, however, there was evidence suggesting that even under the SEC rules, by which aircraft usage was valued at the SIFL rate, proxy disclosure was required, such that the proxies were materially false.  The materiality of the omission of the value of these aircraft flights is demonstrated by: (1) even at the SIFL rate, for most years that value exceeded $50,000—yet the SIFL rate was not applicable since neither defendant ever claimed a dime of income on their W-2s for the use of aircraft; (2) at the charter rates, their use far exceeded $50,000 a year, totaling almost $1 million for Wittig over five years and almost $900,000 for Lake over five years; (3) at either the SIFL or charter rates, the value is conservative in that it is limited to flights that Lake admitted were personal, or flights to the Hamptons or White Plains, or flights to Palm Beach, or flights with family members on Board.  The cost or value of the deadhead flights was not factored in to the amounts attributed to Wittig and Lake.  Furthermore, Meara's calculations were that defendant Wittig avoided reporting compensation, based upon personal use of the company planes, from 1998 to 2002, in the amount of $963,949.  For this same period defendant Lake avoided reporting compensation in the amount of $1,187,405.

forming the basis for the circumvention Count 9 in the Superseding Indictment.

Furthermore, the SEC regulation does not mention or define materiality; although there is a legal definition for materiality with respect to wire fraud.[101] Thus, it would have been error to instruct the jury that materiality is measured by or defined by the SEC regulation.[102] Moreover, there was no evidence that the defendants relied upon this SEC regulation in determining not to

---

[101] *See United States v. Lawrence*, 405 F.3d 888, 899 (10th Cir. 2005) (approving instruction in wire fraud case that a statement is material if "it has a natural tendency to influence, or is capable of influencing a decision or action by another."), *cert. denied*, 126 S. Ct. 468 (2005).

[102] It bears noting that even if aggregate incremental cost were the standard to determine materiality, there was ample evidence from which a reasonable jury could have found materially false omissions of personal use of airplanes. The jury heard for example, that the defendants used planes solely for personal use on many occasions, not coupled with legs of trips that were for legitimate business purposes. They heard evidence, for example, that defendant Lake's family used the plane to attend his daughter's engagement party in Connecticut, to go to Florida to visit defendant Lake's in-laws, and to go to defendant Lake's home in New York once a week. Although there was evidence that defendant Lake had legitimate business reasons to be in New York, a reasonable jury could have found that defendant Lake was not conducting legitimate business in New York that could not have been conducted by telephone. Indeed, although not evidence that is examined with respect to a Rule 29 motion at the close of the government's evidence, there was evidence offered in the government's rebuttal case, that is properly considered with respect to the defendants' posttrial motions for judgment of acquittal. The most compelling of this rebuttal evidence was the testimony of an executive with Guardian that he was forced to take the company plane for business trips when commercial flights were more convenient, in order for Lake to justify being on the plane and traveling to his in-laws' home in Florida. Moreover, there was evidence presented that Lake never conducted business at the Protection One office in Florida, but used that office as a ruse to justify he and his family's almost monthly trips to Florida on the company plane. There was also evidence presented about Wittig and Lake using the company plane to fly themselves and their family to Florida over an extended winter holiday. They used the company plane to shuttle themselves, and their family members to Florida, not all at once, but in several legs and trips. Yet the "business meeting" they called one morning there was merely a ruse to justify use of the company plane and the company incurring the hotel cost for the Wittig family's vacation. Darius Nevin from Guardian testified that he went to the meeting thinking it was a legitimate business meeting, but his planned day-long presentation was abruptly cut short so that Wittig could join his family for leisure activities and a Bermuda short clad Richard Terrill, the company's General Counsel, could get back to the beach and work on his tan. Moreover, there was ample evidence from which a reasonable jury could have concluded that Meara's calculations of value based on a charter rate were appropriate, since the defendants did not take advantage of the IRS rules in claiming income, they were not entitled to claim value at the lesser SIFL rate urged by the defendants. Although defendants maintain that only the aggregate incremental cost is relevant in a case charging fraud on the company; that argument lacks merit. In arguing that the government fatally failed to produce evidence concerning the aggregate incremental cost, the defendants argument entirely misses the point. The circumvention counts were not based on SEC disclosure rules, for the D&O questionnaires had no threshold value for disclosure. And, the wire fraud counts were based on the proxies and reports. To the extent that the proxies and reports were false because they failed to include the value of executive use of airplanes, they were false only if the reporting requirements were triggered, that is the value of the airplane use exceeded 10% of the executive's salary or $50,000.

disclose their personal use of airplanes.[103]  Indeed, there was no evidence that they relied upon it

or were even aware of this regulation at the time they were causing false entries to be made in

reservation logs and D&O questionnaires.   Defendant Wittig chose not to testify, and defendant

Lake testified that he was not aware of the SEC regulation until after the Indictment was returned.

On the other hand, there was evidence that Westar's tax department and CFO told or made

defendants aware of the need to disclose personal use of planes and how the value of personal use

of planes would be handled on individual and corporate tax returns.  It was therefore, not error for

the Court to read the jury an instruction on the definition of "materiality" under the SEC

regulations.

**S.**     ***Ex Parte Investigation into Juror Misconduct Concerning Missing Notebook***

Defendants claim that the Court erred in conducting an *ex parte* investigation during jury

deliberations and interviewing all twelve jurors without giving the parties prior notice, or an

opportunity to be heard.  The defendants do not explain how the Court erred and how they were

prejudiced by the Court interviewing the jurors about notebooks that were missing from the jury

room, in contravention of the Court's instructions that the jurors leave all notes and materials in

the jury room during breaks.[104]

The Court's staff discovered that some of the juror notebooks were missing and that a set

of one juror's notes could not be accounted for in the jury room.  Concerned that there had been

tampering or inappropriate conduct by the jurors, the Court interviewed each juror to ask them if

---

[103]In fact, defendant Lake testified that he relied upon his own sense of what was material in answering questions in the D&O questionnaires.

[104]The Court informally instructed the jurors to leave all notes and materials in the jury room at all times. Of course, the jurors were also bound by the Court's admonition in Instruction 53.  (Doc. 528.)

they had made notes and if so, whether their notes had been kept in the jury room at all times. The Court learned that two of the jurors had made notes, but discarded them, violating the Court's instructions on the notes. The Court then advised counsel of the problem, the interview and the information learned from interviewing the jurors. The parties did not object to the Court's process in interviewing the jurors to ascertain if there were improperly handled notes; nor did the parties object that the Court had investigated before advising them. The Court advised the parties of the investigation and proposed a remedy, that is, again telling all the jurors that the notes must stay in the jury room and should only be discarded by placing them in a box designated for shredding in the jury room. The parties agreed with this procedure. The Court further asked counsel if they wanted the Court to do anything else; and all counsel stated on the record that they had no problem nor any further suggestions.

There was no contemporaneous objection made to this investigation by the defense at the time the Court informed the parties about the inquiry. Without a contemporaneous objection to preserve the issue on appeal, a reversal can only result for "plain error."[105] A court of appeals has discretion under Fed. R. Crim. P. 52(b) to correct "plain errors or defects affecting substantial rights" that were forfeited because not timely raised in the district court, which it should exercise only if the errors seriously affect the fairness, integrity or public reputation of judicial proceedings. To establish plain error, defendants must show that (1) there was error, (2) that the error was plain, and (3) that the plain error affected their substantial rights.[106] An error is plain

---

[105]*United States v. Olano*, 507 U.S. 725 (1993); *United States v. Crockett*, 435 F.3d 1305, 1311 (10th Cir. 2006); *M & I Heat Transfer Prods., Ltd. v. Gorchev*, 141 F.3d 21, 23 (1st Cir.1998) (citing *Parker v. City of Nashua*, 76 F.3d 9, 14 (1st Cir. 1996)).

[106]*E.g.*, *United States v. Apperson*, __F.3d __, 2006 WL 7755152, at *39 (10th Cir. Mar. 28, 2006).

only when it is "clear or obvious" or it is "contrary to well-settled law."[107]  Normally, a court of appeals engages in a specific analysis of the district court's record to determine prejudice, and the defendant bears the burden of persuasion.[108]

There is no showing or even suggestion that the Court's measures to enforce the instructions about securing juror notes in the jury room, affected the fairness, integrity or public reputation of judicial proceedings.  In fact, the Court's investigation was initiated in order to ascertain whether there had been any juror misconduct that might affect the fairness and integrity of the proceedings.  The defendants fail to carry their burden by a specific showing of prejudice.

For all of the above explained reasons, the Court denies the defendants' various motions for judgment of acquittal and their motion for new trial.  The Court finds the jury verdict is supported by substantial evidence and that no prejudicial error exists to warrant a new trial.

**IT IS THEREFORE ORDERED THAT:**

    **A.**    Defendant Lake's Motion for Leave to File Supplemental Memorandum of Law in Support of Defendants' Pending Rule 29 Motions (Doc. 658) is **GRANTED**;

    **B.**    Defendants' Joint Motions for Judgment of Acquittal (Docs. 493, 541) are **DENIED**;

    **C.**    Defendant Wittig's Motion for New Trial (Doc. 538) is **DENIED**;

---

[107]*Olano*, 507 U.S. at 734; *Crockett*, 435 F.3d at 1311.

[108]*Olano*, 507 U.S. at 725.  *Olano* held that presence in the jury room during deliberation of alternates who had been instructed that they could sit in on the deliberations but were not to participate was not plain error, as it did not affect substantial rights of defendants.  The Court framed the ultimate inquiry as whether "the intrusion affect[ed] the jury's deliberations and thereby its verdict?"  *Id.* at 739.  The Court found that defendants failed to make a specific showing of prejudice, and that prejudice would not be presumed.  *Id.*

**D.** Defendant Lake's Motion to Join in Defendant Wittig's Motion for New Trial (Doc. 544) is **GRANTED**.

**E.** The Clerk's Office is directed to file defendant Lake's Supplemental Rule 29 Motion, attached to Document 658 as Attachment 1, upon receipt of this Order.

**IT IS SO ORDERED.**

Dated this 31st day of March, 2006, at Topeka, Kansas.

 S/ Julie A. Robinson
Julie A. Robinson
United States District Judge